1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON et al.,

Plaintiffs,

v.

U.S. DEPARTMENT OF
TRANSPORTATION et al.,

Defendants.

CASE NO. 2:25-cv-00848-TL

ORDER ON MOTION FOR
PRELIMINARY INJUNCTION

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 5). Having reviewed the motion, Defendants' response (Dkt. No. 93), Plaintiffs' reply (Dkt. No. 99), and the relevant record, and having heard oral argument from the Parties on June 17, 2025, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion.

## I.    INTRODUCTION

In a 1995 episode of *The Simpsons*, Homer must cut short a tearful goodbye with his long-lost mother after her traveling companions protest that their "electric van only has 20 minutes of juice left!" *The Simpsons*: "Mother Simpson" (Fox television broadcast, aired Nov.

19, 1995). Some 26 years later, Congress sought to address the phenomenon that has come to be known as "range anxiety": the unease experienced by electric vehicle ("EV") drivers when they are unsure where the next charging station might be, and whether their car's battery has sufficient charge to get them there. *See* Alexandra B. Klass, *Public Utilities and Transportation Electrification*, 104 Iowa L. Rev. 545, 561 (2019) (defining "range anxiety"). In the 2021 Infrastructure Investment and Jobs Act ("IIJA"), Pub. L. 117–58, 135 Stat. 429, 1421, Congress appropriated $5 billion to fund a National Electric Vehicle Infrastructure ("NEVI") Formula Program, the purpose of which was—and still is—"to strategically deploy electric vehicle charging infrastructure and to establish an interconnected network to facilitate data collection, access, and reliability." Congress directed the Secretary of Transportation ("the Secretary") to distribute this money to the states and the District of Columbia between 2022 and 2026. 135 Stat. at 1421. Congress established three specific uses for the money:

> (1) the acquisition and installation of electric vehicle charging infrastructure to serve as a catalyst for the deployment of such infrastructure and to connect it to a network to facilitate data collection, access, and reliability; (2) proper operation and maintenance of electric vehicle charging infrastructure; and (3) data sharing about electric vehicle charging infrastructure to ensure the long-term success of investments made [in the NEVI Formula Program].

*Id.* at 1421–22.

Plaintiff States, relying on the IIJA, made plans to utilize their share of the NEVI Formula funds. States dedicated resources to EV infrastructure. *See, e.g.*, Dkt. No. 23 (Pietz Decl.) ¶ 17; Dkt. No. 28 (Meredith Decl.) ¶ 23. They lined up private-sector partnerships, solicited bids on construction projects, and identified and secured sites where EV infrastructure would be built. *See, e.g.*, Dkt. No. 28 ¶ 28. They prepared to put Congress's new multibillion-dollar program to work for their residents.

But in 2025, the new Presidential administration determined that its Secretary of Transportation would disregard Congress's mandate. Rather than distribute the Program funds as Congress commanded, the Department of Transportation ("DOT") would "immediately pause the disbursement of funds appropriated through . . . the Infrastructure Investment and Jobs Act (Public Law 117–58), including but not limited to funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula Program . . . ." Exec. Order No. 14154, 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025). On February 6, 2025, the Federal Highway Administration ("FHWA"), the agency within the Department of Transportation that had been administering the NEVI Formula Program, rescinded its administrative guidance on the program, revoked the state deployment plans for constructing EV infrastructure that had been created, implemented, and previously approved under that guidance, and, effectively, stopped distributing the Congressionally appropriated funds. *See* Dkt. No. 1-9 ("Biondi Letter") at 2–3. The NEVI Formula Program, in essence, was frozen.

Sixteen states, plus the District of Columbia ("Plaintiff States" or "Plaintiffs"), sued DOT, FHWA, and the highest-ranking official from each of the two agencies ("Defendants"), asserting that the agencies' action represented an unlawful seizure of legislative authority under the separation-of-powers doctrine enshrined in the United States Constitution and an overextension of executive authority beyond what is permitted by law. *See generally* Dkt. No. 1 (Complaint). Congress had directed the Secretary to distribute billions of dollars in NEVI Formula funds to the states, but now, under the President's direction and for impermissible reasons (as explained below), he was (and is) refusing to do so. Presently before the Court is the Plaintiff States' motion for a preliminary injunction that enjoins Defendants from three actions:

> (a)  Categorically 'suspending' or revoking approvals of Plaintiff States' State Electric Vehicle Infrastructure Deployment Plans;

(b)     Withholding or withdrawing NEVI Formula Program
        Funds for any reason not set forth in the IIJA or applicable
        FHWA regulations, and without following the IIJA's
        requirements . . . [; and]

(c)     Effectuating a categorical suspension or termination of the
        NEVI Formula Program for Plaintiff States through any
        other means.

Dkt. No. 5-2 (proposed order) at 2. Because the Court finds that, in effectively suspending the

NEVI Formula Program, Defendants have overstepped their Constitutional and statutory

authority and have attempted to override the express will of Congress, and for further reasons

explained herein, the Court GRANTS Plaintiff's motion.

As will be explained below, the Court's decision is guided by the United States

Constitution and the Administrative Procedure Act ("APA"), Pub. L. 79–404, 60 Stat. 237

(1946). "Separation of powers and checks and balances are fundamental to the structure of the

government established by our Constitution. 'To preserve those checks [on each Branch], and

maintain the separation of powers, the carefully defined limits on the power of each Branch must

not be eroded.'" *Am. Fed'n of Gov't Emps. v. Trump*, No. 25-3293, 2025 WL 1541714, at *7

(9th Cir. May 30, 2025) (quoting *I.N.S. v. Chadha*, 462 U.S. 919, 957–58 (1983)). Specifically,

the Constitution "exclusively grants the power of the purse to Congress, not the President." *City

& County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (first citing U.S.

Const. art. I, § 9, cl. 7 (Appropriations Clause), then citing U.S. Const. art. I, § 8, cl. 1 (Spending

Clause)). Under the APA, "[a]dministrative agencies are creatures of statute. They accordingly

possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of

Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022).

Although range anxiety, EV charging stations, and current DOT leadership's policy

preferences lurk in the background of this case, the bedrock doctrines of separation of powers

and agency accountability, as enshrined in Constitution and statute, are indifferent to subject matter and blind to personality. When the Executive Branch treads upon the will of the Legislative Branch, and when an administrative agency acts contrary to law, it is the Court's responsibility to remediate the situation and restore the balance of power. Such remediation and restoration are what the Court undertakes herein.

## II.    BACKGROUND

### A.    Parties[1]

Plaintiffs are 16 sovereign states of the United States of America, as well as the District of Columbia. Dkt. No. 1 ¶¶ 14, 20. Plaintiff States include: Washington, Colorado, California, Arizona, Delaware, Hawaiʻi, Illinois, Maryland, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Wisconsin. *Id.* ¶¶ 15–31. Plaintiffs "bring this action in their sovereign and proprietary capacities." *Id.* ¶ 14. Defendants are two federal agencies—the United States Department of Transportation, a cabinet-level agency within the Executive Branch of the federal government (*id.* ¶ 32), and the Federal Highway Administration, an agency within DOT (*id.* ¶ 34)—and their respective highest ranking officials—Secretary of Transportation Sean Duffy (*id.* ¶ 33) and FHWA Executive Director and Acting Administrator Gloria M. Shepherd (*id.* ¶ 35). Plaintiffs sue Defendants Duffy and Shepherd in their respective official capacities. *Id.* ¶¶ 33, 35.

---

[1] For clarity and simplicity, the Court will use a state's name to refer to the relevant agencies in that state. For example, California's electric vehicle program is administered by two state agencies, the California Energy Commission ("CEC") and California Department of Transportation ("Caltrans"); this Order refers to the State of California, CEC, and Caltrans as "California." New York's program includes the New York State Department of Transportation ("NYSDOT"), the Power Authority of New York ("NYPA"), and New York State Energy Research and Development Authority ("NYSERDA"); this Order refers to all of these entities, as well as the state itself, as "New York."

**B.    Legal Framework: Statute, Executive Order, and Agency Action**

**1.    Infrastructure Investment and Jobs Act**

*a.    National Electric Vehicle Infrastructure Formula Program*

In 2021, Congress passed, and President Biden signed into law, the Infrastructure Investment and Jobs Act ("IIJA"), Pub. L. 117–58, 135 Stat. 429. Dkt. No. 1 ¶ 36. In the law, Congress established the National Electric Vehicle Infrastructure ("NEVI") Formula Program, which appropriated $5 billion to "'provide funding to States to strategically deploy electric vehicle charging infrastructure and to establish an interconnected network to facilitate data collection, access, and reliability.'" *Id.* ¶¶ 37, 39 (quoting 135 Stat. at 1421). Congress established three prescribed uses for the NEVI funds:

> (1) the acquisition and installation of electric vehicle charging infrastructure to serve as a catalyst for the deployment of such infrastructure and to connect it to a network to facilitate data collection, access, and reliability; (2) proper operation and maintenance of electric vehicle charging infrastructure; and (3) data sharing about electric vehicle charging infrastructure to ensure the long-term success of investments made under [the NEVI Formula Program provisions of the IIJA].

Dkt. No. 1 ¶ 40 (alteration in original) (quoting 135 Stat. at 1421–22).[2] Per the statute, the funds must "remain available until expended." *Id.* ¶ 37 (quoting 135 Stat. at 1421).

Importantly, the appropriated NEVI funds are "formula" funds, which means that they were "appropriated by Congress for a specific purpose and must be distributed on the basis of a statutory formula." *Id.* ¶ 38 (citing *City of Los Angeles v. Barr*, 941 F.3d 931, 935 (9th Cir. 2019)). That is, NEVI funds cannot be used for any purpose other than those that Congress established in the NEVI Formula Program, and the apportionment of the funds among the

---

[2] Part of the appropriated funding is reserved to pay for the administration of the program itself and to fund "an additional grant program." *See* Dkt. No. 1 ¶ 47; Dkt. No. 1-6 (FHWA Apportionment Notice) at 2–3.

recipient states cannot deviate from the prescribed statutory formula. *Id.* ¶ 42. Under the IIJA, the formula used to distribute NEVI funds is "the same federal formula as that which is used to distribute highway funds." *Id.* (citing 135 Stat. at 1422); *see* 23 U.S.C. § 104 (formula for apportionment of federal-aid highway funds).

Under the IIJA, distribution of NEVI Formula funds is the responsibility of the Secretary of Transportation, as delegated to FHWA: The Secretary "'shall distribute among the States the [NEVI Formula Program funds] so that each State receives' the amount determined by the formula." *Id.* ¶ 42 (quoting 135 Stat. at 1422) (alteration in original) (emphasis omitted). The IIJA includes two planning prerequisites that must be fulfilled before the appropriated money can flow from the federal government to the recipient states. First, the IIJA obligated DOT to develop "'guidance for States and localities to strategically deploy electric vehicle charging infrastructure' consistent with the NEVI Formula Program provisions of the IIJA." *Id.* ¶ 44 (quoting 135 Stat. at 1423). On February 10, 2022, FHWA duly issued its NEVI Formula Program Guidance. *Id.* ¶ 45; *see* Dkt. No. 93-1 (2022 NEVI Formula Program Guidance) at 9–39. FHWA has updated the guidance annually, most recently on June 11, 2024. Dkt. No. 1 ¶ 45. Second, to become eligible to receive NEVI funds each year, the IIJA requires each recipient state to submit to DOT a State Electric Vehicle Infrastructure Deployment Plan that "describes how it 'intends to use funds distributed to the State . . . to carry out the [NEVI Formula] Program for each fiscal year in which funds are made available.'" *Id.* ¶ 43 (quoting 135 Stat. at 1422).

### b.   *Distributing NEVI Funds*

There is a "well-defined" process for distributing NEVI funds. *Id.* ¶ 46. The first step is Congressional *appropriation*. *Id.* An appropriation is, in essence, a command from Congress to the Treasury to get out its checkbook; it authorizes the federal government "to incur financial obligations that will result in immediate or future disbursements of funds from the U.S.

Treasury." *Id.* (citing 2 U.S.C. § 622(2)(A)(i)). In the IIJA, Congress appropriated $5 billion to FHWA "to carry out the NEVI Formula Program in accordance with specific directives and subject to express constraints." *Id.*

The next step is *apportionment*. *Id.* ¶ 47. This is the determination of who gets how much of the appropriated funds, and when. The United States Office of Management and Budget ("OMB") "apportioned the funds appropriated by Congress by dividing the $5 billion appropriation across five fiscal years and distributed the funds to the FHWA." *Id.* Next, FHWA further apportions the money by first setting aside administrative and other earmarked funds, *see supra* note 2, then "divid[ing] the remaining funds for that fiscal year among the States according to the non-discretionary statutory formula." *Id.* ¶ 47. The NEVI formula is derived from the statutory formula that FHWA uses to apportion federal highway aid. *Id.* ¶ 48; *see* 23 U.S.C. §§ 104(c), 165. Put another way, the size of a state's slice of the $5 billion NEVI pie is directly proportional to the size of its slice of the federal highway aid pie. A given state's federal highway aid apportionment is "fixed in statute based on historical apportionments and congressionally determined shares." Dkt. No. 1 ¶ 48; *see* 23 U.S.C. § 104(b)–(c). Just as DOT cannot meddle with the Congressionally determined federal highway aid apportionments, "[n]either the Secretary nor the FHWA, nor any other part of the Executive Branch has discretion to determine the amount of funding apportioned to any State under the NEVI Formula Program." Dkt. No. 1 ¶ 48; 23 U.S.C. § 104.

After the funds are apportioned, they are made available for obligation. In the NEVI Formula Program, FHWA made "available for obligation" each state's apportioned funds each fiscal year and advised the states by way of a letter. *See, e.g.*, Dkt. No. 1-7 (Shepherd Letter) at 1 (advising Washington that "Fiscal Year 2022 funds [were] now available . . . for obligation").

When funds became available for obligation, FHWA sent each state the same letter. *See* Dkt. No. 109 (Hr'g Tr.) at 9:10–12.

The next step is *obligation*. Dkt. No. 1 ¶¶ 49–52. An obligation is a legal duty that makes the federal government liable for payment for "goods and services ordered or received," or a legal duty that could mature into such a liability. *See id.* ¶ 50 (citing U.S. Gov't Accountability Off. Pub. No. GAO-05-734SP (*A Glossary of Terms Used in the Federal Budget Process*), at 12–13 (Sept. 2005) ("GAO Glossary")). It is "a 'definite commitment' from the government to pay for something. *Id.* (citing GAO Glossary); *see also* Dkt. 93-1 (Biondi Decl.) ¶ 10 (acknowledging that an obligation creates a "contractual[] commit[ment]" between FHWA and states). "States obligate their share of apportioned NEVI Formula Program funds by submitting to the FHWA an authorization request for specific activities." Dkt. No. 1 ¶ 51. If the activities for which a state requests authorization "meet the minimum standards and requirements" given in 23 C.F.R. § 680 ("National Electric Vehicle Infrastructure Standards and Requirements"), FHWA must approve the request. Dkt. No. 1 ¶ 51; 23 C.F.R. § 680. Upon FHWA's authorization of a request, the funds are obligated, and the promise is made. *Id.*

The fourth step is *disbursement*. Disbursement, simply put, is the actual transfer of funds from the Treasury to the states.

