1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON et al.,

                    Plaintiffs,

      v.

U.S. DEPARTMENT OF
TRANSPORTATION et al.,

                  Defendants.

SIERRA CLUB et al.,

Plaintiff–Intervenor–Movants,

      v.

U.S. DEPARTMENT OF
TRANSPORTATION et al.,

                  Defendants.

CASE NO. 2:25-cv-00848-TL

AMENDED[1] ORDER ON MOTION
TO INTERVENE

This matter is before the Court on a motion to intervene filed by several public interest organizations. Dkt. No. 76. The public interest organizations (collectively, "Movants") are the Sierra Club, Natural Resources Defense Council ("NRDC"), Climate Solutions, Southern Alliance for Clean Energy ("SACE"), CleanAIRE NC, West End Revitalization Association ("WERA"), and Plug In America. *See* Dkt. No. 76 at 6. The Plaintiff States "take no position on the motion" (*id.* at 7); Defendants oppose it (*see generally* Dkt. No. 102 (Defendants'

---

[1] Pursuant to the Court's Order (Dkt. No. 167) on Plaintiff–Intervenor Climate Solutions' Motion for Reconsideration (Dkt. No. 126), the Court AMENDS its July 23, 2025, Order (Dkt. No. 120) on Public Interest Organizations' Motion to Intervene as Party Plaintiffs (Dkt. No. 76).

opposition)). Having reviewed the motion, Defendants' response, Movants' reply (Dkt. No. 105), and the relevant record, the Court GRANTS the motion and allows Movants to intervene permissively under Federal Rule of Civil Procedure 24(b).

## I.    BACKGROUND

This case concerns the National Electric Vehicle Infrastructure ("NEVI") Formula Program, part of the 2021 Infrastructure Investment and Jobs Act ("IIJA"), Pub. L. 117–58, 135 Stat. 429. The Court recited the factual and legal background of Plaintiff States' complaint against the federal-government Defendants in a prior Order and will not duplicate those efforts here. *See* Dkt. No. 110 (order on motion for preliminary injunction) at 5–16. Relevant to the instant motion, "Movants are nonprofit public interest organizations working to reduce transportation-related pollution, accelerate [electric vehicle ("EV")] adoption, and promote an equitable EV transition." Dkt. No. 76 at 6. Movants assert that their respective members "are among the intended beneficiaries of the robust, reliable nationwide charging network the NEVI Formula Program was enacted to create." *Id.*; *see* Dkt. No. 110 at 6–7 (describing NEVI Formula Program). Movants seek to intervene in this case because "the outcome . . . may impair [their] ability to protect their interests" and "because no existing party adequately represents them . . . ." Dkt. No. 76 at 6.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 24 provides for two types of intervention: intervention as of right, *see* Fed. R. Civ. P. 24(a); and permissive intervention, *see* Fed. R. Civ. P. 24(b). Ninth Circuit courts interpret the requirements for intervention "broadly . . . in favor of intervention." *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004).

### A.    Intervention as of Right

Rule 24(a) provides:

> On timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

A potential intervenor of right under Rule 24(a)(2) must show that:

> (1) their motion is timely; (2) they have a "significantly protectable interest relating to the property or transaction which is the subject of the action"; (3) "the disposition of the action may as a practical matter impair or impede [their] ability to protect that interest"; and (4) their "interest is inadequately represented by the parties to the action."

*E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1001 (9th Cir. 2024) (quoting *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011) (en banc)) (alteration in original). A movant seeking to intervene as of right must satisfy all four requirements. *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003). Further, "an intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 440 (2017); *accord Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1172 (9th Cir. 2024).

## B.    Permissive Intervention

Under Rule 24(b)(1), "the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact."

"[A] court may grant permissive intervention where the applicant for intervention shows (1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common." *United States v. City of Los Angeles*, 288 F.3d 391, 403 (9th Cir. 2002) (quoting *Nw. Forest Res.*

*Council v. Glickman*, 82 F.3d 825, 839 (9th Cir. 1996)). "Once the conditions for permissive intervention are met, intervention rests in the sound discretion of the Court." *Nooksack Indian Tribe v. Zinke*, 321 F.R.D. 377, 382 (W.D. Wash. 2017) (citing *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998)). Unlike intervention as of right under Rule 24(a), it appears that permissive intervention under Rule 24(b) does not require that an intervenor maintain Article III standing. *See Emp. Staffing Servs., Inc. v. Aubry*, 20 F.3d 1038, 1042 (9th Cir. 1994) ("the requirement of a legally protectable interest applies only to intervention as of right under Rule 24(a), not permissive intervention under Rule 24(b)"); *but see California v. Health & Human Servs.*, 330 F.R.D. 248, 254 n.2 (N.D. Cal. 2019) (noting that the Supreme Court "has not addressed whether permissive intervenors are subject to the same [standing] requirement" as "intervenor[s] of right").

## III.    DISCUSSION

Movants assert that they are entitled to intervene as of right under Rule 24(a). *See* Dkt. No. 76 at 13. Alternatively, Movants argue that they have satisfied the standard under Rule 24(b) and that the Court should, in its discretion, grant permissive intervention. *See id.* at 18. The Court addresses each type of intervention in turn.

### A.    Intervention as of Right

#### 1.    Standing

First, Defendants argue (and Movants agree) that Movants seek broader relief than Plaintiff States, because Plaintiff States' claims are confined to their individual jurisdictions, whereas Movants' claims expand the scope of the issue to a national level. Dkt. No. 102 at 6–7; Dkt. No. 76 at 26; Dkt. No. 105 at 8. Therefore, the Court begins by examining whether Movants have standing under Article III. *See Town of Chester*, 581 U.S. at 440.