### c.    *Withdrawing or Withholding NEVI Funds*

Under the IIJA, DOT has little discretion to withhold or withdraw NEVI funds from the states. *Id.* ¶ 53. The Department "must distribute to each State its share of NEVI Formula Program funds unless [(1)] the state fails to timely submit its State Electric Vehicle Infrastructure Deployment Plan or [(2)] the Secretary 'determines a State has not taken action to carry out its State Plan.'" *Id.* (cleaned up) (quoting 135 Stat. at 1422). The option to withhold or withdraw funds on the latter basis is unavailable unless DOT complies with substantial procedural

1    requirements. Before DOT determines that a State has not taken sufficient action on its plan, it

2    must first "notify the State, consult with the State, and identify actions that can be taken to

3    rectify concerns, and provide at least 90 days for the State to rectify concerns and take action to

4    carry out its State Plan." *Id.* ¶ 54 (cleaned up) (quoting 135 Stat. at 1422). And even if such a

5    determination is made, DOT cannot do anything about it—that is, it cannot withhold or withdraw

6    NEVI Formula funding—without first complying with *further* procedural requirements: "The

7    Secretary shall provide notice to a State on the intent to withhold or withdraw funds not less than

8    60 days before withholding or withdrawing any funds, during which time the State shall have an

9    opportunity to appeal a decision to withhold or withdraw funds directly to the Secretary." *Id.*

10    (cleaned up) (quoting 135 Stat. at 1422).

11        Further, even if DOT successfully clears these procedural requirements, the IIJA redirects

12    the withheld or withdrawn funds only to certain alternate recipients. Funds withheld or

13    withdrawn from a state may be awarded "on a competitive basis to local jurisdictions within the

14    State for use on projects that meet the eligibility requirements." *Id.* ¶ 55 (quoting 135 Stat. at

15    1422). If the funds are not awarded to local jurisdictions within the state from which they were

16    originally withheld or withdrawn, the IIJA requires that they be distributed among other states

17    "in the same manner as funds distributed for that fiscal year"—that is, by the NEVI

18    apportionment formula described above. *Id.* (quoting 135 Stat. at 1422–23). In short, the statute

19    requires that NEVI Formula funds will be spent by someone, somewhere, on EV infrastructure.

20        **2.    "Unleashing American Energy" Executive Order and DOT Order 2100.7**

21        On January 20, 2025, the first day of his presidency, President Trump issued Executive

22    Order No. 14,154, entitled "Unleashing American Energy." 90 Fed. Reg. 8353 (Jan. 29, 2025).

23    Section 7(a) of the Order directed "[a]ll agencies [to] immediately pause the disbursement of

24    funds appropriated through . . . the Infrastructure Investment and Jobs Act (Public Law 117-58),

including but not limited to funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula Program . . . ." *Id.* at 8357. The Order further directed all agencies to "review their processes, policies, and programs for issuing grants, loans, or any other financial disbursements of such appropriated funds for consistency with the law and [the President's energy policy priorities]." *Id.*

On January 29, 2025, his first full day as Secretary of Transportation, *see* 171 Cong. Rec. S408 (daily ed. Jan. 28, 2025) (vote on Duffy nomination), Defendant Duffy issued DOT Order No. 2100.7, "Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities," Dkt. No. 1-10 (DOT Order No. 2100.7 (Jan. 29, 2025)). This Order purports to "reset[] the principles and standards underpinning U.S. Department of Transportation . . . policies, programs, and activities to mandate reliance on rigorous economic analysis and positive cost-benefit calculations and ensure that all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts bolster the American economy and benefit the American people." *Id.* at 2. The Department's new priorities purport to base "grantmaking, lending, policymaking, and rulemaking activities" on "sound economic principles and analysis supported by rigorous cost-benefit requirements and date-driven decisions." At the same time, however, they include the prioritization of "projects and goals" that, among other things, "give preference to communities with marriage and birth rates higher than the national average; prohibit recipients of DOT support or assistance from imposing vaccine and mask mandates; and require local compliance or cooperation with Federal immigration enforcement."

1   *Id.* at 2, 4 (cleaned up). Order No. 2100.7 became effective immediately, upon its execution by

2   the new Secretary. *Id.* at 2.[3]

3       **3.    Biondi Letter**

4       On February 6, 2025, one week after the DOT's installation of Defendant Duffy and his

5   issuance of Order No. 2100.7, Emily Biondi, Associate Administrator in FHWA's Office of

6   Planning, Environment, and Realty, addressed a letter to "State Department of Transportation

7   Directors" (Dkt. No. 1-9 ("Biondi Letter")). The Biondi Letter stated that "[t]he new leadership

8   of the Department of Transportation (U.S. DOT) has decided to review the policies underlying

9   the implementation of the NEVI Formula Program." *Id.* at 2. The Biondi Letter rescinded "the

10  current NEVI Formula Program Guidance dated June 11, 2024, and all prior versions of this

11  guidance," and "immediately suspend[ed] the approval of all State Electric Vehicle Infrastructure

12  Deployment plans for all fiscal years." *Id.* at 2–3. The Biondi Letter mandated that, "effective

13  immediately, no new obligations may occur under the NEVI Formula Program until the updated

14  final NEVI Formula Program Guidance is issued and new State plans are submitted and

15  approved." *Id.* at 3. The Biondi Letter did not provide a date when updated NEVI Formula

16  Program guidance would be issued but stated that "FHWA aims to have updated draft NEVI

17  Formula Guidance published for public comment in the spring." *Id.* As of the date of this order,

18  no new guidance has been issued, nor has any draft been published for public comment. With no

19  guidance in effect, states cannot submit the deployment plans that the IIJA requires for them to

20  be eligible to receive NEVI Formula funds. In revoking all State Electric Vehicle Infrastructure

21  Deployment Plans, Defendants are, according to Plaintiffs, "withholding approximately $2.74

22

23  [3] The Court notes, as a district court recently found, that "Congress did not authorize or grant authority to the
    Secretary of Transportation to impose immigration enforcement conditions on federal dollars specifically
    appropriated for transportation purposes." *California v. U.S. Dep't of Transp.*, No. C25-208, 2025 WL 1711531, at
24  *2 (D.R.I. June 19, 2025).

billion of the $3.27 [b]illion in NEVI Formula Program funds available to the States for obligation for fiscal years 2022 through 2025." Dkt. No. 1 ¶ 115. Plaintiffs allege that they have been "deprived of access to approximately $1 billion in available NEVI Formula Program funds for those four fiscal years." *Id.*

**C.    Factual Background**

After President Biden signed the IIJA into law on November 15, 2021, FHWA had 90 days to issue the first version of NEVI Formula Program guidance. *See* 135 Stat. at 1423. FHWA complied with the law and issued guidance on February 10, 2022. *See* Dkt. No. 93-1 at 9–39. Plaintiff States then began preparing State Electric Infrastructure Deployment Plans. *See, e.g.*, Dkt. No. 7-1 (California Plan) at 2–65; Dkt. No. 17-1 (New Jersey Plan) at 2–76; Dkt. No. 28-1 (Washington Plan) at 2–59. The State Electric Infrastructure Deployment Plans are detailed and dense planning documents that are not easily summarized. In short, however, the plans detail the *who*, *what*, *when*, *where*, *why*, and *how* of new, statewide electric vehicle infrastructure for each Plaintiff State. They include, among other things, timelines, discussions concerning public engagement, and analyses of commercial and technological trends in EV infrastructure. Plans detail demographic, ecological, geographical, and economic realities within a state, and the "alternative fuel corridors" that have been designated to address them. They identify funding sources, both state and federal, as well as the processes for resolving conflicts and hashing out ambiguities. Plans report the results of public-interest surveys in which state residents have voiced their opinions about desired amenities at EV charging stations, and they explain how contracts for construction will be awarded.

Plaintiff States submitted their respective plans in 2022, as well as annual updates in 2023 and 2024, to FHWA for approval, and the agency approved them for fiscal years 2022,

2023, 2024, and 2025.[4] Dkt. No. 1 ¶¶ 69–70 (District of Columbia), ¶¶ 79–80 (Minnesota),

¶¶ 91–92 (Vermont); Dkt. No. 7 (de Alba Decl.) ¶ 8 (California); Dkt. No. 9 (Toor Decl.) ¶ 9

(Colorado); Dkt. No. 11 (Ward Decl.) ¶ 10 (Arizona); Dkt. No. 12 (Hastings Decl.) ¶ 10

(Delaware); Dkt. No. 13 (Shishido Decl.) ¶ 10 (Hawaiʻi); Dkt. No. 15 (Irvin Decl.) ¶ 10

(Illinois); Dkt. No. 16 (Pines Decl.) ¶ 12 (Maryland); Dkt. No. 17 (Patel Decl.) ¶ 9 (New Jersey);

Dkt. No. 18 (Valdez Decl.) ¶ 9 (New Mexico); Dkt. No. 20 (Nelson Decl.) ¶ 15 (New York);

Dkt. No. 23 (Pietz Decl.) ¶ 11 (Oregon); Dkt. No. 24 (Kearns Decl.) ¶ 14 (Rhode Island); Dkt.

No. 26 (Collins-Worachek Decl.) ¶ 10 (Wisconsin); Dkt. No. 28 (Meredith Decl.) ¶ 24

(Washington); *see also* Dkt. No. 1-8 (NEVI Formula Program Status of Funds) at 2.[5] Upon

FHWA's approval (and re-approval) of a state's EV deployment plan, NEVI Formula funds

became available to that state for obligation. *See, e.g.*, Dkt. No. 1-7 (Washington approval letter)

at 2; Dkt. No. 1-8 at 2. With FHWA-approved deployment plans in hand, states could submit

requests to FHWA for approval of individual projects. Upon approval of a project, FHWA would

obligate NEVI Formula funds to the state for that project. Requests for approval were handled by

FHWA's regional divisions. *See* Dkt. No. 7 ¶ 11. In California, for example,

> FHWA's California division instructed [the state] to use a project-
> by-project, and project-phase by project-phase, approach to seek
> funding obligations. Under this approach, in order for funding to
> become obligated, a State must submit an authorization request to
> FHWA via the online federal portal for each particular phase (e.g.,
> preliminary engineering, right-of-way, construction) of each

---

[4] Unlike other Plaintiff States, Plaintiffs District of Columbia, Minnesota, and Vermont did not submit declarations that attested to FHWA's approval and re-approval of their state deployment plans. Under Local Civil Rule 7(b)(1), because Plaintiffs' "motion requires consideration of facts not appearing of record," Plaintiffs should have "also serve[d] and file[d] copies of all affidavits, declarations, photographic or other evidence presented in support of the motion."

[5] Docket No. 1-8, "NEVI Formula Program Status of Funds," is a table that lists, among other data from FHWA's Fiscal Management Information System, the total amount of NEVI Formula funds made available to each state as of February 6, 2025. Dkt. No. 1-8 at 2. The fact that all 50 states, plus the District of Columbia and Puerto Rico, have had funds made available to them indicates that FHWA approved every state's NEVI deployment plan. *See* IIJA, 135 Stat. at 1422 (conditioning availability of NEVI Formula funds on FHWA's approval of a state deployment plan).

> particular NEVI-funded project carried out by the responsible
> NEVI awardee.

*Id.*; *see also* Dkt. No. 10 (Kelly Decl.) ¶ 13 ("The timing of fund obligation . . . varies by state based on the guidance of the local FHWA Division Office."). Where non-Plaintiff-state Massachusetts has been able to obligate its entire apportionment of 2022–25 NEVI Formula funds (*see* Dkt. No. 1-8 at 2), such an approach would have been impossible in Colorado, where "[t]he FHWA Colorado Division Office discourages early obligation of funds or the full obligation of an entire program beyond what is expected to be spent and reimbursed within the next 12-month period in order to avoid inactivity on a given project" (Dkt. No. 10 ¶ 13).

On February 6, 2025, FHWA issued the Biondi Letter, rescinding FHWA's NEVI Formula Program guidance and revoking all state deployment plans that had been approved pursuant to that guidance. Dkt. 1-9. States were no longer able to submit requests and receive approvals to draw down NEVI Formula funds that had been authorized and apportioned. In California, for example, on March 28, 2025, a state employee attempted to submit the state's "first authorization request for construction incurred for a NEVI-funded project in California." Dkt. No. 8 (Lam Decl.) ¶ 10. But the request—for $310,302 owed on construction of a Tesla charging station in San Diego that was already underway—was met with an error message: "Request cannot be processed. One or more Program Code balances has been exceeded." *Id.*; *see also* Dkt. No. 8-1 at 3; Dkt. No. 100 (O'Dea Decl.) ¶ 7. "All of California's NEVI Formula Program apportioned funds were listed as 'expired,' and [California] was unable to obligate additional dollars for NEVI projects." Dkt. No. 8 ¶ 10. Three days later, on March 31, 2025, the Director of Financial Services for FHWA's California Division advised the state that, pursuant to the Biondi Letter, "the NEVI formula program codes have been placed in 'expired' status. Thus, no funds are available for obligation." *Id.*; *see* Dkt. No. 8-1 at 2. As another example, Delaware

is short "$49,875 of deferred advance construction funding for an FHWA approved NEVI project." Dkt. No. 12 ¶ 18. Delaware now needs to divert that money "from another FHWA, non-NEVI program or [from] state funding" to cover the shortfall, because "FHWA has removed all access to the FY25 NEVI apportionment as well as the planned FY26 NEVI apportionment." *Id.* ¶ 19.

On May 7, 2025, Plaintiffs filed a civil action and the instant motion for a preliminary injunction. Dkt. Nos. 1, 5.

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure 65(a) authorizes district courts to issue preliminary injunctions. Preliminary injunctive relief is an extraordinary remedy that is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

> To obtain a preliminary injunction, a plaintiff must establish that (1) it is likely to prevail on the merits of its substantive claims, (2) it is likely to suffer imminent, irreparable harm absent an injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest."

*All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 490 (9th Cir. 2023) (citing *Winter*, 555 U.S. at 20, 22–23). Ninth Circuit courts evaluate these factors on a "sliding scale"—that is, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and the injunction is in the public interest." *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014). "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020) (quoting *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

#### IV.    Discussion

This case is one of several where plaintiffs have sought to enjoin the Executive Branch of the federal government from implementing a "categorical freeze" on congressionally appropriated funds. *See, e.g.*, *Maryland v. Corp. for Nat'l & Cmty. Serv.* (*AmeriCorps*), No. C25-1363, 2025 WL 1585051 (June 6, 2025); *New York v. Trump*, No. C25-39, 2025 WL 715621 (D.R.I. Mar. 6, 2025); *Washington v. Trump*, 768 F. Supp. 3d 1239 (W.D. Wash. 2025). Plaintiffs here, like the plaintiffs in these other cases, bring statutory claims under the Administrative Procedure Act ("APA"), constitutional claims, and an *ultra vires* claim.

Defendants raise two threshold issues that must be addressed before reaching the merits of Plaintiffs' motion: (1) whether Plaintiffs' claims are ripe (Dkt. No. 93 at 12–15) and (2) whether Defendants have taken final agency action (*id.* at 15–17).

#### A.    Threshold Issues

#### 1.    Ripeness

Article III requires that Plaintiffs' claim(s) be ripe for adjudication. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014). Ripeness is a "jurisdictional prerequisite" in the Ninth Circuit. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). "The ripeness doctrine, which aims to avoid premature and potentially unnecessary adjudication, 'is drawn from both Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Ass'n of Irritated Residents v. U.S. Env't Prot. Agency*, 10 F.4th 937, 944 (9th Cir. 2021) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003)). There are thus two components of ripeness: constitutional and prudential.