Movants, as public-interest organizations, assert associational standing. Dkt. No. 76 at 9; *see* Dkt. No. 102 at 7 ("[Movants] only claim to have associational standing."). An entity has Article III standing to sue on its members' behalf when it satisfies three elements: "(1) its individual members would have standing in their own right, (2) the interests at stake in the litigation are germane to the organization's purposes, and (3) the case may be litigated without participation by individual members of the association." *Airline Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074, 1078 (9th Cir. 2017) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). Further, parties seeking judicial review under the Administrative Procedure Act must "establish that they fall within the zone of interests of the relevant statute." *California v. Trump*, 963 F.3d 926, 941 (9th Cir. 2020) (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)). That is, the interest asserted by the party seeking judicial review "must be arguably within the zone of interests to be protected or regulated by the statute that [the party] says was violated." *Patchak*, 567 U.S. at 224 (quoting *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

a.    *Members' Standing to Sue in Their Own Right*

"To have standing in their own right, an association's members must have 'suffered an injury in fact,' that injury must be 'fairly traceable to the challenged conduct of the defendant,' and the injury must be 'likely to be redressed' by a decision in their favor." *Airline Serv. Providers Ass'n*, 873 F.3d at 1078. (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "The party invoking federal jurisdiction bears the burden of establishing standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013) (quoting *Defs. of Wildlife*, 504 U.S. at 561).

1              i.        Injury in Fact

2        Movants assert that Defendants' actions "harm[] Movants' members by impeding the

3   buildout of a nationwide EV charging network and denying them the program's intended

4   benefits, resulting in economic, health, consumer, and recreational injuries." Dkt. No. 76 at 9.

5   Movants describe these as "classic pocketbook, health, and consumer harms on Movants'

6   members." *Id.* at 11. For their part, Defendants characterize Movants' harm as Movants'

7   "members' generalized desire to reduce transportation-related air pollution," and this, they argue,

8   "cannot support standing." Dkt. No. 102 at 7. Defendants argue further that "generalized

9   anxieties associated with driving electric vehicles and general desire for more charging

10  infrastructure" cannot be deemed a cognizable injury. *Id.* at 9.

11       Under Ninth Circuit precedent, four Movants—the Sierra Club, NRDC, SACE, and Plug

12  In America—have alleged concrete and cognizable injuries based on their members' assertions

13  that "a probabilistic harm will materialize" as a result of Defendants' actions. *See Nat. Res. Def.*

14  *Council v. U.S. Env't Prot. Agency ("NRDC")*, 735 F.3d 873, 878 (9th Cir. 2013). Defendants'

15  blanket characterization of Movants' members' alleged harms as "generalized" does not

16  withstand scrutiny. Indeed, at least one member of each of the four aforementioned Movant

17  organizations has provided a declaration that alleges in detail a particularized harm that does not

18  become "general" merely because Defendants have labeled it as such.

19       The Court is guided here by a recent Ninth Circuit decision involving a citywide

20  ordinance that caused "probabilistic harm." In *California Restaurant Ass'n v. City of Berkeley*,

21  the California Restaurant Association ("Association") adequately established associational

22  standing to challenge a municipal ordinance that prohibited the installation of natural-gas piping

23  within newly constructed buildings. 89 F.4th 1094, 1098 (9th Cir. 2024). The Association

24  "explain[ed] that restaurants rely on natural gas for preparing certain foods and that many chefs

are trained only on natural gas stoves." *Id.* at 1100. Included within the Association's membership were "restauranteurs and chefs who do business or seek to do business in Berkeley." *Id.* The Association "allege[d] that one or more of its members would like to open or relocate a restaurant in a new Berkeley building completed after the Ordinance became effective . . . ," but "could not do so because of the Ordinance's ban on natural gas." *Id.* Given these allegations, the Ninth Circuit concluded that there was a "'credible threat' of a 'probabilistic harm,'" because "the Association's members c[ould] not open a restaurant in any new Berkeley building and use natural gas appliances." *Id.* (quoting *NRDC*, 735 F.3d at 878). It did not matter that "the Association ha[d]n't provided a date certain for any restaurant's opening night," because the city's action had "'increase[d] the threat of future harm to [the organization's] members.'" *Id.* (second alteration in original) (quoting *NRDC*, 735 F.3d at 878).

Here, Movants argue that "reduced access to NEVI-supported charging restricts highway mobility and use of EVs, raises travel and vehicle operating costs, and heightens health and environmental risks." Dkt. No. 76 at 11–12. This harm, as described by Movants' members, is analogous to the harm faced by the plaintiff's members in *California Restaurant Ass'n*. There, the Ninth Circuit found that in banning natural-gas piping, the City of Berkeley preemptively deprived Association members of a place to ply their trade in the city. *Cal. Rest. Ass'n*, 89 F.4th at 1100. Here, Defendants' actions will likely deprive Movants' members of the use of electric vehicles on public highways—particularly those designated by the Federal Highway Administration as alternative fuel corridors ("AFC"). A chef trained exclusively on gas appliances needs their kitchen to be outfitted with a gas stove. Likewise, an EV driver needs their roads to be equipped with reasonably accessible EV charging stations. This is borne out in testimony from Movants' members.

1    **Sierra Club** member Robert Cruickshank, for example, "drive[s] a fully electric 2024

2    Kia EV9." Dkt. No. 77 at 47 (Cruickshank Decl.) ¶ 6. Cruickshank, who lives in Seattle,

3    Washington, would like to drive his EV9 to the Oregon Coast and to Southern California. *Id.*

4    ¶¶ 1, 8. Both trips would include stretches along Interstate 5, which has been designated as an

5    AFC. *Id.* ¶ 8; *see* 23 U.S.C. § 151. Under the IIJA, all "electric vehicle charging infrastructure

6    acquired or installed with [NEVI Formula] funds shall be located along a designated alternative

7    fuel corridor." 135 Stat. at 1423. Prior to Defendants' freezing of the NEVI Formula program,

8    Cruickshank intended to utilize this as-yet unrealized infrastructure. *See* Dkt. No. 77 at 48 ¶ 12.

9    As of May 15, 2025, Cruickshank "ha[d] yet to drive [his] kids to the Oregon Coast and [had]

10   only visit[ed his] family in Southern California by plane because of the lack of charging

11   infrastructure." *Id.* at 47 ¶ 8.