##### a.    Constitutional Ripeness

"'The constitutional component of ripeness overlaps with the "injury in fact" analysis for Article III standing,' and therefore 'the inquiry is largely the same: whether the issues presented

are 'definite and concrete, not hypothetical or abstract.'" *Id.* (quoting *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010)); *see Thomas*, 220 F.3d at 1139 ("[I]n 'measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing.'" (quoting Gene R. Nichol, Jr., *Ripeness and the Constitution*, 54 U. Chi. L. Rev. 153, 172 (1987))).

Here, Defendants argue that, as alleged, Plaintiffs' injuries are merely hypothetical and speculative: "Plaintiffs' alleged potential future injuries stemming from the possibility that FHWA's future guidance will negatively impact their projects cannot form the basis for the Court's subject-matter jurisdiction." Dkt. No. 93 at 13. "Injury can only accrue," Defendants assert, "after the obligation phase because it is only at that point that a State is entitled to receive reimbursement for its expenditure of NEVI funds—before then, all actions are contingent upon FHWA approvals." *Id.* For their part, Plaintiffs assert that the Court "should 'consider the practical effects'" of what Defendants have done. Dkt. No. 99 at 7 (quoting *Washington v. DeVos*, 466 F. Supp. 3d 1151, 1162 (E.D. Wash. 2020)). "Plaintiffs cannot move forward with previously approved State Plans because . . . Defendants . . . have revoked those Plans and refuse to obligate any additional funds under them." *Id.* This, Plaintiffs argue, is an "immediate, concrete, and irreparable" injury. *Id.*

Here, constitutional ripeness is satisfied because Plaintiffs adequately allege injury in fact. "A 'loss of funds promised under federal law satisfies Article III's standing requirement,'" especially where a plaintiff "rel[ies] heavily on federal funding." *City & County of San Francisco*, 897 F.3d at 1235 (quoting *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015)). Ninth Circuit courts have routinely found that a plaintiff's allegation that it "ha[s] lost or will likely lose federal funding" is a cognizable injury-in-fact. *See San Francisco A.I.D.S. Found. v. Trump*, No. C25-1824, 2025 WL 1621636, at *9 (N.D. Cal. June 9,

2025); *Washington v. Trump*, 766 F. Supp. 3d 1138, 1149 (W.D. Wash. 2025) ("The fact that the loss of funds may have not yet materialized . . . does not mean that there is no imminent injury or that Plaintiffs lack standing on this ground."); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 766–67 (9th Cir. 2018) (finding that plaintiffs demonstrated standing by "showing that [agency action] will cause them to lose a substantial amount of funding"). Even an alleged loss of "potential future recoupment of federal funds" represents sufficient injury-in-fact to confer standing, *Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022), as does a "diver[sion] of scarce resources" from one part of a "limited budget" to another, *Serv. Women's Action Network v. Mattis*, 352 F. Supp. 3d 977, 985 (N.D. Cal. 2018).

Further, "economic injury is generally a legally protected interest." *Cent. Ariz. Water Conservation Dist. v. U.S. Env't Prot. Agency*, 990 F.2d 1531, 1537 (9th Cir. 1993). Where a plaintiff has "established business relationships and contracts with others based on [defendant's] program," and "these business deals have not and cannot be realized because of [agency action, t]his loss of business is 'concrete, particularized, and actual . . . ' given its dollar value." *Stenson Tamaddon, LLC v. U.S. Internal Revenue Serv.*, 742 F. Supp. 3d 966, 982 (D. Ariz. 2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

Here, Defendants' actions have deprived Plaintiffs of expected and relied-upon funding. Moreover, Defendants' refusal to obligate IIJA's congressionally appropriated funds has disrupted business expectancies that the respective Plaintiff States have made pursuant to their State Electric Vehicle Infrastructure Deployment Plans. To various degrees, Plaintiffs describe scenarios where Defendants' freeze of expected funding has pulled the rug out from under them, leaving them with partially completed, partially funded infrastructure projects.

**Arizona** submitted deployment plans in 2022, 2023, and 2024, which FHWA approved. Dkt. No. 11 ¶¶ 9–10. In approving Arizona's plans, FHWA "ma[de] funds available for

obligation for fiscal years 2022 through 2025." *Id.* ¶ 10. FHWA advised Arizona that, "[w]ith this approval . . . funds are now available to Arizona for obligation." *Id.* These funds totaled $11.3 million for fiscal year 2022 and $16.3 million each year for fiscal years 2023, 2024, and 2025. *Id.* ¶ 11. Based on FHWA's assertion that such funds were available for obligation, Arizona "relied and acted upon the FHWA's statutory obligation to provide NEVI formula funding consistent with the IIJA's requirements." *Id.* ¶ 19. Prior to the issuance of the Biondi Letter, FHWA had obligated to Arizona $12,090,426 in NEVI Formula funding. *See id.* ¶ 12. But the Biondi Letter "made clear that Arizona would not have access to the approximately $48.1 million of unobligated funds which had been made available to Arizona through its State Plan Approvals." *Id.* ¶ 18. Following Defendants' suspension of Arizona's State Plan, Arizona canceled a "solicitation for 35 prospective EV charging station locations identified in State Plans." *Id.* Arizona "spent a significant amount of funds and staff time preparing this solicitation, which had to be canceled after the State Plans were suspended." *Id.* ¶ 19.

**California** submitted deployment plans in 2022, 2023, and 2024, which FHWA approved. Dkt. No. 7 ¶¶ 7–9. FHWA's approval of California's plans made a total of $301,952,392 in NEVI Formula funds available to California for obligation for fiscal years 2022 through 2025. *Id.* ¶ 9 Congress's appropriation of NEVI funds, combined with FHWA's subsequent approval of California's State Electric Vehicle Infrastructure Deployment Plan, led California to enter into business arrangements with contractors who would "construct the electric vehicle charging infrastructure . . . ." *Id.* ¶ 10. Between October 2023 and September 2024, California awarded projects worth $36.6 million through a solicitation process. *Id.* But "[d]ue to the uncertainty about the availability of federal funding, one [contractor] asked to withdraw one of its two charging station sites from the NEVI program so that it [could] continue with other funding after its construction authorization request was denied." *Id.* ¶ 19. "The longer

1   [California] is prevented from making new obligations of apportioned funds, the more certain it

2   is that awarded projects will lose critical financing, permits and rights-of-way, subcontractors,

3   and/or other project partners, and not be able to proceed." *Id.* ¶ 21. California has identified 21

4   project sites that "are otherwise ready to move forward with development of the charging

5   stations," but cannot because "site hosts . . . are holding off from signing agreements with

6   awardees until federal funding is available for obligation." Dkt. No. 100 ¶ 6.

7        **Colorado** submitted deployment plans in 2022, 2023, and 2024, which FHWA approved.

8   Dkt. No. 9 ¶¶ 8–9. FHWA's approval of Colorado's plans made NEVI Formula funds "available

9   to Colorado for obligation" for fiscal years 2022, 2023, 2024 and 2025. Dkt. No. 10-1 (FHWA

10  approval letters) at 2, 5, 8. These funds totaled $8,368,277 for fiscal year 2022, $12,042,045 for

11  fiscal year 2023, $12,042,129 for fiscal year 2024, and $12,042,139 for fiscal year 2025—in the

12  aggregate, $44,494,590. *See* Dkt. No. 10 (Kelly Decl.) ¶ 10. Colorado "relied on the FHWA's

13  approval of its first three State Plans and the formulaic allocation of the NEVI program to begin

14  awarding grants and contracting with grantees." Dkt. No. 9 ¶ 10. Colorado "has contracted with

15  grantees for approximately $18 million in work to implement Colorado's State Plan." *Id.* ¶ 11.

16  But "only $8 million has been obligated . . . , meaning that only $8 million has been requested

17  and approved . . . . This leaves a gap of $10 million that has been contracted to grantees but not

18  obligated by FHWA." *Id.* As a consequence, although there are projects in Colorado "that are

19  currently in the design phase or actively under construction," Colorado "will not have access to

20  sufficient FHWA obligations to allow all of these projects to proceed to completion." Dkt.

21  No. 10 ¶ 21. Given Defendants' funding freeze, "Colorado will have insufficient funds to

22  reimburse expenses for more than half of the currently executed contracts between [Colorado]

23  and grantees." *Id.*

24

**Delaware** submitted deployment plans in 2022, 2023, and 2024, which FHWA approved. Dkt. No. 12 ¶¶ 9–10. FHWA's approval of Delaware's plans made NEVI Formula funds "available to Delaware for obligation" for fiscal years 2022, 2023, 2024, and 2025—$2,617,339 for fiscal year 2022, $3,766,380 for fiscal year 2023, $3,766,406 for fiscal year 2024, and $3,766,409 for fiscal year 2025. *Id.* ¶¶ 10–11. But the Biondi Letter "made clear that Delaware would not have access to the $7,532,826 of FY25 NEVI program allocation previously provided and the anticipated FY26 NEVI program allocation to be provided" in the future. *Id.* ¶ 18. Delaware "has obligated $10,150,125 for NEVI Program eligible expenses" and has begun construction on two projects. *Id.* ¶ 12. Delaware "relied and acted upon the FHWA's statutory obligation to provide NEVI formula funding consistent with the IIJA's requirements." *Id.* ¶ 19. Delaware's "NEVI Program roll out requirements . . . are all reliant on the receipt and ability to utilize the NEVI funding authorized." *Id.* Further, the state has "finalized two NEVI contracts for three sites across the state. . . . Several other contracts are in the final stages of wrapping up the contract language." *Id.* ¶ 12. But Delaware is short $49,875 for deferred advance construction funding for an FHWA approved NEVI project," and Defendants' actions have rendered NEVI funds unavailable. *Id.* ¶ 18. Consequently, Delaware will need to locate and re-budget "$49,875 of funding from another FHWA, non-NEVI program or state funding" to cover the shortfall. *Id.* ¶ 19.

The **District of Columbia** submitted deployment plans "representing fiscal years 2022 through 2025," which FHWA approved. Dkt. No. 1 ¶¶ 69–70. FHWA's approval of the District's plans made approximately $13 million in NEVI Formula Program funds "available to the District of Columbia for obligation" for fiscal years 2022, 2023, 2024, and 2025. *Id.* ¶¶ 70, 145; Dkt. No. 1-8 at 2. The District "acted in reliance on the FHWA complying with the IIJA to obligate and disburse the District's share of NEVI Formula Program funds to build a robust, reliable, and

interconnected charging network across all eight District Wards to promote EV adoption." Dkt. No. 1 ¶ 146.

**Hawai'i** "prepared and provided to FHWA its State Plans for fiscal years 2022–2025," which FHWA approved. Dkt. No. 13 ¶¶ 9–10. FHWA's approval of Hawai'i's plans made $13,914,498 in NEVI Formula funds "available to Hawai'i for obligation" for fiscal years 2022 through 2025. *Id.* ¶¶ 10–11. Hawai'i "relied and acted upon the FHWA's statutory obligation to provide NEVI formula funding consistent with the IIJA's requirements." *Id.* ¶ 19. In reliance on NEVI funds, Hawai'i "proceeded with purchasing chargers for eight of its NEVI sites . . . and finalizing design for seven additional sites with the assumption the funds would be available for construction, operations, and maintenance. But the Biondi Letter "made clear that Hawai'i would not have access to the remainder of funds not previously obligated of $2,068,482.48 which had been made available to it through its State Plan Approvals." *Id.* ¶ 18. "Without the NEVI Formula Funds, [Hawai'i] will need to utilize local funds intended for other projects to complete the remaining NEVI sites or stop all activities that cannot be funded." *Id.* ¶ 19.

**Illinois** submitted state deployment plans to FHWA in 2022, 2023, and 2024, which FHWA respectively approved. Dkt. No. 15 ¶¶ 9–10. FHWA's approval of Illinois's plans made approximately $117 million in NEVI Formula funds "available to Illinois for obligation" for fiscal years 2022, 2023, 2024, and 2025. *Id.* ¶¶ 10–11. Illinois has "awarded $25.4 million to grantees for approved projects and has contractual obligations with grantees totaling $25.4 million." *Id.* ¶ 12. But the Biondi Letter "made clear that [FHWA] is withholding access to the $117 million which had been made available to Illinois through the FHWA's State Plan Approvals." *Id.* ¶ 18. Illinois "relied and acted upon the FHWA's statutory obligation to provide [Illinois] with its dedicated share of NEVI Formula Program funding consistent with the IIJA's requirements. NEVI Formula Program funding was intended to cover [Illinois's] contractual

obligations." *Id.* ¶ 19. Illinois "is in final negotiations with a consultant to assist with construction oversight of awarded and obligated NEVI Formula Program funded projects, and [Illinois] will need to obligate additional NEVI Formula Program funds to pay for these consulting services." *Id.* ¶ 12.

**Maryland** submitted state deployment plans to FHWA in 2022, 2023, and 2024, which FHWA respectively approved. Dkt. No. 16 ¶¶ 10, 12. FHWA's approval of Maryland's plans made $49,438,402 in NEVI Formula funds "available to Maryland for obligation"—$9,298,080 for fiscal year 2022, $13,380,042 for fiscal year 2023, $13,380,134 for fiscal year 2024, and $13,380,146 for fiscal year 2025. *Id.* ¶ 13. Maryland obligated $14,668,456 of these funds in a first round of "design-build procurement." *Id.* ¶ 14. But the Biondi Letter "made clear that Maryland would not have access to the unobligated total of $34,769,945 in Fiscal Year[s] 22–25 funds which had been made available to Maryland through its State Plan Approvals." *Id.* ¶ 21. Maryland has "relied and acted upon the FHWA's statutory obligation to provide NEVI formula funding consistent with the IIJA's requirements" to continue implementing its deployment plans. *Id.* ¶ 22. The state advertised "NEVI Round 2 procurement" on December 17, 2024, and "submitted an authorization request [to FHWA] for $475,000 to support design work for Round 2 projects" but "is unable to continue with its NEVI Round 2 procurement process," in part due to "the lack of obligated NEVI funds to administer the procurement process . . . ." Dkt. No. 16 ¶¶ 15, 23. "The delay in Round 2 procurement is . . . expected to increase costs for the twenty-nine public electric vehicle charging stations" advertised in the Round 2 procurement. *Id.* ¶ 26; *see id.* ¶ 15.

**Minnesota** submitted state deployment plans to FHWA in 2022, 2023, and 2024, which FHWA approved. Dkt. No. 1 ¶¶ 79–80. FHWA's approval of Minnesota's plans made approximately $54 million in NEVI Formula Program funds "available to Minnesota for

1   obligation" for fiscal years 2022, 2023, 2024, and 2025. *Id.* ¶ 80; Dkt. No. 1-8 at 2. Minnesota,

2   acting "[i]n reliance on the FHWA's compliance with the IIJA . . . included NEVI Formula

3   Program funds as a set-aside in its State Transportation Improvement Program . . . ." *Id.* ¶ 167.

4   Based on the availability of NEVI Formula funds, Minnesota "is taking steps towards executing

5   contracts for [NEVI] projects, which will result in a total of 24 fully executed contracts in

6   summer 2025."*Id.* ¶ 169. But although such funds were "made available," FHWA "has only

7   obligated funds for 19 of these 24 projects." *Id.* ¶ 170. To fulfill conditional awards granted to

8   contractors prior to Defendants' rescission of its State Plan, Minnesota has "identified" state

9   funds in lieu of the expected federal funds. *Id.* ¶ 171.