12        Defendants' freezing of the NEVI Formula program has now left Cruickshank unsure

13   "what charging infrastructure is going to look like" and "has left [him] wondering whether [his

14   EV] is going to be as useful as [he] thought it would be when [he] bought it." *Id.* at 47–48 ¶ 11.

15   Without the NEVI Formula Program, the AFCs he intended to drive on might remain

16   inaccessible. But "[i]f the NEVI program were unfrozen," and the EV infrastructure built out

17   along Interstate 5 as envisioned by the IIJA, Cruickshank "would use [his] EV to travel down to

18   the Oregon Coast and all the way to Southern California, along with other trips around

19   Washington." *Id.* at 48 ¶ 12. Cruickshank is like a Berkeley restauranteur whose prospects for

20   opening an establishment in the city have been torpedoed by the natural-gas ordinance.

21   Cruickshank's intention of effectively driving from Seattle to Los Angeles along a public AFC

22   one day have been harmed by Defendants' actions in this case, just like a chef's intention of

23   effectively sauteing onions in a commercial Berkeley kitchen were harmed by the defendant's

24   actions in *California Restaurant Ass'n*.

**Natural Resources Defense Council** member Marisa McCurdy, a resident of Elkridge, Maryland, purchased a Kia EV9 with the "expectation . . . that the availability and reliability of charging infrastructure could continue to improve," given that "the federal government had passed legislation to fund additional charging infrastructure." Dkt. No. 77 at 179 (McCurdy Decl.) ¶ 6. In light of Defendants' freeze of the NEVI Formula program, however, McCurdy is "concerned that . . . Maryland and other states have been unable to build new charging stations along the highway corridors [she] use[s] and would like to use." *Id.* at 180 ¶ 9. Where EV infrastructure is insufficient, McCurdy uses a "much smaller and less comfortable car for road trips," but "[i]f more chargers are built and charger reliability improves, [she] will take more road trips with [her] EV9." *Id.* at 179–80 ¶ 7. Like Cruickshank's, McCurdy's utilization of public highways and enjoyment of her vehicle have been harmed by Defendants' actions.

Ann Timberlake, a member of both the **Southern Alliance for Clean Energy** and the Sierra Club, lives in Caesar's Head, South Carolina. Dkt. No. 77 at 275 (Timberlake Decl.) ¶¶ 1–2. Timberlake drives a "fully electric Hyundai IONIQ 5." *Id.* at 277 ¶ 13. Timberlake avers that "the lack of federal money for building a network of electric vehicle charging stations leaves [her] uncertain about [her] ability to rely on [her] electric vehicle in the near-term." *Id.* at 280 ¶ 25. In March 2025, Timberlake and her husband evacuated their home in South Carolina and drove to Michigan after wildfires threatened their safety, "embark[ing] on a route through South Carolina, North Carolina, Tennessee, Kentucky, Ohio, and Indiana." *Id.* at 278 ¶ 17. On her trip, Timberlake "learned the hard way that charging [her] electric vehicle away from home is even more of a challenge than anticipated because of the lack of standardized chargers, even along interstate highways." *Id.* at 279 ¶ 23. Timberlake asserts that if she "knew [she] could find a standard and reliable fast charger every 50 miles through the NEVI Program, [she] would be able to travel more easily and with less worry." *Id.* Timberlake avers that she has learned from

experience that Defendants' "indefinite suspension of NEVI Program funding . . . undermines [her] ability to evacuate in [her] electric vehicle in an emergency. . . . Without a reliable network of highway charging infrastructure, as promised by the NEVI program, [she] do[es] not feel confident about evacuating in [her] electric vehicle under the threat of a natural disaster." *Id.* at 280 ¶ 24.

Kent Minault, a member of **Plug In America**, the Sierra Club, and SACE, lives in Knoxville, Tennessee. Dkt. No. 77 at 187 (Minault Decl.) ¶¶ 1–2. Minault drives an electric vehicle, as do his daughter, son-in-law, and grandson. *Id.* at 187 ¶ 2. Minault asserts that he "rel[ies]" on "[p]ublic fast charging stations . . . to make electric driving possible." *Id.* at 189 ¶ 9. But he has had difficulties with the existing network of charging stations, finding them "blocked, broken, or requir[ing] confusing apps or membership just to start a session." *Id.* Minault states that the "NEVI Program makes sure there's a charging station every 50 miles on the key corridors [he] use[s]," which is a "direct benefit to [him] and [his] family." *Id.* at 189 ¶ 10. "Back in 2024," Minault avers, "Tennessee had selected 30 sites for development under Round 1 of the NEVI program, and planned to select more sites in future rounds." *Id.* at 191 ¶ 18. But "none of those projects—including multiple on the corridors [he] regularly travel[s] (I-40, I-75, US 64)— had been obligated before the NEVI funding freeze, meaning they're now stalled indefinitely." *Id.* Defendants' actions threaten to deprive Minault, like the other declarants discussed above, of his ability to drive his electric vehicle on public highways that, until recently, he had expected to be able to accommodate him.

Further, members of these organizations face higher transportation costs due to their inability to rely on their EVs where EV infrastructure is lacking. Defendants' actions will likely prolong this issue—and thus likely increase the economic harm suffered by Movants' members—by denying funding for that necessary infrastructure. Movants present testimony

asserting that EVs are cheaper to operate on a per-mile basis than internal-combustion-engine vehicles. *See, e.g.*, Dkt. No. 77 at 87 (Erb Decl.) ¶¶ 11, 13. "The freeze of the NEVI Formula Program . . . impedes [Sierra Club members'] ability to realize the fuel and maintenance cost savings associated with EV ownership . . . ." Dkt. No. 77 at 108 (Garcia Decl.) ¶ 10. Plug In America's executive director testifies that, "By cutting off [NEVI] funding, chargers become more expensive to deploy, and those costs are passed on to consumers . . . ." Dkt. No. 77 at 169 (Levin Decl.) ¶ 14. Even though SACE member Michael Kevin Heyman asserts that he "spend[s] nothing on [his] EV" with respect to maintenance and gas, and that powering his EV with electricity "feels practically free," he relies on an internal-combustion-engine vehicle when he travels "along corridors that were slated to receive [NEVI]-funded charging stations every 50 miles." Dkt. No. 77 at 120 (Heyman Decl.) ¶¶ 8, 11. The NEVI funding freeze necessarily delays Heyman's ability to eventually take advantage of savings afforded by his EV when he drives along those routes. Similarly, NRDC member Phyllis Blumberg must use her internal-combustion-engine vehicle on long-distance travel through "charging deserts," an imperative that NEVI funding would mitigate—and that is indefinitely prolonged by Defendants' actions. *See* Dkt. No. 77 at 30 (Blumberg Decl.) ¶ 10.