10      **New Jersey** submitted state deployment plans to FHWA in 2022, 2023, and 2024, which

11  FHWA approved. Dkt. No. 17 ¶¶ 8–9. FHWA's approval of New Jersey's plans made

12  approximately $82 million in NEVI Formula funds "available to New Jersey for obligation" for

13  fiscal years 2022, 2023, 2024, and 2025. *Id.* ¶¶ 9–10. The Biondi Letter "made clear that [New

14  Jersey] would not have access to approximately $73 million in funds which had been made

15  available . . . for obligation through its State Plan approvals." *Id.* ¶ 18. New Jersey has "relied

16  and acted upon the FHWA's statutory obligation to provide NEVI formula funding consistent

17  with the IIJA's requirements." *Id.* ¶ 19. The state "awarded a publicly advertised contract for the

18  development, planning, design, installation, five-year operation and maintenance of 76 NEVI-

19  compliant electric vehicle charging ports at 19 locations throughout New Jersey to the lowest

20  bidder for $20.96 million." *Id.* "[W]ithout NEVI Formula Program funding, [New Jersey] is

21  unable to execute the contract because there are no alternative funding sources available." *Id.*

22      **New Mexico** "prepared and provided to the FHWA its State Plans for fiscal years 2022–

23  2025," which FHWA respectively approved for fiscal years 2022, 2023, 2024, and 2025. Dkt.

24  No. 18 ¶¶ 8–9. FHWA's approval of New Mexico's plans made $30,211,385 in NEVI Formula

1    funds "available to [New Mexico] for obligation"—$5,681,977 for fiscal year 2022, $8,176,429

2    for fiscal year 2023, $8,176,486 for fiscal year 2024, and $8,176,493 for fiscal year 2025. *Id.* ¶¶

3    9–10. New Mexico had obligated and contracted $11.6 million of its available funds prior to

4    Defendants' actions. *Id.* ¶ 11. But the Biondi Letter "made clear that [New Mexico] would not

5    have access to the remaining $18.611 million in funds which had been made available to [New

6    Mexico] through its State Plan approvals." *Id.* ¶ 17. New Mexico "relied and acted upon the

7    FHWA's statutory obligation to provide NEVI Formula Funding consistent with the IIJA's

8    requirements." *Id.* ¶ 18. The state "was relying on the federal funding to build out electric vehicle

9    charging stations to advance the adoption of electric vehicles in order to have a positive impact"

10   on the state's greenhouse gas reduction goals. *Id.* A New Mexico state official avers that

11   "projects in the middle of contract negotiations have been forced to abruptly halt, with no clear

12   timeline for when they might resume or whether they will be reimbursed at all." *Id.* Further,

13   "[c]ompanies have hired staff as millions of dollars of investment were anticipated to be made."

14   *Id.* ¶ 19.

15       **New York** "prepared and provided to FHWA its State Plans for fiscal years 2022–2025,"

16   which FHWA approved. Dkt. No. 20 ¶¶ 13, 15. FHWA's approval of New York's State Plans

17   made $138,092,735 in NEVI Formula funds "available to New York for obligation"—

18   $25,971,644 for fiscal year 2022, $37,373,438 for fiscal year 2023, $37,373,747 for fiscal year

19   2024, and $37,373,779 for fiscal year 2025. *Id.* ¶¶ 14–15. But the Biondi Letter "made clear that

20   New York would not have access to New York's estimated remaining balance eligible for

21   obligation of approximately $120,000,000 which had been made available to New York through

22   its State Plan Approvals." *Id.* ¶ 22. New York "relied and acted upon the FHWA's statutory

23   obligation to provide NEVI formula funding consistent with the IIJA's requirements." *Id.* ¶ 23.

24   The state "entered into an agreement for Power Authority of New York to administer a portion of

the NEVI Formula Program that had already been approved by FHWA to [New York]." *Id.* ¶ 6. New York also entered into an agreement with the New York Energy Research and Development Authority "to administer a portion of the NEVI Formula Program that had already been approved by FHWA to [New York]." *Id.* ¶ 7. This agreement presupposed New York's receipt of some $56 million in expected NEVI funds for charging stations and workforce development activities. *Id.* New York is now unable to "move forward on over $50,000,000 in [charging station] projects along New York's highway corridors." *Id.* ¶ 23.

**Oregon** "submitted [to FHWA] and received approval of three NEVI State Plans for fiscal years 2022–2025 . . . ." Dkt. No. 23 ¶ 9. FHWA's approval of Oregon's State Plans made $41,120,395 in NEVI Formula funds "available to Oregon for obligation"—$7,733,679 for fiscal year 2022, $11,128,851 for fiscal year 2023, $11,128,928 for fiscal year 2024, and $11,128,937 for fiscal year 2025. *Id.* ¶¶ 11, 13. But "FHWA is currently restricting [Oregon's] ability to obligate [$15,061,485] that the [state] should have access [to] as a result of FHWA's approval of the NEVI State Plans for fiscal years 2022–2025." *Id.* ¶ 29. Oregon "relied and acted upon the FHWA's statutory obligation to provide NEVI Program Formula funding consistent with the IIJA's requirements." *Id.* ¶ 25. The state "planned to use NEVI funding to develop a total of eleven electric vehicle [alternative fuel corridors]." *Id.* ¶ 10. "In December 2024, [Oregon] issued Notices of Intent to Award [grants] to three private entities . . . , and negotiations between [Oregon] and the grantees regarding the grant terms are ongoing." *Id.* But due to the freeze on NEVI funding, Oregon "either cannot enter into agreements with grantees or it must re-negotiate with grantees to reduce the overall project costs, limiting the additional benefits Oregon would otherwise receive." *Id.* ¶ 26.

**Rhode Island** "prepared and provided to the FHWA its State Plans for fiscal years 2022–2025," which FHWA approved. Dkt. No. 24 ¶¶ 13–14. "Each plan was sequentially structured to

build upon prior progress, moving from corridor compliance to equitable and sustainable statewide EV infrastructure expansion." *Id.* ¶ 15. FHWA's approval of Rhode Island's State Plans made "available to Rhode Island for obligation" NEVI Formula funds of $3,383,835 for fiscal year 2022, $4,869,376 for fiscal year 2023, $4,869,410 for fiscal year 2024, and $4,869,414 for fiscal year 2025. *Id.* ¶¶ 16–17. But the Biondi Letter "made clear that Rhode Island would not have access to the net outstanding $16,150,711.84 which had been made available to Rhode Island through its State Plan approvals." *Id.* ¶ 24. Rhode Island "relied and acted upon the FHWA's statutory obligation to provide NEVI formula funding consistent with the IIJA's requirements." *Id.* ¶ 25. The state "structured its EV infrastructure planning and program delivery model around the multi-year receipt of NEVI Formula Program funding." *Id.* "The suspension of the NEVI Program . . . prevent[ed] Rhode Island from awarding funds to communities and public entities that had already invested time and resources preparing proposals. It forced the closure of an active grant opportunity that many applicants had already initiated or completed internal reviews for . . . ." *Id.* Moreover, "reopening or redesigning paused solicitations will require additional State resources and will extend project delivery timelines." *Id.* ¶ 26. "Rhode Island . . . structured its EV infrastructure planning and program delivery model around the multi-year receipt of NEVI Formula Program funding." *Id.* ¶ 25.

**Vermont** submitted state deployment plans to FHWA in 2022, 2023, and 2024, which FHWA approved. Dkt. No. 1 ¶¶ 91–92. FHWA's approval of Vermont's plans made approximately $16.7 million NEVI Formula Program funds "available to Vermont for obligation" for fiscal years 2022, 2023, 2024, and 2025. *Id.* ¶¶ 92, 204; Dkt. No. 1-8 at 2. "[I]n reliance on the FHWA's approval of its State Plans," Vermont "awarded EV fast charging port projects totaling approximately $9.3 million." Dkt. No. 1 ¶ 206. "Without its NEVI Formula Program funds, Vermont cannot fund all of the projects the State has awarded." *Id.*

**Washington** "submitted its initial State Electric Vehicle Infrastructure Deployment Plan and subsequent updates to the FHWA" in 2022, 2023, and 2024. Dkt. No. 28 ¶ 22. FHWA approved Washington's State Plans and advised that with each approval, "funds are now available to Washington State for obligation." *Id.* ¶ 25. Washington "knew when the NEVI Formula Program was first established in 2021 that it would receive $71.5 million in total, so long as it submitted its State Electric Vehicle Infrastructure Deployment Plan(s) on time and took actions to carry them out"—$10.5 million for fiscal year 2022, $15 million for fiscal year 2023, $15 million for fiscal year 2024, $15 million for fiscal year 2025, and $15 million for fiscal year 2026. *Id.* ¶¶ 20–21. But the Biondi Letter "made abundantly clear that Washington no longer had access to the $56.5 million that had been made available with FHWA's approvals of the Washington State Plans." *Id.* ¶ 35. Washington "planned to invest the $71.5 million in NEVI formula funds along with $18 million in private match for the deployment of [direct-current] fast charging . . . to ensure charging availability every 50 miles." *Id.* ¶ 28. The state "expect[ed] it would receive all $71.5 million of its dedicated and non-discretionary NEVI Formula Program funds . . . ." *Id.* ¶ 22. "The Washington State Legislature has authorized . . . a total of $56.5 million in NEVI funding based on the FHWA's annual NEVI authorizations for electric vehicle charging infrastructure along interstates and US highways." *Id.* ¶ 23. Such authorizations "were made under the expectation that the State would receive its NEVI Formula Program funds as mandated by the IIJA . . . ." *Id.* ¶ 24. Further, "[b]ecause Washington does not have funds to cover the projects for which it sought proposals in the absence of its NEVI Formula Program funding, the State has had to halt all NEVI Formula Program funded work; it cannot award a single grant, enter a single contract, or make any progress toward . . . fulfil[ling] the purpose of the IIJA . . . ." *Id.* 36.

**Wisconsin** "prepared and provided to the FHWA its State Plans for fiscal years 2022–2025," which FHWA approved. Dkt. No. 26 ¶¶ 9–10. FHWA's approval of Wisconsin's plans made $61,901,479 in NEVI Formula Program funds "available to Wisconsin for obligation"—$11,642,061 for fiscal year 2022, $16,753,057 for fiscal year 2023, $16,753,173 for fiscal year 2024, and $16,753,188 for fiscal year 2025. *Id.* ¶¶ 10–11. But the Biondi Letter "made clear that Wisconsin . . . would not have access to the total in FY 22–25 funds which had been made available to [the state] through its State Plan Approvals." *Id.* ¶ 18. Wisconsin "relied and acted upon the FHWA's statutory obligation to provide NEVI formula funding consistent with the IIJA's requirements." Dkt. No. 26 ¶ 19. The state receives approximately 29 percent of its transportation budget from federal funding. *Id.* ¶ 4. Between January 2024 and April 1, 2024, Wisconsin issued 53 grant awards for electric vehicle charging infrastructure. *Id.* ¶ 12. "As of February 6, 2025, 15 grant awards . . . , representing $7.3 million, remain unobligated. Wisconsin is unable to continue work implementing these grant awards." *Id.* ¶ 19. Including its funding for fiscal year 2026, "Wisconsin does not have access to approximately $62.65 million of its remaining apportionment of NEVI Formula Program funding and cannot issue awards under the current [request for proposal]." *Id.*

Defendants attempt to characterize Plaintiffs' alleged injuries as "potential future injuries stemming from the possibility that FHWA's future guidance will negatively impact their projects." Dkt. No. 93 at 13. "These allegations," Defendants argue, "are dependent on contingencies and speculation regarding the content of FHWA's updated guidance that may not materialize." *Id.* But this misrepresents the agency action that Plaintiffs have challenged. Plaintiffs' case is predicated not on what Defendants might do in the future, but on what Defendants have already done—namely the "revocation of State Plans and categorical

withholding of NEVI funds from obligation."[6] Dkt. No. 99 at 8. As Plaintiffs assert, "Plaintiffs cannot move forward with *previously* approved State Plans because, as Defendants admit, they have revoked those plans and refuse to obligate any additional funds under them." *Id.* at 7 (emphasis added); *see supra* Section IV.A.1.a.

An admittedly twentieth-century hypothetical helps to illustrate the hole in Defendants' position. Consider a person who, check in hand, is walking to the bank to cash it. When they get to the bank, they expect to hand the check to a teller, who will negotiate the check and give them cash in return. The check, after all, has made that money available to them. But while they are en route, the payor—the person who wrote the check and from whose account the funds will be drawn—calls the bank and stops payment on the check. When the payee presents the check, will the teller cash it? If, after stopping payment, the payor calls the payee and advises that, upon request, they might issue another check on an unspecified future date, is the payee's position the same as it would have been had the payor never stopped payment? Defendants' answer to this question is yes, irrespective of the rent that the payee cannot now cover, or the gas bill they can no longer pay. That the payee now has a hole in their budget is not the payor's problem—indeed, as far as Defendants are concerned, it is not even a problem at all.

Prior to Defendants' action here, Plaintiffs' FHWA-approved State Plans entitled them to NEVI Formula funding. This is evidenced by FHWA's obligation and disbursement of funds in prior fiscal years, as well as by the plan-approval letters—each Plaintiff received three, one each for fiscal years 2022–23, 2024, and 2025—that FHWA sent, asserting that "funds [were] now available to [a state] for obligation." *See, e.g.*, Dkt. 1-7 at 2; *see also* Dkt. No. 109 at 9:10–12.

---

[6] For this reason, Defendants' reliance on *Texas v. United States*, 523 U.S. 296 (1998), and *Porter v Jones*, 319 F.3d 483 (9th Cir. 1996), falls short. *See* Dkt. No. 93 at 13. These cases address contingent future events, not harms already realized.

And the IIJA itself entitled the states to these funds. But after Defendants revoked Plaintiffs' State Plans, Plaintiffs' access to NEVI Formula funds evaporated. Under *City and County of San Francisco*, this represents an injury-in-fact sufficient to confer standing and, therefore, ripeness. *See* 897 F.3d at 1235.

### b.    Prudential Ripeness

"To assess prudential ripeness, [the court] must 'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Irritated Residents*, 10 F.4th at 944 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). A decision is prudentially ripe for review where the issue "is purely one of statutory interpretation that would not 'benefit from further factual development of the issues presented.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)). Here, the issues are fit for review because, as Plaintiffs assert, "further factual development would not significantly advance the court's ability to deal with the legal issues presented." Dkt. No. 99 at 7 (cleaned up); *see also Irritated Residents*, 10 F.4th at 944 (finding issue "fit for review because it is purely a legal question presented in [a] concrete setting"); *California v. U.S. Dep't of Homeland Sec.*, 476 F. Supp. 3d 994, 1007 (N.D. Cal. 2020) (finding plaintiff's challenge was "a purely legal one" because it concerned whether a statute had been "properly construed and implemented by" the agency). Further, Plaintiffs will suffer hardship if the Court delays its consideration of this case. Without clarity as to the legality of Defendants' actions, the fate of Plaintiffs' EV programming remains uncertain, and "the delay and uncertainty around NEVI funds exposes [Plaintiffs] to rising costs; loss of site hosts, financing, and other critical partners; and similar opportunity costs." Dkt. No. 5 at 22. Plaintiffs assert that they face "budgetary confusion and uncertainty," as well as "an increased burden in administering the NEVI Formula Program . . . ." *Id.* at 23.