Two Movants, however—CleanAIRE NC and WERA—have not provided declarations from members who already own EVs. Although these organizations provide testimony from members who *would like* to purchase EVs (*see, e.g.*, Dkt. No. 77 at 302 (White-Williamson Decl.) ¶ 13; Dkt. No. 77 at 310 (Ayo Wilson Decl.) ¶¶ 14–15), these individuals are distinguishable from those declarants who have already bought EVs and drive them regularly. In *California Restaurant Ass'n*, the Ninth Circuit highlighted the Association's allegation "that its members would open or relocate a restaurant in a new building in Berkeley *but for* the City's ban on natural gas." *Cal. Rest. Ass'n*, 89 F.4th at 1100 (emphasis added). In that case, the

1    Association had noted that its member restaurants (already) "rely on natural gas for preparing

2    certain foods and that many chefs are trained only on natural gas stoves." *Id.* In contrast, a driver

3    who still drives an internal-combustion-engine vehicle does not—and, until they purchase an EV,

4    would not—rely on EV charging infrastructure. Their use of EV infrastructure along AFCs is not

5    *entirely* predicated upon the existence of that EV infrastructure, because even if that

6    infrastructure were built, they would still need to obtain an EV in order to use it. Put differently,

7    an AFC's lack of charging infrastructure is not the but-for cause of these declarants' inability to

8    drive an EV on that AFC. This places these declarants' harm beyond that of the EV-owning

9    declarants, and beyond the acceptable scope of cognizable injury that the Ninth Circuit

10   recognized in *California Restaurant Ass'n.*

11          The Court thus finds that four of the Movants—the Sierra Club, NRDC, SACE, and Plug

12   In America—have adequately established injury-in-fact.

                                    ii.    <u>Fairly Traceable</u>

14          The second element of standing requires that a plaintiff's alleged injury be "fairly

15   traceable to the challenged conduct of the defendant." *Spokeo, Inc.*, 578 U.S. at 338. Defendants

16   assert that Movants "cannot identify any downstream projects that have been impacted by

17   Defendants' actions and that have cause [*sic*] them any direct harm." Dkt. No. 102 at 10. But

18   Movants have done just that. The Supplemental Garcia Declaration (Dkt. No. 106) includes a

19   table that identifies "charging stations planned for deployment under [a] State's NEVI Plan"—

20   i.e., "downstream projects"—that, upon completion, would be utilized by Movants' members. *Id.*

21   at 4–7. These projects would be built (or upgraded) along "corridors the named declarants intend

22   to use for electric vehicle travel." *Id.* at 3 ¶ 7. Jeff Schumann, for example, is a resident of

23   Croton-on-Hudson, New York, and is a member of the Sierra Club. *See* Dkt. No. 77 at 246

24   (Schumann Decl.) ¶¶ 1–2. Schumann asserts, "We would . . . be able to use our EV to travel

1    further south to the Pennsylvania, West Virginia, and Washington, DC areas via highways such

2    as I-87 and I-95, if there were more fast charging stations available." *Id.* at 247 ¶ 7. Such travel

3    would take Schumann through New Jersey on Interstate 95, where the state has plans to use

4    NEVI Formula funds to construct charging stations. *See* Dkt. No. 17-1 (Patel Decl. Ex. A) at

5    128, 137. Defendants' actions have rendered it impossible for New Jersey to move forward with

6    these plans, thus depriving Schumann of his intended route through that state. *See* Dkt. No. 17

7    (Patel Decl.) ¶¶ 18–19.

8         This fact pattern fits into the *California Restaurant Ass'n* framework. If the highways

9    along which charging stations will not be built are the Berkeley buildings where natural-gas

10   piping has been banned, then Movants' EV-owning members are the chefs and restauranteurs

11   who, consequently, cannot open restaurants there. But for Defendants' decision to freeze the

12   NEVI Formula Program, these projects—which are predicated on their home states' receipt of

13   NEVI Formula funds—would be constructed, and Movants' members would use them. This

14   cause-and-effect satisfies the "fairly traceable" requirement of the standing inquiry. *See Sywula*

15   *v. Teleport Mobility, Inc.*, 652 F. Supp. 3d 1195, 1221–22 (S.D. Cal. 2023) (finding the "fairly

16   traceable" requirement "akin to but-for causation") (citing *Adam v. Barone*, 41 F.4th 230, 235

17   (3d Cir. 2022)).

                              iii.      <u>Redressability</u>

19        Movants assert that "[v]acating Defendants' actions and restoring NEVI funding would

20   redress Movants' injuries by allowing continued buildout of the nationwide fast-charging

21   network." Dkt. No. 76 at 12. For their part, Defendants do not contest Movants' redressability

22   argument. *See* Dkt. No. 102 at 10. The Court treats this silence as a concession that Movants'

23   assertions have merit. *See Rintoul v. Old Dominion Freight Line, Inc.*, No. C21-1733, 2024 WL

24   2974469, at *2 (D. Or. June 13, 2024) ("Generally, the failure to respond to an argument on its

1    merits is grounds for deeming that argument abandoned or conceded.") (citing *Ramirez v.*

2    *Ghilotti Bros.*, 941 F. Supp. 2d 1197, 1210 & n.7 (N.D. Cal. 2013) (collecting cases)).

3    Regardless, Movants' satisfaction of the "fairly traceable" requirement suffices to satisfy the

4    redressability requirement. *See Washington v. Trump*, 766 F. Supp. 3d 1138, 1147 (W.D. Wash.

5    2025) (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ("If a

6    defendant's action causes an injury, enjoining the action or awarding damages for the action will

7    typically redress that injury.")).