1    For their part, Defendants do not address prudential ripeness in their brief. At oral

2   argument, however, Defendants cited *Colwell v. Department of Health and Human Services*, 558

3   F.3d 1112, 1116 (9th Cir. 2009), in which the plaintiffs brought a pre-enforcement challenge to

4   "Policy Guidance issued by the Department of Health and Human Services." *See* Dkt. No. 109 at

5   25:8–26:6. The Ninth Circuit held that the *Colwell* plaintiffs' claim was prudentially unripe

6   because it was ambiguous whether the "Policy Guidance" that the plaintiffs had challenged

7   comprised mandatory rules that the plaintiffs were compelled to follow, or whether the language

8   of the "Policy Guidance" was merely suggestive and did not threaten enforcement consequences

9   for plaintiffs should they fail to comply. *Id.* at 1127. The court determined that such "ambiguity

10   [would likely] be reduced or resolved based on the enforcement activities HHS [might]

11   undertake in the future," so it deemed the plaintiffs' claim "not now fit for decision." *Id.* at 1128.

12   But *Colwell* is inapposite here. Defendants have not issued any guidance, mandatory or

13   otherwise, for Plaintiffs to challenge. As Plaintiffs assert, the real issue is Defendants' revocation

14   of state NEVI deployment plans and FHWA's subsequent freeze on distribution of NEVI

15   Formula Program funds. Put another way, Defendants' issuance (or non-issuance) of updated

16   NEVI Formula Program guidance has no bearing on the legality or illegality of their revocation

17   of the State Plans and freezing of the funds. New guidance will not undo the revocation,

18   irrespective of the substance of that guidance.[7]

19    Having considered the constitutional and prudential issues, the Court concludes that this

20   case is ripe for consideration.

21

22

23   ───────────────────────

[7] Although Defendants refer to FHWA's action on state deployment plans as a "suspension" (Dkt. No. 93 at 12), the
24   Court agrees with Plaintiffs' assertion that "FHWA's so-called 'suspension' is . . . a revocation," because the Biondi
Letter "made clear [that FHWA] has no intention of reapproving any previously approved plan" (Dkt. No. 1 ¶ 110).

1    2.    **Final Agency Action**

2    Under the APA, an agency action is not reviewable unless it is a "final agency action."

3   5 U.S.C. § 704. The Supreme Court has identified two conditions that must be satisfied for an

4   agency action to be considered final: (1) "the action must mark the consummation of the

5   agency's decisionmaking process"; and (2) "the action must be one by which rights or

6   obligations have been determined, or from which legal consequences will flow." *Bennett v.*

7   *Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Courts within the Ninth Circuit "look to

8   factors such as whether the action amounts to a definitive statement of the agency's position,

9   whether it has a direct and immediate effect on the day-to-day operations of the subject party,

10  and if immediate compliance is expected." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of the*

11  *Airforce*, 128 F.4th 1089 (9th Cir. 2025) (quoting *Nat'l Lab. Rels. Bd. v. Siren Retail Corp.*, 99

12  F.4th 1118, 1123 (9th Cir. 2024)) (cleaned up). Courts "also focus on the practical and legal

13  effects of the agency action: The finality element must be interpreted in a pragmatic and flexible

14  manner." *Id.* (quoting *Saliba v. U.S. Sec. & Exch. Comm'n*, 47 F.4th 961, 967 (9th Cir. 2022)

15  (internal quotation marks omitted)).

16  Here, as will be discussed below, Defendants' action is properly considered a final

17  agency action under the APA. "[A]n emerging consensus of district courts recently hearing cases

18  about different aspects of federal funding freezes" have found such freezes to be final for the

19  purposes of APA reviewability. *Woonasquatucket River Watershed Council v. U.S. Dep't of*

20  *Agric.*, No. C25-97, 2025 WL 1116157, at *16 (D.R.I. Apr. 15, 2025); *see Louisiana v. Biden*,

21  622 F. Supp. 3d 267, 291–92 (W.D. La. 2022) (collecting cases).

22    *a.    "Consummation" of the Decision Making Process*

23  Defendants argue that they "have not taken 'final agency action' reviewable under the

24  APA," but have instead just begun the process that will eventually lead to a final action. Dkt.

No. 93 at 15; Dkt. No. 93 at 15–17. "FHWA has not asserted its ultimate administrative position with respect to NEVI guidance," Defendants argue. *Id.* at 16. "[R]ather[,] it has merely stated that it is reviewing NEVI guidance and evaluating whether it accords with current policies." *Id.* Defendants take the position that "FHWA's interim decisions with respect to prior guidance will be subsumed by its ultimate consideration of State obligations submitted pursuant to updated guidance . . . ." *Id.* at 16–17.

But Defendants mischaracterize their conduct. FHWA's "ultimate administrative position with respect to NEVI guidance" (*id.* at 16) is not the issue here, nor is the agency's present and ongoing review of NEVI guidance. *See City & County of San Francisco v. Trump*, No. C25-1350, 2025 WL 1282637, at *34 (N.D. Cal. May 3, 2025). Rather, Defendants' complained-of conduct is the rescission of the prior guidance and revocation of the State Deployment Plans, the practical result of which is a funding freeze—the "categorical withholding of NEVI funds from obligation." Dkt. No. 99 at 8. In reviewing actions that various federal agencies have taken this year for the express purpose of aligning themselves with executive orders issued by the new administration, Courts have characterized decisions that have resulted in categorical funding freezes as the "consummation of [an] agency's decisionmaking process to comply with the President's executive order . . . ." *New York v. Trump*, 2025 WL 715621, at *8 (quoting *Drs. For Am. v. Off. Of Pers. Mgmt.*, 766 F. Supp. 3d 39, 50 (D.D.C. 2025). Moreover, from a practical standpoint, "there are no further steps [Defendants] need to take to determine whether they will freeze that funding," thus indicating consummation of the decision making process. *Woonasquatucket River*, 2025 WL 1116157, at *15.

Further, examined in light of the Ninth Circuit's indicia of finality, the funding freeze amounts to a definitive statement of the agency's position, and Plaintiff States have demonstrated that the freeze has had an immediate effect on the day-to-day operations of their respective

transportation agencies. The February 6, 2025, Biondi Letter asserts that "FHWA is updating the NEVI Formula Program Guidance to align with current U.S. DOT policy and priorities, including those set forth in DOT Order 2100.7, titled 'Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities.'" Dkt. No. 1-9 at 2–3. Given the concrete policy and priorities described in DOT Order 2100.7, which contemplate factors such as communities' "marriage and birth rates" and "vaccine and mask mandates" (Dkt. No. 1-10 (DOT Order No. 2100.7) at 4), the assertion in the Biondi Letter clearly "'mark[s] the consummation of' the [FHWA's] 'decision-making process'" that funding not in line with DOT Order 2100.7 will not be forthcoming. It is one thing for Defendants to commit to making funding decisions that are generally aligned with the direction that a cabinet-level agency envisions. It is quite another to determine that, when choosing the locations of electric vehicle charging stations, states will need to consider specific, data-based criteria such as whether communities have "marriage and birth rates higher than the national average"; or black-and-white policy determinations such as whether a jurisdiction maintains mandates regarding vaccines and masks. Such fully formed directives and attention to detail are far more indicative of the end of the decision-making process, not the beginning.

As to the immediate effect on day-to-day operations that Defendants' actions have had, Plaintiffs provide multiple examples. For example:

- On March 28, 2025, California sought to submit to FHWA an "authorization request for construction incurred for a NEVI-funded project . . . for $310,302 incurred in constructing a Tesla charging station." Dkt. No. 8 (Lam Decl.) ¶ 10. But the employee who made the request "received the following message from the online funding portal: 'Request cannot be processed. One or more Program Code balances has been exceeded.'" *Id.*; *see* Dkt. No. 8-1 (Lam Decl. Ex. 1) at 3. Plaintiffs assert that "[s]ince FHWA issued the Notice, Plaintiff States have been unable to obligate new NEVI funds, even for projects in previously approved State Plans." Dkt. No. 5 at 9. Defendants' funding freeze has caused, among other things, "disruptions to State NEVI implementation programs [and] delays in construction of infrastructure." *Id.* at 10.

It is hard to conceive of a more exemplary effect on day-to-day operations than a shovel-ready construction project suddenly delayed because its funding has failed to materialize. Further:

- Washington avers that it "has had to transition the full-time employee it hired for NEVI work to another temporary assignment and has been unable to hire the other full-time employee for which [it] received hiring approval." Dkt. No. 28 ¶ 37.

- Rhode Island asserts that Defendants' actions "forced the closure of an active grant opportunity that many applicants had already initiated or completed internal reviews for, delaying project pipelines." Dkt. No. 24 ¶ 25.

- Oregon "cannot execute existing contracts without significant modification or fund the construction phases for . . . eight corridors." Dkt. No. 23 ¶ 31.

*See also supra* Section IV.A.1.a. These are not representative instances of plans that might be canceled, or priorities that might need to be rearranged. Rather, these are contingencies that Plaintiffs presently face and are demonstrative of the immediate impact of Defendants' actions.

### b.    *Determination of Rights or Obligations/Legal Consequences*

It is also clear that "legal consequences will flow" from Defendants' actions. Defendants argue that an inquiry into whether legal consequences will flow "turns on whether [Defendants'] actions result in 'concrete consequences.'" Dkt. No. 93 at 17 (quoting *S. Cal. All. Of Publicly Owned Treatment Works v. U.S. Env't Prot. Agency*, 8 F.4th 831, 836 (9th Cir. 2021)). "That threshold is not cleared if 'subsequent agency decision making is necessary to create any practical consequences.'" *Id.* (quoting *S. Cal. All.*, 8 F.4th at 837). But if the budgetary reshuffling, cancelation and delay of construction projects, and scrapping of Plaintiffs' State Plans do not constitute "practical consequences," it is difficult to imagine what would. *See supra* Sections IV.A.1.a.

1    Further, it is disingenuous for Defendants to assert that there are no practical

2   consequences to their actions because, "[t]o be sure, there are currently no approved State plans."

3   Dkt. No. 93 at 17. There are, of course, currently no approved State Plans because Defendants

4   revoked the approved State Plans that already existed and had previously been approved. Indeed,

5   Defendants' arguments here ring hollow. Defendants assert that "Plaintiffs are unable to submit

6   requests for new obligations." *Id.* But before Defendants' revocation of Plaintiffs' State Plans,

7   Plaintiffs absolutely were able to submit requestions for new obligations. That Plaintiffs were

8   entitled to federal funding before Defendants acted, and unentitled to it afterward, is a practical

9   consequence. The IIJA itself creates a step-by-step process by which a state may secure NEVI

10   Formula funds. After the crucial approval of a state's plan, funds become "available . . . for

11   obligation." *See, e.g.*, Dkt. No. 1-7 at 2. Congress dictated that, under the law, FHWA could not

12   consider a request for obligation made prior to the agency's approval of a plan, but could

13   consider such a request afterward. By statute, approval (and, by corollary, revocation) of a state

14   plan creates (or destroys) a legal interest with respect to the availability of NEVI Formula funds

15   to that state. When Defendants took steps to quash that Congressionally-conceived interest, they

16   engendered legal consequences.

17    The Court thus finds that Plaintiffs have established both prongs of the *Bennett* test, and

18   Defendants' actions here are properly considered final agency action for the purposes of

19   reviewability under the APA.

20   **B.    Preliminary Injunction**

21    The Court now turns to the merits of Plaintiffs' request for a preliminary injunction. As

22   discussed above,

23        [t]o obtain a preliminary injunction, a plaintiff must establish that:
          (1) it is likely to prevail on the merits of its substantive claims,
24        (2) it is likely to suffer imminent, irreparable harm absent an

injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest.

*All. for the Wild Rockies*, 68 F.4th at 490. "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman*, 977 F.3d at 940–41. The Court addresses each element in turn.

### 1.    Likelihood of Success on the Merits

Plaintiffs' complaint comprises six causes of action—three violations of the APA (Dkt. No. 1 ¶¶ 213–257); violation of the separation-of-powers doctrine (*id.* ¶¶ 258–269); violation of the Take Care Clause (*id.* ¶¶ 270–277); and common-law *ultra vires* action (*id.* ¶¶ 278–286). As noted by Defendants, Plaintiffs do not discuss their Take Care Clause and *ultra vires* claims in their motion and do not rely on these claims to support a preliminary injunction. *See* Dkt. No. 93 at 26 n.2. The Court will thus consider Plaintiffs' request for an injunction on the basis of their first four claims.

#### a.    *First APA Claim: In Excess of Statutory Authority*

Under the APA, the Court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Plaintiffs assert that "[b]y unilaterally revoking all State Plans and withholding congressionally appropriated funding, Defendants acted in excess of statutory authority and contrary to the IIJA." Dkt. No. 5 at 12.

When examining a statute, a court "start[s] with the plain meaning of the statute's text." *Hunsaker v. United States*, 902 F.3d 963, 967 (9th Cir. 2018) (quoting *Father M. v. Various Tort Claimants (In re Roman Catholic Archbishop of Portland in Or.)*, 661 F.3d 417, 432 (9th Cir. 2011)). The statute under review here, the IIJA, provides that: "$5,000,000,000, to remain available until expended for amounts made available for each of fiscal years 2022 through 2026,

1    shall be to carry out a National Electric Vehicle Formula Program." 135 Stat. at 1421. "[F]or

2    each of fiscal years 2022 through 2026, the Secretary [of Transportation] shall distribute among

3    the States the funds made available under this paragraph in this Act . . . ." *Id.* at 1422. The statute

4    fixes each state's share of the appropriated funds in accordance with the pre-existing statutory

5    formula used for apportionment of funds in the Federal-Aid Highway Program. *See id.*; 23

6    U.S.C. § 104. The language of the IIJA clearly defines the Secretary of Transportation's duty to

7    distribute funds under the law and provides the Secretary with no room to improvise. *See Serv.*

8    *Emps. Int'l Union v. United States*, 598 F.3d 1110, 1113 (9th Cir. 2010) (finding that Congress's

9    use of the word "shall" "does not confer on the agency discretion to decide how much ought to

10   be paid").

11       As Plaintiffs point out, the statute authorizes the Secretary to "withhold or withdraw"

12   NEVI Formula funds under certain limited circumstances, in accordance with a prescribed

13   procedure. *See* Dkt. No. 5 at 12. If a state does not submit to the Secretary a plan that

14   "describ[es] how [it] intends to use [its NEVI Formula] funds . . . for each fiscal year in which

15   funds are made available," or if a state "has not taken actions to carry out its plan," then the

16   Secretary may withhold or withdraw that state's share of the funds. 135 Stat. at 1422. But before

17   doing so, the Secretary "shall provide notice to a State on the intent to withhold or withdraw

18   funds not less than 60 days before withholding or withdrawing any funds, during which time the

19   State shall have an opportunity to appeal a decision to withhold or withdraw funds directly to the

20   Secretary." *Id.* And if, after complying with these procedural requirements, the Secretary is still

21   determined to withhold NEVI Formula funds from a state, the Secretary has clearly prescribed

22   channels through which the funds may be redirected. Withheld or withdrawn funds may be

23   awarded "on a competitive basis to local jurisdictions within the State [from which they were

24   withheld or withdrawn] for use on projects that meet the eligibility requirements." *Id.* If the

funds are not awarded to local jurisdictions within the state from which they were originally

withheld or withdrawn, then they must be distributed among other states "in the same manner as

funds distributed for that fiscal year"—that is, by the NEVI apportionment formula described

above. *Id.* This is not ambiguous language; there is little, if any, room for interpretation of what

the IIJA commands Defendants to do. But the record indicates that Defendants have declined to

follow their clear statutory instructions.