8                              iv.      Zone of Interests

9            The "zone of interests test is 'not especially demanding' in the APA context." *California*

10   *v. Trump*, 963 F.3d at 941 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572

11   U.S. 118, 130 (2014)). "[A] plaintiff can satisfy the test in either one of two ways: (1) 'if it is

12   among those [who] Congress expressly or directly indicated were the intended beneficiaries of a

13   statute,' or (2) 'if it is a suitable challenger to enforce the statute—that is, if its interests are

14   sufficiently congruent with those of the intended beneficiaries that the litigants are not more

15   likely to frustrate than to further . . . statutory objectives.'" *Id.* at 941–42 (omission in original)

16   (quoting *Scheduled Airlines Traffic Offs., Inc. v. Dep't of Def.*, 87 F.3d 1356, 1359 (D.C. Cir.

17   1996)).

18           Defendants argue that "[t]he NEVI Program merely controls the funding relationship

19   between the federal government and the States and provides no legal interests to purported

20   beneficiaries of the effects of State electric vehicle projects." Dkt. No. 102 at 11. Therefore,

21   Defendants conclude, Movants "are not within the NEVI statute's zone of interest and cannot use

22   its provisions to establish standing." *Id.* Movants point out that the zone-of-interests test "'is not

23   meant to be especially demanding' and must be applied 'in keeping with Congress's evident

24   intent when enacting the APA to make agency action presumptively reviewable.'" Dkt. No. 105

at 6 (quoting *Patchak*, 567 U.S. at 224–25). And *both* Defendants and Movants recognize that the test precludes judicial review "only when a plaintiff's interests are . . . marginally related to or inconsistent with the purposes implicit in the statute." *Id.* (omission in original) (quoting *Patchak*, 567 U.S. at 225); Dkt. No. 102 at 11 (quoting *Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950, 955 (D.C. Cir. 2000)).

A primary purpose of the NEVI Formula Program provision of the IIJA is "to provide funding to States to strategically deploy electric vehicle charging infrastructure . . . ." 135 Stat. at 1421. This is also the primary purpose of Movants' proposed complaint-in-intervention. *See generally* Dkt. No. 76-1. Movants' express intent in seeking to unfreeze the NEVI Formula Program—i.e., that money flow from the federal government to the states—is certainly consistent with the purposes implicit in the statute. Defendants' argument that Movants fail the test because the statute "provides no legal interests to purported beneficiaries of the effects of State electric vehicle projects" is simply an attempt to make the not-especially-demanding test more demanding. Defendants provide no authority for their position and, as mentioned above, actually cite authority that cuts against their argument. *See* Dkt. No. 102 at 11. Movants have met the zone-of-interests requirement.

Accordingly, four Movants—Sierra Club, NRDC, SACE, and Plug In America—have established that that their members would have standing to sue Defendants in their own right.

### b.    *Germane to Organization's Purpose*

Movants assert that "[t]he interests they seek to protect are germane to their organizational purposes—promoting EV adoption and reducing transportation-related air pollution . . . ." Dkt. No. 76 at 12. Defendants do not directly address Movants' assertion, and they assert that "the infrastructure built pursuant to the NEVI Program may implicate the Organizations' general policy goals . . . ." Dkt. No. 102 at 11. The Court accepts Defendants'

1   failure to rebut Movants' argument as a concession that it has merit. *See Rintoul*, 2024 WL

2   2974469, at *2. But even without Defendants' concession, it is clear that construction of EV

3   infrastructure is sufficiently related to Movants' organizational purposes for the purpose of

4   establishing associational standing. The Sierra Club's advocacy "to accelerate the adoption and

5   use of zero-emission EVs . . . includes support for policies and programs that lower barriers to

6   EV use—such as improving access to reliable EV charging infrastructure." Dkt. No. 76-1 ¶ 13.

7   The NRDC "advocates for building a more resilient transportation system with zero emission

8   vehicles . . . ." *Id.* ¶ 14. SACE "works to accelerate the transition to electric transportation by

9   promoting clean, electric vehicles and improving EV charging infrastructure." *Id.* ¶ 16. And Plug

10  In America is "committed to accelerating the transition to plug-in electric vehicles powered by

11  clean, affordable, domestic electricity," providing "resources to help consumers across the

12  country choose suitable EVs, understand charging options, and navigate incentives." *Id.* ¶ 19.

13      The asserted purposes of Movants' organizations dovetail with the stated purpose of the

14  NEVI Formula Program—i.e., "to provide funding to States to strategically deploy electric

15  vehicle charging infrastructure and to establish an interconnected network to facilitate data

16  collection, access, and reliability." 135 Stat. at 1421. Because Movants' purpose in intervening in

17  this case is to compel Defendants to execute the NEVI Formula Program as the IIJA prescribes,

18  it is clear that they seek to protect interests germane to their organizational purposes.

19                  **c.      *Litigation Without Participation of Members***

20      Movants assert that "neither the claims nor the relief sought requires individual member

21  participation." Dkt. No. 76 at 12–13. Defendants do not rebut Movants' assertion, thereby

22  conceding that it has merit. *See Rintoul*, 2024 WL 2974469, at *2. Moreover, "Where, as here,

23  associational plaintiffs do not seek individualized relief for their members that would require

24  individualized proof, the participation of individual members is not required." *S.F. Baykeeper v.*

*W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 752 (N.D. Cal. 2011) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343–44 (1977)). Movants here seek declaratory, injunctive, and mandamus relief. *See* Dkt. No. 76-1 at 34–35. None of the requested relief is particular or individualized to any specific member of the Movant organizations. Therefore, Movants can litigate this case without the participation of their individual members, and this element of associational standing is satisfied.

### 2.    Rule 24(a) Factors

Having established that four Movants have Article III standing, the Court turns to the four requirements for intervening as of right.

#### a.    *Timeliness*

First, the motion to intervene must be timely. *E. Bay Sanctuary Covenant*, 102 F.4th at 1001. "Timeliness is a flexible concept; its determination is left to the district court's discretion." *Alisal Water Corp.*, 370 F.3d at 921. "Three factors should be evaluated to determine whether a motion to intervene is timely: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Cal. Dep't of Toxic Substances Control v. Com. Realty Projects, Inc.*, 309 F.3d 1113, 1119 (9th Cir. 2002). Here, Movants sought to intervene only 15 days after Plaintiff States filed their complaint. *Compare* Dkt. No. 76, *with* Dkt. No. 1 (complaint). Defendants concede that Movants "moved to intervene shortly after this case was filed" and do not present any arguments that the motion was untimely or that intervention would be prejudicial. Dkt. No. 102 at 12. This case is still in its early stages: Defendants have not answered the complaint, and no dispositive motions have been filed. Movants' motion to intervene is therefore timely. *See Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 162 F. Supp. 3d 1053, 1056 (C.D. Cal. 2014) (finding

1    motion to intervene timely where "[n]o Defendant has answered the complaint and no dispositive

2    motions have been filed").