In freezing NEVI Formula funds, Defendants have "withheld or withdrawn" funds in a

manner both procedurally and substantively different from that prescribed in the statute. The

language of the statute, as described above, is straightforward. It obligates Defendants to

distribute the NEVI Formula funds. It specifies how much, to whom, and for what purposes. It

does not permit a categorial freeze premised on the Department of Transportation's realignment

with new executive policies, and it does not contemplate the Secretary's revocation of State

Plans that FHWA has already approved.

Defendants argue that their revocation of the State Plans was proper because,

"[c]onsistent with statutory authority and established practice": (1) FHWA has "the authority to

revisit and reevaluate past guidance"; and (2) the State Plans are required to comply with FHWA

guidance. *See* Dkt. No. 93 at 18–19. The first point is reasonable, and the Court agrees with

Defendants that barring an agency from revising previously promulgated guidance "would mean

that agencies could never correct past actions, and instead would be perpetually bound by

policies with which they disagree." *Id.* at 19; *see Solar Energy Indus. Ass'n v. Fed. Energy Reg.*

*Comm'n*, 80 F.4th 956, 979 (9th Cir. 2023) ("The APA does not require 'regulatory agencies [to]

establish rules of conduct to last forever,' [and] . . . [a]n agency may change its position for any

number of reasons, such as a change in factual circumstances or a shift in its policy priorities."

(quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

43 (1983)). But Defendants have not actually "corrected" past actions here, because they have not issued any new guidance with which the State Plans must comply. Defendants assert, without authority, that "[a]s an adjunct of its ability to update new NEVI Program guidance, FHWA has the authority to suspend state plans for unobligated funds pending the issuance of that guidance." Dkt. No. 93 at 19–20. Because Congress "required the issuance of guidance for a program that necessarily extends across multiple administrations," Defendants argue, "and delegated the issuance of that guidance to the agency tasked with administering the program," they "must have the authority to briefly suspend State plans while the congressionally required guidance is updated." *Id.* at 20.

Although the Court sees the logic in Defendants' position that it may reconsider administrative guidance issued by the prior administration, it does not find authority for suspending State Plans in the statutory text (or caselaw), nor does it see the "established practice" to which Defendants refer. Moreover, at oral argument, Defendants appeared to take the rather extreme position that this administration could not be expected to abide by *any* regulatory guidance that had been installed or promulgated before January 20, 2025. *See* Dkt. No. 109 at 23:23–24:1. As discussed above, the IIJA contemplates FHWA's withholding and withdrawing a state's NEVI Formula funds under very limited circumstances, none of which has obtained here. Further, Defendants provide no authority for their presumption that guidance is necessarily revised on a "suspend, revoke, and replace" basis. In prior years, when FHWA updated its NEVI Formula Program Guidance, the revised and reissued guidance expressly superseded the guidance it replaced, resulting in a seamless transition from one regime to the next. *See, e.g.*, Dkt. No. 93-1 (2024 NEVI Formula Program Guidance) at 81 ("The attached guidance supersedes the guidance that was issued on June 2, 2023."). When FHWA previously updated its guidance, it required states "to submit an EV Infrastructure Deployment Plan (Plan)

on an annual basis that describe[d] how the State intend[ed] to use its apportioned NEVI

Formula Program funds in accordance with [updated] guidance." *Id.* But new guidance did not

revoke or suspend plans approved under the old guidance and did not cancel projects conceived

under the old guidance.

Moreover, even Defendants' repeated assertion that their actions merely amount to a

"temporary pause" (Dkt. No. 93 at 12, 28) and a "brief suspen[sion]" (*id.* at 20), are unavailing

with respect to Defendants' ultimate compliance with the law. The President issued the

"Unleashing American Energy" Executive Order on his first day in office. Secretary Duffy

issued DOT Order No. 2100.7 on his first full day in office. In contrast, the Biondi Letter advised

on February 6, 2025, that new NEVI Formula Program guidance would be "published for public

comment in the spring," thereby giving FHWA a leisurely four-and-a-half-month timeframe to

take its first step toward rebooting the program. Dkt. No. 1-8 at 3. But spring has come and gone,

and FHWA has not published new guidance. Given FHWA's pace, as well as its failure to meet

its self-imposed spring deadline, it appears unlikely (if not impossible at this point) that new

guidance will be issued, commented-upon, and then finalized before the end of fiscal year 2025

on September 30, 2025, to say nothing of the fact that, upon the issuance of the new guidance,

NEVI Formula funds will remain unavailable to states until they draft and submit—and FHWA

approves—new state deployment plans.

The Court need only look at a calendar to spot the disingenuousness of Defendants'

position. President Biden signed IIJA into law on November 15, 2021. It took FHWA 87 days,

until February 10, 2022, to issue guidance. It then took Plaintiff Washington another 172 days,

until August 1, 2022, to submit its state plan to FHWA. *See* Dkt. No. 28-1 at 5. FHWA took 45

days, until September 14, 2022, to approve Washington's plan, at which point fiscal year 2022

funds became available to Washington for obligation. *See* Dkt. No. 1-7 at 2. All told, then, 304

1   days elapsed between the enactment of the IIJA and the availability of funds. Defendants

2   rescinded FHWA's NEVI Formula Program guidance and revoked the State Plans on February 6,

3   2025. *See* Dkt. No. 1-9 at 2. The rescission left FHWA in the same position it was in on the date

4   that the IIJA was enacted—that is, back at square one and statutorily obligated to provide

5   guidance to the states on how to access the congressionally appropriated NEVI Formula funds.

6   *See* 135 Stat. at 1421–22. If the Parties were to adhere to the same timeline that they followed in

7   2021–22, then Washington could expect to again be eligible to obligate NEVI formula funds on

8   or about December 7, 2025, more than two months *after* the end of fiscal year 2025. *See* 31

9   U.S.C. § 1102 ("The fiscal year of the Treasury begins on October 1 of each year and ends on

10   September 30 of the following year."). Notwithstanding Defendants' assertion that "FHWA will

11   re-issue NEVI guidance, and pursuant to that guidance, States will be permitted to submit

12   updated plans and requests for obligations," the Court is skeptical that all of the paperwork—at a

13   minimum, agency guidance, State Plans, and agency approvals, to say nothing of the individual

14   projects that must then be approved by FHWA—will be signed, sealed, and delivered in time for

15   the Secretary to fulfill the statutory requirement to distribute the fiscal year 2025 funds by the

16   end of fiscal year 2025.

17         When the IIJA was enacted, the statute provided the Secretary of Transportation with 90

18   days to issue agency guidance on NEVI Formula Program funds, a deadline the agency duly

19   complied with. *See* Dkt. No. 93-1 at 11. Since Defendants committed themselves to re-issuing a

20   new version of the guidance on February 6, 2025, more than four months—far in excess of 90

21   days—have passed. Were Defendants serious about their obligation to distribute the NEVI

22   Formula funds as mandated by Congress, they might have displayed more alacrity so as to ensure

23   timely distribution of the funds. That Defendants have been content to do nothing more than

24   assert an "aim[] to have undated draft NEVI Formula Guidance published for public comment in

the spring" belies their professed intention of timely bringing the NEVI Formula Program back

online and in accordance with the statute. At oral argument, the Court asked Defendants' counsel

when FHWA would provide states with its updated guidance, but counsel was not able to

provide the Court with a date, or even a rough timeframe. *See* Dkt. No. 109 at 21:12–15.

Finally, as explained in the Biondi Letter, FHWA actually intends to issue updated NEVI

Formula Program guidance twice—first in a draft version "for public comment," then as "final"

guidance that "responds to the comments received." Dkt. No. 1-9 at 3. FHWA will not permit

states to submit new state deployment plans until the "final" version of the guidance has been

issued, which will not happen until after the "public comment period has closed," thereby

extending the purportedly "brief" pause in the NEVI Formula Program even more. *Id.* Such foot-

dragging strikes the Court as completely unnecessary. Congress did not mandate notice-and-

comment rulemaking when directing DOT to issue NEVI Formula Program guidance. When

FHWA developed and issued the first version of NEVI Formula Program guidance in 2021–22,

it solicited public input just 15 days after the IIJA was enacted and, even then, committed to

"issu[ing] guidance and begin[ning] other activities related to implementation" of the IIJA while

still fielding suggestions from the public. IIJA Request for Information, 86 Fed. Reg. 68297,

68298 (Dec. 1, 2021). All told, what Defendants have done, and what they continue to do (or not

do), truly renders their actions here a funding freeze, not a temporary pause or brief suspension.

Thus, the Court finds that Defendants have likely exceeded their statutory authority and

Plaintiffs are likely to succeed on the merits of their first cause of action.

### b.    Second APA Claim: Arbitrary and Capricious Agency Action

Under the APA, a court "shall . . . hold unlawful and set aside agency action, findings,

and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). "Under the arbitrary and capricious standard, [a

1   court's] scope of review is narrow and deferential. *Arrington v. Daniels*, 516 F.3d 1106, 1112

2   (9th Cir. 2008). "Agency action is valid 'if a reasonable basis exists for [the agency's]

3   decision.'" *Id.* (quoting *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006))

4   (alteration in original). "A reasonable basis exists where the agency 'considered the relevant

5   factors and articulated a rational connection between the facts found and the choices made.'" *Id.*

6   (quoting *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1093

7   (9th Cir. 2005)). Where an agency has changed its policy, it must "show that there are good

8   reasons for the new policy," and it must demonstrate that it has considered any "serious reliance

9   interests" prior to changing course. *F.C.C. v. Fox Television Studios*, 556 U.S. 502, 515 (2009).

10  An agency must also demonstrate that it has considered "alternatives . . . within the ambit of the

11  existing policy." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020)

12  (cleaned up). Further, an agency action is "arbitrary and capricious" where "the agency has relied

13  on factors which Congress has not intended it to consider . . . ." *State Farm*, 463 U.S. at 43.

14      Here, Defendants' rescission of the NEVI Formula Program guidance and revocation of

15  State Electric Vehicle Infrastructure Deployment Plans was arbitrary and capricious. Defendants

16  attempt to rely on two paragraphs in the Biondi Letter to satisfy their burden under the APA but

17  fall far short of adequately explaining their actions. *See* Dkt. No. 1-9 at 2–3. "The FHWA is

18  updating the NEVI Formula Program Guidance to align with current U.S. DOT policy and

19  priorities, including those set forth in DOT Order 2100.7, titled 'Ensuring Reliance Upon Sound

20  Economic Analysis in Department of Transportation Policies, Programs, and Activities.'" *Id.*

21  This sentence represents the entirety of Defendants' stated reasoning behind the decision.

22      It is not evident that FHWA considered relevant factors that informed its decision. The

23  agency explained that it was "updating the NEVI Formula Program Guidance to align with

24  current U.S. DOT policy and priorities, including those set forth in DOT Order 2100.7, titled

'Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities.'" Dkt. No. 1-9 at 2–3. In directing the Secretary of Transportation to develop NEVI Formula Program guidance, Congress enumerated eight specific factors to consider, as well as "any other factors, as determined by the Secretary":

> (1) the distance between publicly available electric vehicle charging infrastructure;

> (2) connections to the electric grid, including electric distribution upgrades; vehicle-to-grid integration, including smart charge management or other protocols that can minimize impacts to the grid; alignment with electric distribution interconnection processes, and plans for the use of renewable energy sources to power charging and energy storage;

> (3) the proximity of existing off-highway travel centers, fuel retailers, and small businesses to electric vehicle charging infrastructure acquired or funded under this paragraph in this Act;

> (4) the need for publicly available electric vehicle charging infrastructure in rural corridors and underserved or disadvantaged communities;

> (5) the long-term operation and maintenance of publicly available electric vehicle charging infrastructure to avoid stranded assets and protect the investment of public funds in that infrastructure;

> (6) existing private, national, State, local, Tribal, and territorial government electric vehicle charging infrastructure programs and incentives;

> (7) fostering enhanced, coordinated, public-private or private investment in electric vehicle charging infrastructure; [and]

> (8) meeting current and anticipated market demands for electric vehicle charging infrastructure, including with regard to power levels and charging speed, and minimizing the time to charge current and anticipated vehicles[.]

135 Stat. at 1423. But even given the broad discretion of this catch-all factor, the scope of which

is subject to interpretation,[8] the Biondi Letter does not "articulate[] a rational connection

between the facts found and the choices made." *Arrington*, 516 F.3d at 1112. Indeed, the Biondi

Letter does not articulate any facts at all and instead provides only an implication that the current

NEVI Formula Program guidance does not "align with current U.S. DOT policy and priorities."

Dkt. No. 1-9 at 2–3.[9] The Biondi Letter does not explain how the current guidance is out-of-step

with current policy and, therefore, does not explain why it needs to be rescinded. A court "may

not infer an agency's reasoning from mere silence." *Arrington*, 516 F.3d at 1112.

    Further, the Biondi Letter does not demonstrate that FHWA considered the serious

reliance interests engendered by the old policy—namely, the administrative, economic, and

infrastructural arrangements that the states had made based on FHWA's approval of prior State

Plans. Indeed, the Biondi Letter is again completely silent as to any reliance issues it considered

(if any). The Biondi Letter also does not demonstrate that FHWA considered any alternatives

beyond the wholesale rescission of the guidance and revocation of the State Plans. In their

opposition to Plaintiffs' motion here, Defendants only conclusorily assert that "FHWA [has not]

acted arbitrarily and capriciously." Dkt. No. 93 at 7. They ignore the substantive shortcomings of

the Biondi Letter as an instrument by which FHWA changed policy and instead focus on

FHWA's authority to make the change in the first place—that is, Defendants ignore the *why* and

---

[8] Plaintiffs assert that, because the IIJA's reference to "'other factors' that can influence the Guidance follow[s] more specific terms[, u]nder the principle of *ejusdem generis* [*sic*] . . . , the general term should be understood as a reference to subjects akin to the one with specific enumeration." Dkt. No. 5 at 16 (quoting *Norfolk &. Western Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991)). Defendants do not address this argument in their briefing. *See generally* Dkt. No. 93. Because the Court finds that Defendants' action was arbitrary and capricious for reasons aside from Defendants' alleged consideration of improper factors, the Court does not take up the question of how broad Congress intended the scope of these "other factors" to be.

[9] It is true that the Biden-era guidance on EV infrastructure did not incorporate positions regarding vaccine and mask mandates and federal immigration enforcement, two subjects of DOT's new policy and priorities. *See* Dkt. No. 93-1 at 34–35.

1  the *how* of their conduct and exclusively predicate their argument on the *what*. This is not

2  sufficient to survive arbitrary-and-capricious review.

3  Therefore, the Court finds that Defendants' action was likely arbitrary and capricious,

4  and that Plaintiffs are likely to succeed on their second cause of action.

5  **c.    *Third APA Claim: Not in Accordance with Law and Without Observance of Procedure Required by Law***

6

7  Under the APA, a court "shall . . . hold unlawful and set aside agency action, findings,

8  and conclusions found to be— (A) . . . not in accordance with law" or "(D) without observance

9  of procedure required by law." 5 U.S.C. § 706(2). Plaintiffs argue that Defendants violated the

10 APA by failing to abide by the IIJA's "specific procedures for the withholding or withdrawal of

11 NEVI funds." Dkt. No. 5 at 17. Defendants explain their conduct by characterizing it not as a

12 withholding or withdrawal of funds, but rather as an exercise of FHWA's authority to "guide

13 precisely how apportioned funds are utilized." Dkt. No. 93 at 18. But common sense counsels

14 against this characterization.