3                    **b.**    ***Significantly Protectable Interest***

4          Second, the applicant must claim a "significantly protectable" interest relating to the

5    property or transaction which is the subject of the action. *E. Bay Sanctuary Covenant*, 102 F.4th

6    at 1001. "An applicant has a 'significant protectable interest' in an action if (1) it asserts an

7    interest that is protected under some law, and (2) there is a 'relationship' between its legally

8    protected interest and the plaintiff's claims." *City of Los Angeles*, 288 F.3d at 398 (quoting

9    *Donnelly*, 159 F.3d at 409). "The relationship requirement is met 'if the resolution of the

10   plaintiff's claims actually will affect the applicant." *Id.* (quoting *Donnelly*, 159 F.3d at 410).

11   "The 'interest' test is not a clear-cut or bright-line rule, because '[n]o specific legal or equitable

12   interest need be established.'" *Id.* (quoting *Greene v. United States*, 996 F.2d 973, 976 (9th Cir.

13   1993) (alteration in original)).

14         Movants argue that they have a significantly protectable interest here because "[t]heir

15   members seek access to the nationwide EV charging network the NEVI Formula Program was

16   created to support." Dkt. No. 76 at 14. "Movants also played a key role in advocating for NEVI's

17   inclusion in the Infrastructure Investment and Jobs Act and have participated extensively in

18   administrative proceedings and stakeholder efforts related to its implementation." *Id.* at 15.

19   Defendants counter by asserting that "[b]ecause the [Movants] do not have *any* statutory rights

20   that could feasibly be impaired by the outcome of this case, they are not entitled to intervene as

21   of right." Dkt. No. 102 at 13.

22         But Defendants' invocation of "statutory rights" is a red herring. "[I]nterests less plainly

23   protectable by traditional legal doctrines [have] sufficed for intervention of right." *Sierra Club v.*

24   *U.S. Env't Prot. Agency*, 995 F.2d 1478, 1482 (9th Cir. 1993). Public-interest organizations have

a right to intervene in cases that directly implicate causes or issues that they have "supported"—e.g., a ballot measure—or "championed"—e.g., the Equal Rights Amendment to the Constitution. *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 527 (9th Cir. 1983). In reviewing other Ninth Circuit cases where public-interest organizations had intervened as of right, the *Sagebrush Rebellion* court first cited *Washington State Building and Construction Trades Council, AFL-CIO, v. Spellman*, 684 F.2d 627 (9th Cir. 1982), where the underlying issue was a state ballot initiative that voters had approved, but which was ultimately preempted by the Supremacy Clause of the United States Constitution. In *Spellman*, the Ninth Circuit held that "the public interest group that sponsored the initiative[] was entitled to intervention as a matter of right under Rule 24(a)." 684 F.2d at 630. The *Sagebrush Rebellion* court then cited *Idaho v. Freeman*, 625 F.2d 886 (9th Cir. 1980), where "the National Organization for Women had the right to intervene in a suit challenging procedures for ratification of the proposed Equal Rights Amendment to the Constitution of the United States, a cause which that organization had championed." *Sagebrush Rebellion*, 713 F.2d at 527. The *Sagebrush Rebellion* Court reiterated that the Ninth Circuit had not had "any difficulty determining that the organization seeking to intervene had an interest in the subject of the suit . . . ." *Id.* That is, an organization's political investment in the subject matter of the case—the NEVI Formula Program, in this instance—is a significantly protectable interest such that intervention as of right is appropriate.

Moreover, Defendants' characterization of the Movants' interest in the NEVI Formula Program as "general advocacy" is not accurate. Dkt. No. 102 at 14. Movants have, *inter alia*, provided comments and testimony from organization officials that demonstrates their participation in establishing minimum standards for NEVI-funded charging stations during the rulemaking process, as well as their engagement in state-level stakeholder processes to help shape States' plans for infrastructure deployment under the NEVI Formula Program. *See* Dkt.

No. 77 at 107 (Garcia Decl.) ¶ 8 ("[The Sierra Club] submitted comments during the Federal

Highway Administration's rulemaking process to establish minimum standards for NEVI-funded

charging stations, as well as in response to FHWA's request for public input on its NEVI

program guidance."); Dkt. No. 77 at 116 (Hammon Decl.) ¶ 9 ("NRDC and [its] allies submitted

comments to FHWA on the agency's proposed NEVI minimum standards . . . [and] monitored

and supported the States' NEVI planning and implementation efforts."); Dkt. No. 77 at 167

(Levin Decl.) ¶ 9 ("In response to [FHWA's] initial Request for Information, [Plug In America]

submitted a 30-page comment covering every element of implementation, including

affordability, cybersecurity, siting, equity, and long-term reliability."); Dkt. No. 77 at 268 (Smith

Decl.) ¶ 9 ("[SACE] [has] participated in federal implementation discussions, including creation

of the Federal Highway Administration's NEVI guidance, and spoken at conferences hosted by

the Joint Office of Energy and Transportation . . . to ensure Southeast-specific needs are

addressed.").

    None of this is mere "general advocacy." These actions represent substantial and specific

participation in administrative rulemaking regarding the implementation of the NEVI Formula

Program as well as a significant investment of Movants' resources in the adoption and

implementation of the NEVI Formula Program. Therefore, Movants have demonstrated that they

maintain a significantly protectable interest in the subject of this litigation.

### c.    *Impairment or Impediment of Ability to Protect Interest*

    Third, the party seeking to intervene must be so situated that the disposition of the action

may as a practical matter impair or impede its ability to protect its interest. *E. Bay Sanctuary

Covenant*, 102 F.4th at 1001. The standard here is possibility, not certainty. *See City of Los

Angeles*, 288 F.3d at 401. "If an absentee would be substantially affected in a practical sense by

the determination made in an action, he should, as a general rule, be entitled to intervene . . . ."