15 Defendants admit that they have instituted "a temporary pause on the distribution of

16 NEVI funds." Dkt. No. 93 at 28. Irrespective of what Defendants are doing concurrently with the

17 temporary pause—including "review[ing]" and "restructuring" NEVI Formula Program guidance

18 (*id.*)—the Court cannot interpret a "temporary pause" as anything other than the withholding of

19 funds. The faucet has been turned off. As discussed above, the IIJA prescribes specific

20 circumstances where the Secretary of Transportation may withhold or withdraw NEVI Formula

21 funds. *See supra* Section II.B.1.c. If a state has not submitted a plan, or if it has failed to take

22 action to carry out its plan, then funds may be withheld or withdrawn. 135 Stat. at 1422. But

23 Plaintiff States *have* submitted plans and *were* apportioned funds. *See, e.g.*, Dkt. No. 1-8. There

24 is no indication that the Secretary of Transportation has determined that any of the Plaintiff

States has failed to take action to carry out its plan. Regardless, FHWA instituted its "temporary pause." And even if the Secretary of Transportation had properly determined that it might be appropriate under the statute to withhold or withdraw funds, the statute required that 60 days' notice be provided to the states prior to any withholding or withdrawal of funds, "during which the States shall have an opportunity to appeal a decision to withhold or withdraw funds directly to the Secretary." 135 Stat. at 1422. There is no indication that, prior to the issuance of the Biondi Letter, any of this happened. Defendants' actions were thus not in accordance with the IIJA.

Therefore, the Court finds that Defendants' action was likely not in accordance with law and was performed without observance of procedure required by law. Plaintiffs are likely to succeed on their third cause of action.

### d. *Violation of Separation of Powers*

"The Constitution limits [the President's] functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). "Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress. Simply put, 'the President does not have unilateral authority to refuse to spend the funds.'" *City & County of San Francisco*, 897 F.3d at 1232 (quoting *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)). Plaintiffs assert that "Defendants' attempt to withhold NEVI funds from Plaintiff States [is a] violation of the clear language of the IIJA" and, therefore, violates the separation-of-powers doctrine. Dkt. No. 5 at 19. Quoting *City and County of San Francisco*, Plaintiffs assert that "Defendants 'claimed for themselves Congress's exclusive spending power,' while 'also attempting to coopt Congress's power to legislate.'" *Id.* (cleaned up) (quoting *City & County of San Francisco*, 897 F.3d at 1234)).

For Defendants' part, beyond a general assertion that Plaintiffs' separation-of-powers claim is meritless, their position here is somewhat confusing. Defendants direct most of their argument on the subject toward defending against a claim that they admit Plaintiffs have not actually alleged. *See* Dkt. No. 93 at 24 ("Defendants acknowledge that Plaintiffs have not explicitly pled an Impoundment Control Act claim."); *id.* at 21–26. Though well-reasoned and forcefully argued, Defendants' lengthy discussion on the inapplicability of Impoundment Control Act is irrelevant to the matter at hand.[10] What is more, Defendants' counsel conceded at oral argument that the Executive here has not attempted to utilize the Impoundment Control Act to propose rescinding the funds allocated by Congress. *See* Dkt. No. 109 at 39:12–13.

Other courts faced with similar issues have resolved separation-of-powers questions without recourse to the Impoundment Control Act. For example, in finding that the President had overstepped his Constitutional authority when he refused to spend Congressionally appropriated funds, the Ninth Circuit in *City and County of San Francisco* mentioned the Impoundment Control Act only in passing, and even then merely to demonstrate that in enacting the statute, "Congress ha[d] affirmatively and authoritatively spoken" on "the President's duty to execute appropriations laws." *City & County of San Francisco*, 897 F.3d at 1234. And in a recent case in this District regarding the Executive Branch's alleged interference with the distribution of Congressionally appropriated funds, the court no need to discuss the Impoundment Control Act. *See King County v. Turner*, No. C25-814, 2025 WL 1582368, at *14–25 (W.D. Wash. June 3, 2025).

---

[10] Plaintiffs cite the Impoundment Control Act to draw attention to "the general procedure by which the Executive may propose to Congress to either rescind or cancel funds" and to point out that that procedure is not applicable to the facts of this case. *See* Dkt. No. 5 at 19.

"The [Appropriations] Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.'" *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990)). Here, the complained-of funding freeze was conceived in Section 7(a) of the President's "Unleashing American Energy" Executive Order, not the IIJA. In the Executive Order, the President directed "[a]ll agencies [to] immediately pause the disbursement of funds appropriated through the . . . Infrastructure Investment and Jobs Act (Public Law 117–58), including but not limited to funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula Program . . . ." "Unleashing Am. Energy," 90 Fed. Reg. at 8357. As discussed above, Defendants gave effect to the President's order through the issuance of the Biondi Letter, which instituted the "temporary pause" in the NEVI Formula Program. *See* Dkt. No. 1-9. Under *City and County of San Francisco*, implementing the pause was an inappropriate seizure of Congress's budgetary authority: "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & County of San Francisco*, 897 F.3d at 1235. Observed from the other direction, "[t]here is sufficient evidence that, in implementing the funding freeze, the Agency Defendants withheld funding that Congress did *not* tie to compliance with the President's policy priorities in the . . . the Unleashing EO." *New York v. Trump*, 2025 WL 715621, at *11.

Therefore, the Court finds that Defendants' action likely violated the separation-of-powers doctrine, and that Plaintiffs are likely to succeed on their fourth cause of action.

1

2.    **Imminent/Irreparable Harm**

2

Plaintiffs must establish that they will likely suffer irreparable harm in the absence of

3

preliminary relief. *Winter*, 555 U.S. at 20. "Irreparable harm is traditionally defined as harm for

4

which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal.*

5

*v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent-A-Center, Inc. v. Canyon Television*

6

*& Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)).

7

Plaintiffs allege two kinds of irreparable harm:

8

> First, Defendants' actions interrupt and impede Plaintiff States'
> ongoing programs to deploy EV charging infrastructure, thwart

9

> policies these States adopted to combat climate change, reduce
> harmful pollution, broaden access to EVs, and create jobs. Second,

10

> Defendants' . . . actions increase Plaintiff States' administrative
> burdens in implementing the NEVI Formula Program and interfere

11

> with their ability to budget, plan ,and serve their residents.

12

Dkt. No. 5 at 20. Plaintiffs assert that "[n]either type of harm is compensable with money

13

damages," and that these harms "already have occurred and, absent entry of an injunction, will

14

continue." *Id.* Defendants present three arguments in opposition. First, Defendants assert that

15

"Plaintiffs waited too long to seek preliminary relief," which "implies a lack of urgency and

16

irreparable harm." Dkt. No. 93 at 26–27 (quoting *Miller ex rel. N.L.R.B. v. Cal. Pac. Med. Ctr.*,

17

991 F.2d 536, 544 (9th Cir. 1993)). Second, Defendants argue that "Plaintiffs' claimed economic

18

injuries are not irreparable," because "monetary injury is not normally considered irreparable."

19

*Id.* at 27 (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202

20

(9th Cir. 1980)). Third, Defendants argue that the injuries alleged by Plaintiffs "depend[] on an

21

attenuated chain of possibilities." *Id.* at 28. Defendants further question the likelihood that these

22

"potential" injuries will actually befall Plaintiffs. *Id.* at 28–29.

23

24

a.      *Lack of Urgency*

The Court rejects Defendants' contention that Plaintiffs are ineligible for relief here because they waited 12 weeks after the February 6, 2025, issuance of the Biondi Letter to request an injunction. *See* Dkt. No. 93 at 26–27. For one thing, courts are "loath to withhold relief solely on that ground." *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984). For another, Defendants baldly presume that the 12-week period between Defendants' letter and Plaintiffs' motion is, in fact, a "delay." But is the 12 weeks between the Biondi Letter and Plaintiffs' motion the appropriate time period to consider here and, if so, is it really too long? Defendants do not provide any authority indicating that it is, only a collection of caselaw that shows courts' general disfavor of "delays" when considering motions for preliminary injunctive relief that involved plaintiffs who moved for injunctions *years* after the challenged action. *See id.* at 27.[11]

Furthermore, Defendants provide no basis on which to conclude that 12 weeks is, in fact, properly considered a delay in the first place. Given this hole in Defendants' argument, the Court credits Plaintiffs' explanation of their timeline. First, even though the Biondi Letter issued February 6, 2025, "the magnitude of the potential harm" from the letter only became apparent later, on or about March 31, 2025, when FHWA confirmed to California that, "As a result of the [Biondi Letter] . . . , the NEVI formula program codes have been placed in 'expired' status. Thus, no funds are available for obligation." Dkt. No. 8 ¶ 11. Thus, "Plaintiffs filed suit—and immediately sought injunctive relief—only 37 days after FHWA confirmed it had rejected

---

[11] Defendants cite *Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (plaintiffs waited six years prior to moving for preliminary injunction); *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1375, 1377 (9th Cir. 1985) ("many years"); *Lydo Enters.*, 745 F.2d at 1211, 1213 (five years). Further, Defendants cite *Arc of California*, where the Ninth Circuit found that a three-month period between the passage of a statute and plaintiffs' moving for a preliminary injunction was not indicative of a lack of urgency on the plaintiffs' part. 757 F.3d at 990.

California's construction authorization request based on the FHWA Letter." Dkt. No. 99 at 17.

"Under such circumstances, waiting to file for preliminary relief until a credible case for

irreparable harm can be made is prudent rather than dilatory." *Arc of Cal.*, 757 F.3d at 991.

Therefore, Plaintiffs' purported "delay" does not negate a showing of irreparable harm.

The Court turns now to Plaintiffs' substantive allegations of harm.

### b. *Harm to EV Infrastructure Programs*

First, Plaintiffs argue that "Defendants' actions will cause significant irreparable harm by

arresting Plaintiff States' programs created to further their sovereign interests in protecting

residents' welfare, their economies, and the environment." Dkt. No. 5 at 20. Plaintiffs identify

concrete actions that they have taken "in reliance on [Congressional] support": "Plaintiff States

developed deployment plans, sought out private partnerships, conducted public outreach,

committed state tax dollars, and hired or redirected existing staff resources to carry out the NEVI

Formula Program." *Id.* at 21. Plaintiffs have awarded contracts, signed contracts, and

commenced—or are about to commence—construction on infrastructure projects. *Id.* Plaintiffs

argue that "Defendants' actions have halted these processes and threaten to scuttle projects—or

even entire state programs—altogether." *Id.* at 22.

In arguing that Plaintiffs' alleged harms are purely economic, and therefore redressable

with monetary damages, Defendants assert that Plaintiffs "have not established that a temporary

pause on the distribution of NEVI funds threatens the very existence of their projects." Dkt.

No. 93 at 28. The evidence submitted by Plaintiffs belies this assertion. For example:

- "As of February 6, 2025, 15 grant awards under the Wisconsin Department of Transportation's first RFP, representing $7.3 million, remain unobligated. Wisconsin is unable to continue work implementing these grant awards." Dkt. No. 26 ¶ 19. Wisconsin issued a second RFP in Spring 2025 but "does not have access to approximately $62.65 million of its remaining apportionment of NEVI Formula Program funding and cannot issue awards under the [second] RFP." *Id.*

- In Rhode Island,

> The suspension of the NEVI Program caused immediate
> disruption by causing the halt of the open application
> period, preventing Rhode Island from awarding funds to
> communities and public entities that had already invested
> time and resources preparing proposals. It forced the
> closure of an active grant opportunity that many applicants
> had already initiated or completed internal reviews for,
> delaying project pipelines. In addition, it created
> uncertainty for future programming, as staffing resources
> and strategic partnerships had been mobilized under the
> assumption of continued funding and plan stability.

Dkt. No. 24 ¶ 25.

- In California, an awardee of NEVI projects has lost site hosts with whom it "had letters of intent or memorandums of understanding," leaving the awardee with projects to build but, suddenly, no place to build them and resulting in "significant[] delay[s] or abandon[ment]." Dkt. No. 7 ¶ 20; *see* Dkt. No. 100 ¶ 6.

These are but three instances of harms alleged by Plaintiffs that cannot be rectified by Defendants simply disbursing funds on an indeterminate date in the future. Nor do they represent scenarios where Defendants' as-yet unscheduled resumption of the NEVI Formula Program will leave Plaintiffs where they were prior to its suspension.

In *AmeriCorps*, the court found irreparable harm where the federal government's funding freeze "directed an AmeriCorps-funded program to 'pause all activities.'" *AmeriCorps*, 2025 WL 1585051, at *34. "[O]rganizations that depend heavily on AmeriCorps funding to deliver essential services now face an immediate and critical threat to their operations, with many forced to significantly scale back or, in some cases, cease operations entirely." *Id.* (cleaned up). The cessation or termination of social programs, combined with the loss of personnel who have developed connections with the communities they serve, will lead to an "erosion of trust"; relationships "cannot simply be replaced or restarted without significant damage to the progress made . . . ." *Id.*

1    Similarly, the court in *Washington v. Trump* found "immediate and irreparable injuries"

2    where a funding freeze threatened "grants that are currently underway." 768 F. Supp. 3d at 1279.

3    Indeed, as Plaintiffs here assert, "[e]ven if Defendants eventually return to distributing funds as

4    required, that will not cure the delay and loss of industry confidence in States' NEVI

5    implementation programs." Dkt. No. 5 at 22. These harms are not, as Defendants insist,

6    "squarely economic in nature." Dkt. No. 93 at 28.

7        Defendants insisted at oral argument that, because the only action that the IIJA

8    contemplates is the distribution of money, any harm caused by Defendants' nondistribution will

9    be cured when (and if) money begins to flow. *See* Dkt. No. 109 at 36:11–13. But IIJA does not

10   merely distribute funds; money appropriated by the statute is apportioned, obligated, and

11   disbursed to pay for particular things, at particular times, in particular places. As California's

12   testimony makes clear, when an EV infrastructure project predicated on NEVI Formula funding

13   loses that funding—even, as Defendants insist, temporarily—that program runs the risk of dying

14   on the vine. Where a site host "decided not to enter into final agreements [with the state] once

15   they learned that NEVI funding was paused" and "instead pursued EV charging partners that

16   would be able to proceed without NEVI funding," the project can no longer be built in its

17   planned location. Dkt. No. 7 ¶ 20. "If the NEVI awardee cannot find a site host, its project will

18   be significantly delayed or abandoned," potentially "result[ing] in failure to achieve NEVI

19   requirements such as NEVI-compliant EV chargers every 50 miles along federally-approved

20   corridors." *Id.*

21       Consider a hypothetical situation where a government program seeks to encourage

22   farmers to cultivate a particular crop—say, wheat. In the winter, the government promises to pay

23   a farmer $1,000 for each acre of wheat under cultivation. Encouraged by the subsidy, a farmer

24   prepares a field for wheat, purchases fertilizer optimized for wheat cultivation, and contracts to

1    sell the crop to a local miller. But with planting season looming, the government advises that it

2    has "temporarily paused" the wheat subsidy: The $1,000-per-acre subsidy will not be distributed.