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011) (quoting Fed. R. Civ. P. 24 advisory committee's note to 1966 amendment). This element is closely linked to the second element. *See California ex rel. Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006) ("Having found that appellants have a significant protectable interest, we have little difficulty concluding that the disposition of this case may, as a practical matter, affect it.").

Movants argue that "[t]he relief sought in [their] Complaint-in-Intervention is essential to safeguarding their interest, which could be directly and adversely affected if they are not permitted to participate in this litigation." Dkt. No. 76 at 15. For their part, Defendants do not address this factor in their opposition, thus conceding that Movants' position has merit. *See Rintoul*, 2024 WL 2974469, at *2.

Given Movants' concern with respect to construction of EV infrastructure, a disposition in favor of Defendants here would impair or impede Movants' interests. This case is about freeing up funding to build out EV infrastructure that Movants have demonstrated is a primary purpose of their organizations. Permitting Defendants to continue to withhold funds for EV infrastructure would frustrate Movants' essential purposes. Therefore, Movants' interests could be impaired or impeded by disposition of this case in their absence.

### d.    *Inadequate Representation*

Fourth, the party seeking to intervene must be inadequately represented by the parties to the action. *E. Bay Sanctuary Covenant*, 102 F.4th at 1001. A court considers three factors in determining the adequacy of representation:

> (1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments;
> (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect.

*Arakaki*, 324 F.3d at 1086 (citing *California v. Tahoe Reg'l Planning Agency*, 792 F.2d 775, 778 (9th Cir. 1986)). Of these, the third is "the most important factor." *Id.* "Where the party and the proposed intervenor share the same 'ultimate objective,' a presumption of adequacy of representation applies, and the intervenor can rebut that presumption only with a 'compelling showing' to the contrary." *Id.* at 951 (quoting *Arakaki*, 324 F.3d at 1086).

Movants necessarily seek relief for a broader geographic scope than Plaintiff States, because each Plaintiff State's interest is confined to its individual jurisdiction. *See* Dkt. No. 76 at 26; Dkt. No. 105 at 8. Notably, in arguing that Movants do not have standing to intervene, Defendants admitted as much. Dkt. No. 102 at 6–7. Having acknowledged that Movants "expand the requested relief to a national level" (*id.* at 7), Defendants cannot logically take the position that the present Parties will "undoubtedly make all of the [Movants'] arguments," or that Movants will not offer any necessary elements to the proceeding that the Plaintiff States will neglect. After all, Plaintiff States and Movants approach the issues of this case from different directions. Under the IIJA, the NEVI Formula Program is conceived of as a *national* program— that is, indeed, the Program's first name. But each Plaintiff State is, understandably, primarily interested in its respective slice of the pie. Plaintiff States have provided declarations from state officials that reference individual projects and funding earmarked for their respective states, while Movants have provided declarations from members who intend to utilize the Program's infrastructure on multiple roads, in multiple states. *Compare, e.g.*, Dkt. No. 23 (Pietz Decl.) ¶ 16 (describing Oregon's plans for EV infrastructure on Interstate 5, Interstate 205, and U.S. Highway 97), *with* Dkt. No. 77 at 88 (Erb Decl.) ¶ 14 (describing a 5,000-mile road trip through eight states). The record demonstrates that Movants will present different perspectives than the Plaintiff States, and they are perspectives that Movants cannot count on Plaintiff States to share or present to the Court.

\*      \*      \*

Therefore, having considered the applicable factors, the Court finds that intervention as of right is appropriate for Movants Sierra Club, NRDC, SACE, and Plug In America.

## B.      Permissive Intervention

Even though the Court has not found that all Movants can intervene as of right, the Court nevertheless finds that all seven Movants qualify for permissive intervention under Rule 24(b). "[P]ermissive intervention [is] granted by the courts on a case-by-case basis, founded on the analysis of the factors identified in Rule 24(b)." *City of Los Angeles*, 288 F.3d at 403. As recited above,

> [A] court may grant permissive intervention where the applicant for intervention shows (1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common.

*Id.* "When the prerequisites for permissive intervention are met, a district court is 'entitled to consider other factors in making its discretionary decision on the issue of permissive intervention.'" *Brumback v. Ferguson*, 343 F.R.D. 335, 345 (E.D. Wash. 2022) (quoting *Callahan v. Brookdale Senior Living Comtys., Inc.*, 42 F.4th 1013, 1022 (9th Cir. 2022)).

### 1.      Independent Grounds for Jurisdiction

"[T]he independent jurisdictional grounds requirement does not apply to proposed intervenors in federal-question cases when the proposed intervenor is not raising new claims." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011). Here, all five of Movants' claims have also been pleaded by Plaintiff States. *Compare* Dkt. No. 76-1 ¶¶ 77–155, *with* Dkt. No. 1 ¶¶ 213–286. Indeed, Defendants admit as much, asserting that "[w]hatever claims or defenses [Movants] believe they possess . . . are entirely duplicative of the

1    Plaintiff States' claims and defenses." Dkt. No. 102 at 15. Therefore, this element does not apply

2    to Movants' request to intervene here.[2]

3        **2.    Timeliness**

4        As discussed above, *see supra* Section III.A.2.a., Movants' motion is timely.

5        **3.    Question of Law or Question of Fact in Common**

6        Movants assert that their claims "are factually and legally related to the main action."

7    Dkt. No. 76 at 18. Indeed, "Movants challenge the same agency actions as the Plaintiff States

8    and seek to restore lawful implementation of the NEVI Formula Program to protect their own

9    interests and those of their members." *Id.* at 18–19. Defendants argue that Movants "lack a

10   distinct 'claim or defense that shares with the main action a common question of law or fact.'"

11   Dkt. No. 102 at 15 (quoting Fed. R. Civ. P. 24(b)(1)(B)). But Defendants have added a word to

12   the Rule. There is no requirement, in either Ninth Circuit caselaw or Rule 24, that a claim or

13   defense that shares a common question of law or fact with the main action be *distinct*;

14   Defendants have inserted the word into the rule and pitched their argument under this

15   nonexistent standard. The Court is not persuaded. In challenging the same conduct and seeking

16   similar relief, it is plain that Movants' claims overlap with those of the Plaintiff States.