3    The farmer cannot afford to have a field lie fallow and, therefore, abandons wheat for a different

4    crop, albeit one not incentivized by a government subsidy—say, corn. The farmer purchases new

5    fertilizer and seeds, searches for a buyer for the old fertilizer, prepares the land for corn

6    cultivation, and pleads with the miller to modify the contract from wheat to corn. Then, after all

7    of this, the government restarts the wheat program and re-offers the subsidy. But even if the

8    farmer wants to go back to Plan A, it is too late. The farmer has purchased new fertilizer and new

9    seeds and has lost the contract with the miller. Perhaps most importantly, the field has been

10    committed to, fertilized, and sown with another crop; it cannot suddenly be switched back to

11    wheat simply because the government has pulled out its checkbook. So, too, with an EV

12    charging station originally sited in a prime location, then forced to relocate after its site host pulls

13    out of its NEVI-funded deal with the state. Just as the farmer cannot plant the wheat in the same

14    field as the corn, a state cannot have the original site back that has been recommitted to a

15    different entity. A new location must be found, administrative time and resources expended, and

16    a new arrangement with a new host worked out. This is not mere economic harm; it affects

17    "permit[ting] and rights-of-way," as well as the availability of "subcontractors and/or other

18    project partners." Dkt. No. 7 ¶ 21; *see* Dkt. No. 109 at 13:21–15:5 (describing various examples

19    of non-economic harm sustained by Plaintiff States); *see also AmeriCorps*, 2025 WL 1585051, at

20    *36 (finding irreparable harm where funding freeze forced organizations "to come up with

21    alternative programs to address gaps left by the withdrawal of funds and programs").

22                    ***c.    Increased Administrative Burden***

23                Plaintiffs assert that "[t]he budgetary confusion and uncertainty" caused by Defendants'

24    actions constitute further irreparable harm. Dkt. No. 5 at 23. Defendants attack this allegation

through a strawman argument, focusing exclusively on the "increased administrative costs" and "cost increases from delayed construction" that Plaintiffs include underneath the administrative-burden umbrella. Dkt. No. 93 at 28. The Court *conditionally* agrees with Defendants that the decrease in NEVI Formula funding available for actual EV infrastructure—a decrease caused by Plaintiffs' being forced to spend NEVI Formula funds on their respective administrative responses to the funding freeze—is an economic injury that could be addressed through monetary damages. *See* Dkt. No. 93 at 28. But the full extent of this injury could only be truly and fully redressed by the disbursement of funds above and beyond what Congress originally promised. After all, if a state solicits a request for proposals for an EV infrastructure project, then withdraws it, then—upon the re-availability of the funds—re-solicits it, the administrative cost has been doubled without any commensurate increase to the benefit: two solicitations undertaken, but only one project realized. That is to say, it is unfortunate and wasteful that, if and when the NEVI Formula Program resumes, Plaintiffs will find themselves with less money for construction, having been forced to draw down funds by taking actions necessary to respond to the loss of funds in the first place.

In identifying their respective injuries further, Plaintiffs also cite "operational harms," such as "increased staff time spent fielding industry inquiries, redesigning paused solicitations, or reconfiguring budgets." Dkt. No. 5 at 23. Plaintiffs assert further that "the interference with Plaintiff States' ability to budget, plan for the future, and properly serve their residents is itself an intangible, uncompensable harm." *Id.* at 24. The Court agrees. The "mitigating steps" that Plaintiffs have taken in response to the funding freeze—such as Washington's reassignment of its full-time NEVI employee and its cancelation of a second NEVI hire—constitute irreparable harm. *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (finding

1    irreparable harm where uncertainty caused by executive action "interfere[d] with [plaintiffs']

2    ability to budget, plan for the future, and properly serve their residents").

3          Finally, the Court notes Defendants' disingenuous assertion that Plaintiffs have

4    "recognize[d] that once Defendants resume NEVI Program fund distribution, their alleged injury

5    will be ameliorated." Dkt. No. 93 at 29. Plaintiffs have made no such recognition and have in

6    fact argued—and demonstrated—quite the opposite through their briefing, oral argument, and

7    submission of testimony from state transportation officials. *See* Dkt. No. 109 at 43:10–44:1. It is

8    telling that Defendants' opposition brief fails to address a single concrete instance of harm

9    alleged by any one of the Plaintiffs and instead relies on the categorical argument that all of

10    Plaintiffs' alleged harms are economic. Put another way, Defendants do not deny that their

11    actions have substantially harmed Plaintiffs. Rather, they simply assume that the costs will be the

12    same and insist that the Court can simply put a price tag on everything and send them a bill.

13          The Court disagrees and finds that Plaintiffs have sufficiently established the likelihood

14    that they will suffer irreparable harm without injunctive relief.

15        **3.**    **Balance of Equities/Public Interest**

16          When deciding whether to grant an injunction, "courts must balance the competing

17    claims of injury and must consider the effect of each party of the granting or withholding of the

18    requested relief." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017)

19    (quoting *Winter*, 555 U.S. at 24). The Court must also consider whether granting an injunction is

20    in the public interest. *Winter*, 555 U.S. at 20. These two factors merge when the federal

21    government is a party. *Roman*, 977 F.3d at 940–41. "The rule of law is secured by a strong

22    public interest that the laws 'enacted by their representatives are not imperiled by executive

23    fiat.'" *Washington*, 768 F. Supp. 3d at 1280 (quoting *E. Bay Sanctuary Covenant*, 932 F.3d at

24    779).

The balance of equities clearly tips in favor of Plaintiffs. In passing the IIJA, Congress made it the policy of the federal government to spend $5 billion in public funds on the "acquisition and installation of electric vehicle charging infrastructure." 135 Stat. at 1421. This statute has not been repealed, and thus Plaintiffs' argument that "[s]o long as Defendants continue to withhold NEVI funds, Plaintiff States will be unable to proceed with—and the public will not benefit from—full implementation of their plans to deploy EV charging infrastructure," carries substantial weight. Dkt. No. 5 at 26. As demonstrated in their imposition of a "temporary"—yet indefinite—"pause" on the NEVI Formula Program, Defendants' ongoing actions run counter to the expressed will of Congress. Moreover, as discussed above, the Court agrees that Defendants' actions have caused, and continue to cause, immediate and irreparable harm to Plaintiffs.

For their part, "Defendants do not have a legitimate interest in ensuring that funds are spent"—or, in this case, not spent—"pursuant to conditions that were likely imposed in violation of the APA and/or the Constitution." *King County*, 2025 WL 1582368, at *20 (citing *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (there is no legitimate government interest in violating federal law)). Moreover, the Court is unmoved by Defendants' argument that "granting the preliminary injunction that Plaintiffs seek would disrupt Defendants' efforts to finalize and promulgate NEVI guidance in accordance with current policies and priorities." Dkt. No. 93 at 29. This self-deprecating assertion is unreasonable. After issuing NEVI Formula Program guidance in 2022, FHWA managed to update it and reissue it in 2023, and again in 2024, without suspending the program altogether. Defendants argue, essentially, that under this administration, FHWA cannot walk and chew gum at the same time: The only way that the agency can properly re-examine, then re-issue, the guidance is if it is relieved of its responsibilities to administer the program. Given that FHWA had no problem doing this

1    simultaneously under the prior administration, and given the inefficiency of such a stop-start

2    approach to the administration of the agency's affairs, the Court is confident that the agency can

3    continue this feat of multitasking under the current administration.

4        Therefore, the balance of equities and public-interest factors tip in favor of Plaintiffs.

5    *    *    *

6        Having considered the applicable factors, the Court GRANTS IN PART and DENIES IN PART

7    Plaintiff's motion for a preliminary injunction as follows.

8    **C.    Scope of Injunction**

9        As a general rule, injunctions "should be limited to apply only to named plaintiffs where

10   there is no class certification . . . ." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486,

11   1501 (9th Cir. 1996). Here, Plaintiffs ask the Court to enjoin Defendants from: (1) suspending or

12   revoking approvals of Plaintiff States' State Electric Vehicle Infrastructure Deployment Plans;

13   (2) improperly withholding or withdrawing—i.e., not in accordance with the IIJA—NEVI

14   Formula Program funds from Plaintiff States; and (3) "effectuating" a categorical suspension or

15   termination of the NEVI Formula Program for Plaintiff States. Dkt. No. 5-2 at 2. Plaintiffs do not

16   seek nationwide relief or to enjoin Defendants from continuing their actions vis-à-vis non-

17   Plaintiff states. For their part, Defendants do not address the scope of Plaintiffs' requested

18   injunction.

19       It is, however, Plaintiffs' burden to establish irreparable harm as to *all* Plaintiffs who seek

20   injunctive relief. *See Allied Concrete & Supply Co. v. Brown*, No. C16-4830, 2016 WL 9275783,

21   at *4 (C.D. Cal. Oct. 18, 2016). Here, three Plaintiffs—the District of Columbia, Minnesota, and

22   Vermont—did not proffer any evidence—such as a declaration from a state (or District)

23   official—that demonstrates the irreparable harm that would befall them absent injunctive relief.

24   Although these three Plaintiffs, like the others, established sufficient *injury* to satisfy the ripeness

1  requirement, *see supra* Section IV.A.1, they have not provided any testimony, beyond what is

2  alleged in the complaint, that demonstrates, say, a delayed or canceled project, a budget thrown

3  into chaos, or a withdrawn request for proposals. Therefore, these Plaintiffs have not satisfied all

4  four *Winter* elements, and the Court cannot grant them the requested relief.

5        Given that the injunctive relief here will likely be rendered moot once Defendants follow

6  through on their stated intention to issue new NEVI Formula Program guidance that comports

7  with the current administration's policies, and states submit their new state deployment plans, the

8  Court is not overly concerned that certain Plaintiff States' deployment plans will for the near-

9  term future be active, while other states' deployment plans will remain revoked.[12] Presumably,

10  Defendants will issue new NEVI Formula Program guidance, at which point all states, plus the

11  District of Columbia, will be required to submit updated State Plans, just as they were required to

12  do under the former administration. *See* Dkt. No. 93 at 19.

13  **D.    Bond Requirement**

14        Defendants argue that, "should the Court be inclined to order any injunctive relief, the

15  Court should also order Plaintiffs to post security." Dkt. No. 93 at 30. Under Federal Rule of

16  Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining

17  order only if the movant gives security in an amount that the court considers proper to pay the

18  costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

19  But "[d]espite the seemingly mandatory language, 'Rule 65(c) invests the district court with

20  discretion as to the amount of security required, *if any*.'" *Johnson v. Couturier*, 572 F.3d 1067,

21  1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)). In

22  public-interest litigation where the court enjoins unlawful agency action, a "nominal" bond is

23

24

---

[12] In any event, the Court is not in a position to make any determination as to whether any non-Plaintiff states may suffer or have suffered immediate or irreparable harm, as that information is not before the Court.

appropriate, especially where, as here, the government-defendant fails to provide any evidence

that an injunction would impose a substantial cost. *Barahona-Gomez v. Reno*, 167 F.3d 1228,

1237 (9th Cir. 1999); *see U.S. Mission Corp. v. City of Mercer Island*, No. C14-1844, 2015 WL

540182, at *9 (W.D. Wash. Feb. 10, 2015) (setting "nominal" bond of $100.00). In

environmental cases, a nominal bond or bond waiver has been found to be appropriate in light of

"the important public interest in the enforcement of [federal environmental law]."

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir.

2016) (collecting cases). In recent cases where courts have enjoined federal-agency defendants,

bonds have been waived altogether. *See King County*, 2025 WL 1582368, at *20 (denying

enjoined federal-government defendants' request for bond); *AmeriCorps*, 2025 WL 1585051, at

*39 (same); *California*, 2025 WL 1711531, at *4 (waiving bond).

Here, the Court waives the imposition of any bond on Plaintiffs. The harm Defendants

seek to hedge against is "premature disbursement of funds." Dkt. No. 93 at 30. But given that

Defendants are obligated to distribute these funds under the IIJA to *someone*, the only harm

attendant to a "premature disbursement" does not redound to Defendants. Rather, at worst,

Defendants might someday, upon complying with the IIJA's procedural prerequisites for

withdrawing or withholding NEVI Formula funds, potentially divert such withdrawn or withheld

funds to other recipients as prescribed in the statute. The "harm" that Defendants actually

identify, then, is the nondistribution of withdrawn or withheld NEVI Formula funds to alternate

recipients. Such harm is speculative and attenuated and, moreover, only sustained, if at all, by

parties that cannot be identified at this time. In enjoining Defendants, the Court merely

"require[s] Defendants to adhere to the formula fund process contemplated by Congress, while

maintaining FHWA's normal, proper oversight role prior to any actual obligation or

disbursement." Dkt. No. 99 at 18 (citing *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir.

2013) (holding that federal government "cannot suffer harm from an injunction that merely ends an unlawful practice")).

**E.     Stay**

Defendants request that "if this Court does enter injunctive relief, that [such] relief be stayed for a period of seven days to allow the Solicitor General to determine whether to appeal and seek a stay pending appeal." Dkt. No. 93 at 30–31. Although the Court is mindful that, as Plaintiffs point out, Defendants' request is "cursory" (Dkt. No. 99 at 18), seven days is a short period of time. The Court thus STAYS the injunction for **seven (7) days, until July 1, 2025**, or until Defendants appeal this Order to the Ninth Circuit, whichever comes first.

## V.     CONCLUSION

Accordingly, Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 5) is GRANTED IN PART and DENIED IN PART. As to Plaintiffs Arizona, California, Colorado, Delaware, Hawaiʻi, Illinois, Maryland, New Jersey, New Mexico, New York, Oregon, Rhode Island, Washington, and Wisconsin, Plaintiffs' motion is GRANTED. As to Plaintiffs District of Columbia, Minnesota, and Vermont, Plaintiffs' motion is DENIED. It is further ORDERED:

(1)     Defendants and all their respective officers, agents, servants, employees and attorneys, and any person in active concert or participation with them who receive actual notice of this order are hereby fully ENJOINED from the following:

(a)     Suspending or revoking—or maintaining any current suspension or revocation of—previously-approved State Electric Vehicle Infrastructure Deployment Plans of Plaintiffs Arizona, California, Colorado, Delaware, Hawaiʻi, Illinois, Maryland, New Jersey, New Mexico, New York, Oregon, Rhode Island, Washington, and Wisconsin. These States' State Electric Vehicle Infrastructure Deployment Plans SHALL be restored to the legal status they were in prior to the February 6, 2025, issuance of the Biondi Letter; and

(b)     Withholding or withdrawing NEVI Formula Program funds for any such previously approved State Electric Vehicle Infrastructure Deployment Plans for any reason not set forth in the IIJA or

applicable FHWA regulations; or withholding or withdrawing NEVI Formula Program funds from a state without following the IIJA's substantive and procedural requirements, including by refusing to review and/or process requests for authorization to obligate funds for specific EV charging infrastructure development activities.

(2)    This injunction is STAYED for **seven (7) days, until July 1, 2025**. If Defendants do not appeal this Order, the injunction SHALL go into effect on **July 2, 2025**.

(3)    **Within five (5) days** of the lifting of the stay, Defendants' attorneys SHALL provide written notice of this Order to all Defendants and agencies and their employees or contractors with responsibility for administering the NEVI Formula Program. Defendants SHALL file a copy of the notice on the docket at the same time.

(4)    Upon the lifting of the stay, this preliminary injunction SHALL remain in effect pending further orders from this Court.

Dated this 24th day of June 2025.

Tana Lin
United States District Judge