17   Therefore, this element is satisfied for permissive intervention.

18

19

20

---

21   [2] Movants assert that they have made an "Impoundment Control Act claim" that "is not shared by the Plaintiff
     States." Dkt. No. 105 at 9. But Movants do not bring a distinct cause of action under the Impoundment Control Act
22   ("ICA"), which only empowers the Comptroller General to bring a civil action under its authority, and even then
     only in the U.S. District Court for the District of Columbia. *See* 2 U.S.C. § 687. Moreover, Movants invoke the ICA
23   in their proposed complaint-in-intervention similarly to how Plaintiff States invoke the law in their complaint—that
     is, as merely indicative that Defendants have acted contrary to law. *Compare* Dkt. No. 76-1 ¶¶ 100–105, *with* Dkt.
     No. 1 ¶¶ 264–266. Count 1 of the proposed complaint-in-intervention is actually an allegation of a "Violation of the
24   Administrative Procedure Act." Dkt. No. 76-1 at 23.

1
### 4.    Other Factors

2      Other relevant factors that Ninth Circuit courts may consider in an application for

3  permissive intervention include:

4            [T]he nature and extent of the intervenors' interest, their standing
           to raise relevant legal issues, the legal position they seek to
5            advance, and its probable relation to the merits of the case. The
           court may also consider whether changes have occurred in the
6            litigation so that intervention that was once denied should be
           reexamined, whether the intervenors' interests are adequately
7            represented by other parties, whether intervention will prolong or
           unduly delay the litigation, and whether parties seeking
8            intervention will significantly contribute to full development of the
           underlying factual issues in the suit and to the just and equitable
9            adjudication of the legal questions presented.

10  *Callahan*, 42 F.4th at 1022.

11      Here, as discussed above, *see supra* Section III.A.1, four of the seven Movants have

12  Constitutional standing to raise relevant legal issues.[3] Further, Movants argue that their "focused

13  interests in accelerating EV adoption, along with their broader geographic scope and specialized

14  knowledge of EV policy, including the NEVI Formula Program itself, position them to

15  meaningfully contribute to the development of a complete factual record and inform the

16  proceedings." Dkt. No. 76 at 19. Movants assert that allowing them to intervene here, "rather

17  than pursue a separate lawsuit concerning the same program and government action, . . . serves

18  the interests of judicial economy and efficiency," as it "avoids overlapping litigation and ensures

19  that the Court has before it the full range of legal arguments and stakeholder perspectives

20  necessary to resolve the case fairly and efficiently." *Id.*

21

22

23  _____
[3] The three Movants who lack Article III standing are not barred from permissively intervening based upon that fact
24  alone, because the Ninth Circuit has held that the legally-protectable-interest requirement does not apply to
permissive intervention. *Emp. Staffing Servs.*, 20 F.3d at 1042.

The Court agrees. In *Brumback*, where the court applied the *Callahan* factors recited above to decide a question of permissive intervention, the court put particular emphasis on the prospective intervenors' "expertise . . . in the particular subject matter of th[e] case," and on the prospective intervenors' "valuable and specialized experience." *Brumback*, 343 F.R.D. at 346. Here, each Movant represents a different constituency and provides a different perspective on the issues of the case. Movants share substantial goals and values, but no organization's mission coincides entirely with another's. Moreover, no organization's focus is identical to those of the sovereign Plaintiff States.

The Sierra Club's stated mission is "to explore, enjoy and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives." Dkt. No. 77 at 106 (Garcia Decl.) ¶ 3. The organization is national and boasts of 617,335 active members nationwide. *Id.* ¶ 4. NRDC's purpose is "to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends." Dkt. No. 77 at 115 (Hammon Decl.) ¶ 6. NRDC is also a national organization that "advocates for policies . . . at the federal and state levels." *Id.* ¶¶ 5, 7. Plug In America focuses primarily on transitioning drivers from internal-combustion-engine vehicles to electric vehicles. Dkt. No. 77 at 166 (Levin Decl.) ¶ 2. It is "a national nonprofit focused on electric vehicles . . . that represents the voices of drivers . . . ." *Id.* ¶ 4. CleanAIRE NC represents residents of North Carolina and works "to ensure all North Carolinians have access to clean air." Dkt. No. 77 at 207 (Robbins Decl.) ¶¶ 2–4. Climate Solutions is a "Northwest-based clean energy economy nonprofit." Dkt. No. 77 at 259 (Small Decl.) ¶ 2. According to its executive director, "Climate Solutions works to: (1) champion transformational policies and market-based innovations; (2) catalyze powerful partnerships and a

diverse movement for action and accountability; and (3) communicate a bold vision for solutions at scale required by climate science." *Id.* SACE is a Knoxville, Tennessee–based organization focused on "reduc[ing] carbon emissions and promot[ing] clean energy solutions" across the southeastern United States. Dkt. No. 77 at 267 (Smith Decl.) ¶¶ 2, 5. Finally, WERA "is based in Mebane[, North Carolina,] and has long advocated for infrastructure improvements in . . . areas excluded from basic public services due to systemic racism." Dkt. No. 77 at 307 (Ayo Wilson Decl.) ¶ 3.

Movants here "ha[ve] shown that [they] will bring a unique perspective and expertise to this action that will not necessarily . . . duplicate Plaintiff States' role." *Cal. Dump Truck Owners Ass'n v. Nichols*, 275 F.R.D. 303, 309 (E.D. Cal. 2011); *see Sullivan v. Ferguson*, No. C22-5403, 2022 WL 10428165, at *5 (W.D. Wash. Oct. 18, 2022) ("Alliance's expertise in firearms and Second Amendment litigation is likely to contribute to full development of the underlying factual issues and provide a useful perspective that otherwise is not represented in the suit."). Under these circumstances, the Court believes permissive intervention is appropriate.

\*        \*        \*

Movants have satisfied the requirements for permissive intervention, and the Court finds that permissive intervention is warranted and appropriate under the circumstances.

## IV.    CONCLUSION

Accordingly, Movants' Motion to Intervene (Dkt. No. 76) is GRANTED.

Dated this 29th day of October 2025.

_____
Tana Lin
United States District Judge