U.S. Department of Justice

Civil Division, Federal Programs Branch

1100 L Street N.W.
Washington, DC 20005

---

| | |
|---|---|
| Heidy L. Gonzalez | Tel.: (202) 598-7409 |
| Trial Attorney | heidy.gonzalez@usdoj.gov |

January 26, 2026

**Via Electronic Mail**

U.S. Department of Transportation

> **Re:** **State of Washington et al. v. Dep't of Transp. et al.**, No. 25-cv-00848 (W.D. Wash.) – Notice of Summary Judgment Order

Dear Counsel:

On January 23, 2026, the district court in the Western District of Washington entered summary judgment with respect to the National Electric Vehicle Infrastructure Formula Program. A copy of the summary judgment order is attached. Please take steps to ensure that no later than January 28, 2026, this summary judgment order is shared with all Defendants and agencies and their employees or contractors with responsibility for administering the NEVI Formula Program.

Sincerely,

*/s/ Heidy L. Gonzalez*
Heidy L. Gonzalez

# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON et al.,

Plaintiffs,

v.

U.S. DEPARTMENT OF
TRANSPORTATION et al.,

Defendants.

CASE NO. 2:25-cv-00848-TL

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

SIERRA CLUB et al.,

Plaintiff–Intervenors,

v.

U.S. DEPARTMENT OF
TRANSPORTATION et al.,

Defendants.

## I.    INTRODUCTION

This case puts to the test our system of government's emphasis on consistency, comity, and continuity. The National Electric Vehicle Infrastructure ("NEVI") Formula Program, a program enacted by Congress in 2021, has been up and running under the United States Department of Transportation's ("DOT") management since 2022. Upon the transition to the new presidential administration in 2025, DOT's new leadership abruptly stopped the program in order to purportedly align it with the administration's new priorities. But rather than work within the statutory confines of established administrative law, and take deliberate (and deliberative) steps as required by the Administrative Procedure Act ("APA") to make those changes,

Defendants DOT and the Federal Highway Administration ("FHWA") instead yanked the NEVI Formula Program's cord out of the outlet, calling for an instantaneous and sudden cessation of the program, at least until it could be re-started under the auspices of the new administration. Stakeholders and beneficiaries of the NEVI Formula Program have sued, asserting that Defendants did not follow the law when they rescinded the program. As a result, Plaintiff States have dedicated substantial time, resources, and work that must now be scrapped, duplicated, or re-conceived. For their part, members of the Plaintiff–Intervenor organizations, who had expected to enjoy economic, quality-of-life, and environmental benefits from the implementation of the NEVI Formula Program, have now seen those expectations significantly dampened.

Such capriciousness runs counter to the Administrative Procedure Act; it is simply not how things are lawfully done.

\* \* \*

This matter is before the Court on Plaintiff States' and Plaintiff–Intervenors' (collectively, "Plaintiffs"), and Defendants' motions for summary judgment. Dkt. Nos. 141 (Defendants); 142 (Plaintiff States); 150 (Plaintiff–Intervenors). Having reviewed the Parties' motions, responses (Dkt. Nos. 163 (Defendants); 165 (Plaintiff States); 166 (Plaintiff–Intervenors), and the relevant record, and having heard oral argument on January 13, 2026, the Court GRANTS IN PART and DENIES IN PART Plaintiff States' and Plaintiff–Intervenors' motions, DENIES Defendants' motion, and ENTERS JUDGMENT against Defendants.

//

//

//

//

//

## II.  BACKGROUND

**A.  Parties[1]**

There are two sets of Plaintiffs in this case.[2] Plaintiff States are 20 sovereign states of the United States of America, as well as the District of Columbia. Dkt. No. 124 ¶¶ 14, 20. Plaintiff States include: Washington, Colorado, California, Arizona, Delaware, Hawai'i, Illinois, Kentucky,[3] Maryland, Minnesota, New Jersey, New Mexico, Michigan, New York, North Carolina, Oregon, Pennsylvania,[4] Rhode Island, Vermont, and Wisconsin. *Id.* ¶¶ 15–35. Plaintiff States "bring this action in their sovereign and proprietary capacities." *Id.* ¶ 14.

Plaintiff–Intervenors are seven public interest organizations: Sierra Club, Natural Resources Defense Council ("NRDC"), Climate Solutions, Southern Alliance for Clean Energy, CleanAIRE NC, West End Revitalization Association, and Plug In America. Dkt. No. 76 (motion to intervene). Plaintiff–Intervenors are not-for-profit organizations that advocate for environmental issues, including, but not limited to, climate change and air pollution, public health, clean energy, responsible and equitable energy choices, environmental equity, environmental justice and equitable infrastructure, and electric-vehicle adoption. *See* Dkt. No. 76-1 (complaint-in-intervention) ¶¶ 13–19.

---

[1] For clarity and simplicity, the Court will use a state's name to refer to the relevant agencies in that state. For example, California's electric vehicle program is administered by two state agencies, the California Energy Commission ("CEC") and California Department of Transportation ("Caltrans"); this Order refers to the State of California, CEC, and Caltrans as "California." New York's program includes the New York State Department of Transportation ("NYSDOT"), the Power Authority of New York ("NYPA"), and New York State Energy Research and Development Authority ("NYSERDA"); this Order refers to all of these entities, as well as the state itself, as "New York."

[2] In this Order, the term "Plaintiffs" refers collectively to both Plaintiff States and Plaintiff–Intervenors.

[3] "The Office of the Governor of Kentucky, *ex rel.* Andy Beshear, brings this suit in his official capacity as Governor of the Commonwealth of Kentucky." Dkt. No. 124 ¶ 23. For consistency and clarity, the Court refers to this Plaintiff as "Kentucky."

[4] "Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania." Dkt. No. 124 ¶ 32. For consistency and clarity, the Court refers to this Plaintiff as "Pennsylvania."

1       Defendants are two federal agencies—the United States Department of Transportation, a

2   cabinet-level agency within the Executive Branch of the federal government (Dkt. No. 124 ¶ 36),

3   and the Federal Highway Administration, an agency within DOT (*id.* ¶ 38)—and their respective

4   highest-ranking officials—Secretary of Transportation Sean Duffy (*id.* ¶ 37) and FHWA

5   Executive Director and Acting Administrator Gloria M. Shepherd (*id.* ¶ 39).[5] Plaintiffs sue

6   Defendants Duffy and Shepherd in their respective official capacities. *Id.* ¶¶ 37, 39.

**B.     Legal Framework: Statute, Executive Order, and Agency Actions**

**1.     Infrastructure Investment and Jobs Act**

**a.     *National Electric Vehicle Infrastructure Formula Program***

In 2021, Congress passed, and President Biden signed into law, the Infrastructure

Investment and Jobs Act ("IIJA"), Pub. L. No. 117–58, 135 Stat. 429. Dkt. No. 124 ¶ 40. In the

law, Congress established the National Electric Vehicle Infrastructure ("NEVI") Formula

Program, which appropriated $5 billion to "provide funding to States to strategically deploy

electric vehicle charging infrastructure and to establish an interconnected network to facilitate

data collection, access, and reliability." *Id.* ¶¶ 41–42 (quoting 135 Stat. at 1421). Congress

established three prescribed uses for the NEVI Formula Program funds:

> (1) the acquisition and installation of electric vehicle charging
> infrastructure to serve as a catalyst for the deployment of such
> infrastructure and to connect it to a network to facilitate data
> collection, access, and reliability; (2) proper operation and
> maintenance of electric vehicle charging infrastructure; and
> (3) data sharing about electric vehicle charging infrastructure to
> ensure the long-term success of investments made under [the
> NEVI Formula Program provisions of the IIJA].

---

[5] On September 18, 2025, the Senate confirmed Sean McMaster as the new Administrator of FHWA. S. Res. 377, 119th Cong. Pursuant to Federal Rule of Civil Procedure 25(d), McMaster is automatically substituted as a Defendant in this case.

1    Dkt. No. 124 ¶ 43 (alteration in original) (quoting 135 Stat. at 1421–22).[6] Per the statute, the

2    funds must "remain available until expended." *Id.* ¶ 41 (quoting 135 Stat. at 1421).

3           Importantly, the appropriated NEVI Formula funds are "formula" funds, which means

4    that they were "appropriated by Congress for a specific purpose and must be distributed on the

5    basis of a statutory formula." *Id.* (citing *City of Los Angeles v. Barr*, 941 F.3d 931, 935 (9th Cir.

6    2019)). That is, NEVI Formula funds cannot be used for any purpose other than those that

7    Congress established in the NEVI Formula Program, and the apportionment of the funds among

8    the recipient states cannot deviate from the prescribed statutory formula. *Id.* ¶ 45. Under the

9    IIJA, the formula used to distribute NEVI Formula funds is "the same federal formula as that

10   which is used to distribute highway funds." *Id.* ¶ 41 (citing 135 Stat. at 1422); *see* 23 U.S.C.

11   § 104 (formula for apportionment of federal-aid highway funds).

12          Under the IIJA, distribution of NEVI Formula funds is the responsibility of the Secretary

13   of Transportation, as delegated to FHWA: The Secretary "'shall distribute among the States the

14   [NEVI Formula Program funds] so that each State receives' the amount determined by the

15   formula." *Id.* ¶ 45 (quoting 135 Stat. at 1422) (alteration in original) (emphasis omitted). The

16   IIJA includes two planning prerequisites that must be fulfilled before the appropriated money

17   can flow from the federal government to the recipient states.

18          First, the IIJA obligated DOT to develop "'guidance for States and localities to

19   strategically deploy electric vehicle charging infrastructure' consistent with the NEVI Formula

20   Program provisions of the IIJA." *Id.* ¶ 47 (quoting 135 Stat. at 1423). On February 10, 2022,

21   FHWA duly issued its NEVI Formula Program Guidance. *Id.* ¶ 48; *see* Dkt. No. 93-1 (2022

22   NEVI Formula Program Guidance) at 9–39. FHWA has updated the guidance annually, most

23   _____

24   [6] Part of the appropriated funding is reserved to pay for the administration of the program itself and to fund "an
     additional grant program." *See* Dkt. No. 1 ¶ 47; Dkt. No. 1-6 (FHWA Apportionment Notice) at 2–3.

recently on August 11, 2025. Dkt. No. 164 (Biondi Supp. Decl.) ¶ 3. This most recent guidance represents the first NEVI Formula Program guidance issued under the Trump administration.

Second, to become eligible to receive NEVI Formula funds each year, the IIJA requires each recipient state to submit to DOT a State Electric Vehicle Infrastructure Deployment Plan that "describ[es] how it 'intends to use funds distributed to the State . . . to carry out the [NEVI Formula] Program for each fiscal year in which funds are made available.'" Dkt. No. 124 ¶ 46 (quoting 135 Stat. at 1422).

### b.  *Distributing NEVI Funds*

There is a "well-defined" process for distributing NEVI Formula funds. *Id.* ¶ 49. The first step is Congressional *appropriation*. *Id.* An appropriation is, in essence, a command from Congress to the Treasury to get out its checkbook; it authorizes the federal government "to incur financial obligations that will result in immediate or future disbursements of funds from the U.S. Treasury." *Id.* (citing 2 U.S.C. § 622(2)(A)(i)). In the IIJA, Congress appropriated $5 billion to FHWA "to carry out the NEVI Formula Program in accordance with specific directives and subject to express constraints." *Id.*

The next step is *apportionment*. *Id.* ¶ 50. This is the determination of who gets how much of the appropriated funds, and when. The United States Office of Management and Budget ("OMB") "apportioned the funds appropriated by Congress by dividing the $5 billion appropriation across five fiscal years and distributed the funds to the FHWA." *Id.* Next, FHWA further apportions the money by first setting aside administrative and other earmarked funds, *see supra* note 6, then "divid[ing] the remaining funds for that fiscal year among the States according to the non-discretionary statutory formula." *Id.* ¶ 50. The NEVI formula is derived from the statutory formula that FHWA uses to apportion federal highway aid. *Id.* ¶ 51; *see* 23 U.S.C. §§ 104(c), 165. Put another way, the size of a state's slice of the $5 billion NEVI pie is directly

proportional to the size of its slice of the federal highway aid pie. A given state's federal highway aid apportionment is "fixed in statute based on historical apportionments and congressionally determined shares." Dkt. No. 124 ¶ 51; *see* 23 U.S.C. § 104(b)–(c). Just as DOT cannot meddle with the Congressionally determined federal highway aid apportionments, "[n]either the Secretary nor the FHWA, nor any other part of the Executive Branch has discretion to determine the amount of funding apportioned to any State under the NEVI Formula Program." Dkt. No. 124 ¶ 51; *see* 23 U.S.C. § 104.

After the funds are apportioned, they are made available for obligation. In the NEVI Formula Program, FHWA made "available for obligation" each state's apportioned funds each fiscal year and advised the states by way of a letter. *See, e.g.*, Dkt. No. 1-7 (Shepherd Letter) at 1 (advising Washington that "Fiscal Year 2022 funds [were] now available . . . for obligation"). When funds became available for obligation, FHWA sent each state the same letter. *See* Dkt. No. 109 (Hr'g Tr.) at 9:10–12.

The next step is *obligation*. Dkt. No. 124 ¶¶ 52–55. An obligation is a legal duty that makes the federal government liable for payment for "goods and services ordered or received," or a legal duty that could mature into such a liability. *See id.* ¶ 53 (citing U.S. Gov't Accountability Off. Pub. No. GAO-05-734SP (*A Glossary of Terms Used in the Federal Budget Process*), at 45, 48, 70 (Sept. 2005) ("GAO Glossary")). It is "a 'definite commitment'" from the government to pay for something. *Id.* (citing GAO Glossary); *see also* Dkt. 93-1 ¶ 10 (acknowledging that an obligation creates a "contractual[] commit[ment]" between FHWA and states). "States obligate their share of apportioned NEVI Formula Program funds by submitting to the FHWA an authorization request for specific activities." Dkt. No. 124 ¶ 54. If the activities for which a state requests authorization "meet the minimum standards and requirements" given in 23 C.F.R. § 680 ("National Electric Vehicle Infrastructure Standards and Requirements"),

FHWA must approve the request. Dkt. No. 124 ¶ 54; *see* 23 C.F.R. § 680. Upon FHWA's authorization of a request, the funds are obligated, and the promise is made. Dkt. No. 124 ¶ 54.

The fourth step is *disbursement*. Disbursement, simply put, is the actual transfer of funds from the Treasury to the states.

<strong>c.     <em>Withdrawing or Withholding NEVI Funds</em></strong>

Under the IIJA, DOT has little discretion to withhold or withdraw NEVI Formula funds from the states. *Id.* ¶ 56. The Department "must distribute to each State its share of NEVI Formula Program funds unless [(1)] the state fails to timely submit its State Electric Vehicle Infrastructure Deployment Plan or [(2)] the Secretary 'determines a State has not taken action to carry out its State Plan.'" *Id.* (citation modified) (quoting 135 Stat. at 1422). The option to withhold or withdraw funds on the latter basis is unavailable unless DOT complies with substantial procedural requirements. Before DOT determines that a State has not taken sufficient action on its plan, it must first "notify the State, consult with the State, and identify actions that can be taken to rectify concerns, and provide at least 90 days for the State to rectify concerns and take action to carry out its State Plan." *Id.* ¶ 57 (citation modified) (quoting 135 Stat. at 1422). And even if such a determination is made, DOT cannot do anything about it—that is, it cannot withhold or withdraw NEVI Formula funding—without first complying with *further* procedural requirements. Pursuant to the IIJA, "The Secretary shall provide notice to a State on the intent to withhold or withdraw funds not less than 60 days before withholding or withdrawing any funds, during which time the State shall have an opportunity to appeal a decision to withhold or withdraw funds directly to the Secretary." *Id.* (citation modified) (quoting 135 Stat. at 1422).

Further, even if DOT successfully clears these procedural requirements, the IIJA redirects the withheld or withdrawn funds only to certain alternate recipients. Funds withheld or withdrawn from a state may be awarded "on a competitive basis to local jurisdictions within the

State for use on projects that meet the eligibility requirements." *Id.* ¶ 58 (quoting 135 Stat. at 1422). If the funds are not awarded to local jurisdictions within the state from which they were originally withheld or withdrawn, the IIJA requires that they be distributed among other states "in the same manner as funds distributed for that fiscal year"—that is, by the NEVI apportionment formula described above. *Id.* (quoting 135 Stat. at 1422–23). In short, the statute requires that NEVI Formula funds be spent by someone, somewhere, on EV infrastructure.

### 2. "Unleashing American Energy" Executive Order and DOT Order No. 2100.7

On January 20, 2025, the first day of his presidency, President Trump issued Executive Order No. 14,154, entitled "Unleashing American Energy." 90 Fed. Reg. 8353 (Jan. 29, 2025). Section 7(a) of the Order directed "[a]ll agencies [to] immediately pause the disbursement of funds appropriated through . . . the Infrastructure Investment and Jobs Act (Public Law 117-58), including but not limited to funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula Program . . . ." *Id.* at 8357. The Order further directed all agencies to "review their processes, policies, and programs for issuing grants, loans, or any other financial disbursements of such appropriated funds for consistency with the law and [the President's energy policy priorities]." *Id.*

On January 29, 2025, his first full day as Secretary of Transportation, *see* 171 Cong. Rec. S408 (daily ed. Jan. 28, 2025) (vote on Duffy nomination), Secretary Duffy issued DOT Order No. 2100.7, "Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities," Dkt. No. 1-10 (DOT Order No. 2100.7 (Jan. 29, 2025)). This Order purports to "reset[] the principles and standards underpinning U.S. Department of Transportation . . . policies, programs, and activities to mandate reliance on rigorous economic analysis and positive cost-benefit calculations and ensure that all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts bolster the American economy

and benefit the American people." *Id.* at 2. The Department's new priorities purport to base

"grantmaking, lending, policymaking, and rulemaking activities" on "sound economic principles

and analysis supported by rigorous cost-benefit requirements and data-driven decisions." *Id.* At

the same time, however, they include the prioritization of "projects and goals" that, among other

things, "give preference to communities with marriage and birth rates higher than the national

average; prohibit recipients of DOT support or assistance from imposing vaccine and mask

mandates; and require local compliance or cooperation with Federal immigration enforcement."

*Id.* at 2, 4 (citation modified). Order No. 2100.7 became effective immediately, upon its

execution by the new Secretary. *Id.* at 2.[7]

### 3.   Biondi Letter

On February 6, 2025, one week after the DOT's installation of Secretary Duffy and his

issuance of Order No. 2100.7, Emily Biondi, Associate Administrator in FHWA's Office of

Planning, Environment, and Realty, addressed a letter to "State Department of Transportation

Directors" (Dkt. No. 1-9 ("Biondi Letter")). The Biondi Letter stated that "[t]he new leadership

of the Department of Transportation (U.S. DOT) has decided to review the policies underlying

the implementation of the NEVI Formula Program." *Id.* at 2. The Biondi Letter rescinded "the

current NEVI Formula Program Guidance dated June 11, 2024, and all prior versions of this

guidance," and "immediately suspend[ed] the approval of all State Electric Vehicle Infrastructure

Deployment plans for all fiscal years." *Id.* at 2–3. The Biondi Letter mandated that, "effective

immediately, no new obligations may occur under the NEVI Formula Program until the updated

final NEVI Formula Program Guidance is issued and new State plans are submitted and

---

[7] The Court notes, as a district court found in June 2025, that "Congress did not authorize or grant authority to the Secretary of Transportation to impose immigration enforcement conditions on federal dollars specifically appropriated for transportation purposes." *California v. U.S. Dep't of Transp.*, 786 F. Supp. 3d 316, 322 (D.R.I. 2025).

approved." *Id.* at 3. The Biondi Letter did not provide a date when updated NEVI Formula

Program guidance would be issued but stated that "FHWA aim[ed] to have updated draft NEVI

Formula Guidance published for public comment in the spring." *Id.* FHWA missed its spring

goal but ultimately issued the updated guidance on August 11, 2025. Dkt. No. 164 ¶ 3.

In revoking all State Electric Vehicle Infrastructure Deployment Plans, Defendants,

according to Plaintiff States, "withh[eld] approximately $2.74 billion of the $3.27 [b]illion in

NEVI Formula Program funds available to the States for obligation for fiscal years 2022 through

2025." Dkt. No. 124 ¶ 126. Plaintiff States allege that they have been "deprived of access to

approximately $1 billion in available NEVI Formula Program funds for those four fiscal years."

*Id.*

### 4. August 2025 Interim Final Guidance

On August 11, 2025, FHWA promulgated the new NEVI Formula Program guidance that

the Biondi Letter had promised. *See* National Electric Vehicle Infrastructure Formula Program

Guidance, 90 Fed. Reg. 39025 (Aug. 13, 2025), *available at*

https://www.fhwa.dot.gov/environment/nevi/resources/NEVI-Interim-Final-Program-Guidance-

8-11-2025.pdf [https://perma.cc/8JGZ-RU85]. FHWA characterized the new guidance as

"Interim Final Guidance" and opened a two-week window for public comment. 90 Fed. Reg. at

39025–26. The Agency advised that it would "consider substantive comments received on the

Interim Final Guidance and will consider whether any further changes are needed based on

comments received." *Id.* at 39026. As of the date of this Order, FHWA has not published any

further guidance, and the "Interim Final Guidance" remains in effect.[8]

---

[8] At oral argument, Defendants' counsel represented that FHWA did not intend to update the Interim Final
Guidance.

The Interim Final Guidance "rescind[ed] previous guidance documents and policies that are not required by clear and express statutory language." Interim Final Guidance at 1. Pursuant to the new guidance, states were required to submit to FHWA new State EV Infrastructure Deployment Plans within 30 days. *Id.* at 4. The new guidance presented only three requirements for such plans:[9]

- A description of how the State intends to use NEVI Program funds for each fiscal year. The Plan should cover all unobligated funding for fiscal years 2022–2026.
- A Community Engagement Outcomes Report, per 23 CFR 680.112(d)[; and]
- A description of physical and cybersecurity strategies, per 23 CFR 680.106(h).

*Id.* at 3. States were encouraged to "utilize a streamlined format for their Plans." *Id.* FHWA advised that "[p]reviously developed or submitted Plans for fiscal years 2022–2025 can be resubmitted, but will only be reviewed for the statutory and regulatory requirements noted above." *Id.*

## C.    Factual Background

After President Biden signed the IIJA into law on November 15, 2021, FHWA had 90 days to issue the first version of NEVI Formula Program guidance. *See* 135 Stat. at 1423. FHWA complied with the law and issued guidance on February 10, 2022. *See* Dkt. No. 93-1 at 9–39. Plaintiff States then began preparing State Electric Infrastructure Deployment Plans. *See, e.g.*, Dkt. No. 7-1 (California Plan) at 2–65; Dkt. No. 17-1 (New Jersey Plan) at 2–76; Dkt. No. 28-1 (Washington Plan) at 2–59. The State Electric Infrastructure Deployment Plans are detailed and dense planning documents that are not easily summarized. In short, however, the plans detail the *who*, *what*, *when*, *where*, *why*, and *how* of new, statewide electric vehicle infrastructure for each

---

[9] These requirements already were included in the prior administration's NEVI Formula Program guidance. *See* Dkt. No. 115-2 at 82, 89, 95.

Plaintiff State. They include, among other things, timelines, discussions concerning public engagement, and analyses of commercial and technological trends in EV infrastructure. Plans detail demographic, ecological, geographical, and economic realities within a state, and the "alternative fuel corridors" that have been designated to address them. They identify funding sources, both state and federal, as well as the processes for resolving conflicts and hashing out ambiguities. Plans report the results of public-interest surveys in which state residents have voiced their opinions about desired amenities at EV charging stations, and they explain how contracts for construction will be awarded.

Plaintiff States submitted their respective plans in 2022, as well as annual updates in 2023 and 2024, to FHWA for approval, and the agency approved them for fiscal years 2022, 2023, 2024, and 2025. Dkt. No. 146 (Malik Decl.) ¶¶ 7–8 (District of Columbia); Dkt. No. 143 (Cownie Decl.) ¶¶ 6–7 (Minnesota); Dkt. No. 148 (Perchlik Decl.) ¶¶ 10–11 (Vermont); Dkt. No. 7 (de Alba Decl.) ¶ 8 (California); Dkt. No. 9 (Toor Decl.) ¶ 9 (Colorado); Dkt. No. 11 (Ward Decl.) ¶ 10 (Arizona); Dkt. No. 12 (Hastings Decl.) ¶ 10 (Delaware); Dkt. No. 13 (Shishido Decl.) ¶ 10 (Hawai'i); Dkt. No. 15 (Irvin Decl.) ¶ 10 (Illinois); Dkt. No. 144 (Gray Decl.) ¶¶ 5–6 (Kentucky); Dkt. No. 16 (Pines Decl.) ¶ 12 (Maryland); Dkt. No. 149 (Wieferich Decl.) ¶¶ 6–7 (Michigan); Dkt. No. 17 (Patel Decl.) ¶ 9 (New Jersey); Dkt. No. 18 (Valdez Decl.) ¶ 9 (New Mexico); Dkt. No. 20 (Nelson Decl.) ¶ 15 (New York); Dkt. No. 145 (Hildebrandt Decl.) ¶¶ 9–10 (North Carolina); Dkt. No. 23 (Pietz Decl.) ¶ 11 (Oregon); Dkt. No. 147 (Carroll Decl.) ¶¶ 6–8 (Pennsylvania); Dkt. No. 24 (Kearns Decl.) ¶ 14 (Rhode Island); Dkt. No. 26 (Collins-Worachek Decl.) ¶ 10 (Wisconsin); Dkt. No. 28 (Meredith Decl.) ¶ 24

1  (Washington); *see also* Dkt. No. 1-8 (NEVI Formula Program Status of Funds) at 2.[10] Upon

2  FHWA's approval (and re-approval) of a state's EV deployment plan, NEVI Formula funds

3  became available to that state for obligation. *See, e.g.*, Dkt. No. 1-7 (Washington approval letter)

4  at 2; Dkt. No. 115-2 at 118. With FHWA-approved deployment plans in hand, states could

5  submit requests to FHWA for approval of individual projects. Upon approval of a project,

6  FHWA would obligate NEVI Formula funds to the state for that project. Requests for approval

7  were handled by FHWA's regional divisions. *See* Dkt. No. 7 ¶ 11. In California, for example,

> FHWA's California division instructed [the state] to use a project-by-project, and project-phase by project-phase, approach to seek funding obligations. Under this approach, in order for funding to become obligated, a State must submit an authorization request to FHWA via the online federal portal for each particular phase (e.g., preliminary engineering, right-of-way, construction) of each particular NEVI-funded project carried out by the responsible NEVI awardee.

13  *Id.*; *see also* Dkt. No. 10 (Kelly Decl.) ¶ 13 ("The timing of fund obligation . . . varies by state

14  based on the guidance of the local FHWA Division Office."). Where non–Plaintiff State

15  Massachusetts has been able to obligate its entire apportionment of 2022–25 NEVI Formula

16  funds (*see* Dkt. No. 115-2 at 118), such an approach would have been impossible in Colorado,

17  where "[t]he FHWA Colorado Division Office discourages early obligation of funds or the full

18  obligation of an entire program beyond what is expected to be spent and reimbursed within the

19  next 12-month period in order to avoid inactivity on a given project" (Dkt. No. 10 ¶ 13).

---

[10] Docket No. 115-2, "NEVI Formula Program Status of Funds," is a table that lists, among other data from FHWA's Fiscal Management Information System, the total amount of NEVI Formula funds made available to each state as of February 6, 2025. Dkt. No. 1-8 at 2. The fact that all 50 states, plus the District of Columbia and Puerto Rico, have had funds made available to them indicates that FHWA approved every state's NEVI deployment plan. *See* IIJA, 135 Stat. at 1422 (conditioning availability of NEVI Formula funds on FHWA's approval of a state deployment plan). At oral argument on the Parties' motions for summary judgment on January 13, 2026, however, Defendants' counsel informed the Court that Florida, which is not a Plaintiff State, did not have an approved NEVI deployment plan.

On February 6, 2025, FHWA issued the Biondi Letter, rescinding FHWA's NEVI Formula Program guidance and revoking all state deployment plans that had been approved pursuant to that guidance. Dkt. 1-9. States were no longer able to submit requests and receive approvals to draw down NEVI Formula funds that had been authorized and apportioned. In California, for example, on March 28, 2025, a state employee attempted to submit that state's "first authorization request for construction incurred for a NEVI-funded project in California." Dkt. No. 8 (Lam Decl.) ¶ 10. But the request—for $310,302 owed on construction of a Tesla charging station in San Diego that was already underway—was met with an error message: "Request cannot be processed. One or more Program Code balances has been exceeded." *Id.*; *see also* Dkt. No. 8-1 at 3; Dkt. No. 100 (O'Dea Decl.) ¶ 7. "All of California's NEVI Formula Program apportioned funds were listed as 'expired,' and [California] was unable to obligate additional dollars for NEVI projects." Dkt. No. 8 ¶ 10. Three days later, on March 31, 2025, the Director of Financial Services for FHWA's California Division advised the state that, pursuant to the Biondi Letter, "the NEVI formula program codes have been placed in 'expired' status. Thus, no funds are available for obligation." *Id.* ¶ 11; *see* Dkt. No. 8-1 at 2. As another example, Delaware is short "$49,875 of deferred advance construction funding for an FHWA approved NEVI project." Dkt. No. 12 ¶ 18. Delaware now needs to divert that money "from another FHWA, non-NEVI program or [from] state funding" to cover the shortfall, because "FHWA has removed all access to the FY25 NEVI apportionment as well as the planned FY26 NEVI apportionment." *Id.* ¶ 19.

On May 7, 2025, Plaintiff States filed a civil action and a motion for a preliminary injunction. Dkt. Nos. 1, 5. On June 24, 2025, the Court granted Plaintiff States' motion for a preliminary injunction. Dkt. No. 110. After the Court issued the injunction, the Parties conferred, then jointly advised the Court that this case "presents questions of law that may be resolvable

1    through dispositive cross-motions without the need for factual discovery." Dkt. No. 118 at 1

2    (stipulated motion for proposed briefing schedule).

3          On August 1, 2025, Plaintiff States filed a First Amended Complaint ("FAC") which,

4    while substantively similar to their original complaint, added several new states as Plaintiff

5    States, including Kentucky, Michigan, North Carolina, and Pennsylvania. *See* Dkt. No. 124. The

6    FAC brings the same six causes of action as the original complaint: (1) Defendants acted in

7    excess of statutory authority, in violation of the Administrative Procedure Act ("APA"), when

8    they revoked State Plan Approvals and withheld NEVI Formula Funds (*id.* ¶¶ 242–250);

9    (2) Defendants acted arbitrarily and capriciously and not in accordance with law, in violation of

10   the APA, when they revoked State Plan Approvals and withheld NEVI Formula Funds (*id.*

11   ¶¶ 251–269); (3) Defendants acted out of accordance with law and without observance of lawful

12   procedure, in violation of the APA, when they withheld NEVI Formula Funds (*id.* ¶¶ 270–286);

13   (4) Defendants violated the separation-of-powers doctrine and usurped Congressional authority

14   when they revoked State Plan Approvals and prohibited Plaintiff States from obligating funds

15   (*id.* ¶¶ 287–298); (5) Defendants violated the Take Care Clause when they revoked State Plan

16   Approvals and withheld NEVI Formula Funds (*id.* ¶¶ 299–306); and (6) Defendants acted *ultra*

17   *vires*, outside the scope of statutory authority conferred on the Executive Branch, when they

18   revoked State Plan Approvals and withheld NEVI Formula Funds (*id.* ¶¶ 307–315). Counts I, II,

19   and III are brought pursuant to the APA; Counts IV and V plead Constitutional violations; and

20   Count VI is brought pursuant to common law.

21         On May 22, 2025, seven public interest organizations—Sierra Club, Natural Resources

22   Defense Council, Climate Solutions, Southern Alliance for Clean Energy, CleanAire NC, West

23   End Revitalization Organization, and Plug In America—moved to intervene as party plaintiffs.

24   Dkt. No. 76. On July 23, 2025, the Court granted the motion, and allowed the seven

organizations to permissively intervene under Federal Rule of Civil Procedure 24(b). Dkt.

No. 120.[11] Plaintiff–Intervenors' filed a complaint-in-intervention that, unlike the Plaintiff

States' FAC, alleges harm—and seeks relief—in every NEVI jurisdiction where unobligated

funds were frozen. *See* Dkt. No. 76-1 at 34. The complaint-in-intervention pleads five causes of

action: (1) violation of the Administrative Procedure Act: in excess of statutory authority, not in

accordance with law, and without observance of required procedure (*id.* ¶¶ 77–107); (2) violation

of the Administrative Procedure Act: arbitrary and capricious (*id.* ¶¶ 108–126); (3) violation of

separation of powers (*id.* ¶¶ 127–140); (4) violation of the Take Care Clause of the United States

Constitution (*id.* ¶¶ 141–148); and (5) *ultra vires* action (*id.* ¶¶ 149–155).

On August 26, 2025, Plaintiff States and Defendants moved for summary judgment. Dkt.

Nos. 141, 142. On September 2, 2025, Plaintiff–Intervenors moved for summary judgment. Dkt.

No. 150.

## III.    LEGAL STANDARD

APA challenges are "routinely" resolved via summary judgment. *Raj & Co. v. U.S.

Citizenship & Immigr. Servs.*, 85 F. Supp. 3d 1241, 1244 (W.D. Wash. 2015). "The function of

the district court on summary judgment [in an APA case] is consequently 'to determine whether

or not as a matter of law the evidence in the administrative record permitted the agency to make

the decision it did.'" *Raj & Co.*, 85 F. Supp. 3d at 1244–45 (quoting *Occidental Eng'g Co. v.

I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985)). Accordingly, "summary judgment functions as a

mechanism for determining as a matter of law whether the administrative record supports the

agency's decision and whether the agency complied with the APA." *Victorov v. Barr*, No. C19-

---

[11] On October 29, 2025, the Court withdrew its original order granting intervention and issued an amended order. Dkt. No. 168. The amended order did not change the disposition of Plaintiff–Intervenors' motion to intervene. *Compare id.* at 27, *with* Dkt. No. 120 at 28.

6948, 2020 WL 3213788, at *2 (C.D. Cal. Apr. 9, 2020) (citing *Occidental Eng'g*, 753 F.2d at 769).

Generally, judicial review of an agency decision is limited to the administrative record. *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005). "Although the Court's review of the evidence is to be 'searching and careful,' it is 'not empowered to substitute [its] judgment for that of the agency.'" *GB Int'l v. Crandall*, 403 F. Supp. 3d 927, 931 (W.D. Wash. 2019), *aff'd*, 851 F. App'x 689 (9th Cir. 2021) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

## IV.   DISCUSSION

### A.   APA Claims

In its Order that granted Plaintiff States' motion for a preliminary injunction, the Court made several rulings that Defendants now attempt to re-litigate in their motion for summary judgment. *See* Dkt. No. 141 at 21–26. Defendants again argue, as they did when opposing a preliminary injunction (*see* Dkt. No. 93 at 15–21), that: (1) judicial review here is inappropriate because Defendants have not taken any final agency action (*see* Dkt. No. 141 at 21); (2) Defendants have not exceeded their statutory authority (*see id.* at 24); (3) Defendants have acted neither arbitrarily nor capriciously (*see id.*); and (4) Defendants have not acted contrarily to law (*see id.* at 25). The first issue is a threshold question that must be answered before the Court undertakes judicial review under the APA. *See* 5 U.S.C. § 704; *see San Francisco Herring Ass'n v. U.S. Dep't of the Interior*, 683 F. App'x 579, 580 (9th Cir. 2017). The latter three coincide with Plaintiff States' APA-based causes of action (i.e., Counts I, II, and III of the FAC) and with Plaintiff–Intervenors' APA-based causes of action (i.e., Counts 1 and 2 of the complaint-in-intervention). In other words, these issues represent the merits of the APA claims.

Defendants do not offer any new legal arguments now, and the evidence manifested in the administrative record (Dkt. No. 115-2) and in their subsequent declarations (Dkt. Nos. 164, 173)—that is, evidence that was not before the Court when it originally ruled on these issues— does not render their recycled arguments any more persuasive. Still, "[t]he 'general rule' is that 'decisions on preliminary injunctions are not binding at trial on the merits, and do not constitute the law of the case.'" *Chinatown Neighborhood Ass'n v. Harris*, 33 F. Supp. 3d 1085, 1094 (N.D. Cal. 2014) (quoting *S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1136 (9th Cir. 2004)). Therefore, the Court will revisit these issues, but only to the extent that present circumstances suggest or demand a different outcome.

### 1.    Final Agency Action

Under the APA, only a "final agency action" is subject to judicial review. 5 U.S.C. § 704; *see Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). To constitute a final agency action, two conditions must be satisfied. "First, the action must mark the consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 177–78. "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (internal quotation marks and citations omitted). In its prior Order, the Court, having characterized Defendants' action(s) as a "federal funding freeze," found that Defendants' action satisfied both conditions. *See* Dkt. No. 110 at 34. The Court finds no basis to disturb that ruling.

In their motion for summary judgment, and at oral argument, Defendants argue that their funding freeze was merely a "pause" or "suspen[sion]"; it was "preliminary action." Dkt. No. 141 at 22, 23. Defendants bolster their position by noting that "subsequent action—FHWA's now-complete issuance of updated guidance, its approval of State plans under the recently-updated guidance, its approval of States' requests for obligation, and ultimately its approval of

specific funding requests—[was] necessary to create any legal liability to disburse funds." *Id.* at 23. This is a red herring.

The Court rejected Defendants' argument in its prior Order (*see* Dkt. No. 110 at 34–38), and it rejects it again here. The legal liability is not derived from the disbursement of funds. Rather, it is derived from the lawful administration of the NEVI Formula Program, as legislatively enacted in the IIJA. The claims in Plaintiff States' and Plaintiff–Intervenors' complaints stem from the Defendants' failure to lawfully administer the program as Congress intended. Defendants' repackaging of their argument to now take into account the "re-issued NEVI guidance" does not affect the Court's prior reasoning. As the Plaintiff States assert, the action under review here "definitively revoked . . . State Plan approvals and definitively prohibited the obligations of funds made available as a result of those approvals." Dkt. No. 142 at 18. Had Defendants' issuance of new guidance *undone* that revocation—that is, had Defendants' "pause" truly been temporary, as they have argued—then the Court could consider that the issuance of new guidance has substantially changed the playing field such that it might now deem their original action to have been preliminary and temporary. But that is not what has happened. Defendants "revoked approval of [Plaintiff States]' State Plans with no prospect of revisiting that decision and will not allow Plaintiff [State]s to obligate funds *until an entirely new series of agency actions*—the issuance of new guidance and the approval of new State Plans— has taken place." Dkt. No. 142 at 18–19 (emphasis added). As the Plaintiff States succinctly put it, "Before February 6, about $1.5 billion was available for the States to obligate for NEVI projects; after February 6, that number dropped to zero." *Id.* at 19.

The Court previously characterized Defendants' conduct as "the rescission of the prior guidance and revocation of the State Deployment Plans, the practical result of which is a funding freeze." Dkt. No. 110 at 35. Nothing in the current factual record demonstrates that this was a

mischaracterization. Courts have routinely found funding freezes to be final agency actions. *See, e.g.*, *City & County of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1199 (N.D. Cal. 2025); *New York v. Trump*, 769 F. Supp. 3d 119, 136–37 (D.R.I. 2025); *Maryland v. Corp. for Nat'l & Comty. Serv.*, 785 F. Supp. 3d 68, 92 (D. Md. 2025); *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Human Servs.*, 798 F. Supp. 3d 77, 115 (D. Mass. 2025). Defendants have not presented any argument or additional evidence that compels a different result here. The Court therefore incorporates its findings from its prior order (Dkt. No. 110 at 34–38) and once again concludes that Defendants' action was final and is therefore subject to judicial review under the APA. *See* 5 U.S.C. § 704.

### 2.   Exceeding Statutory Authority

Under the APA, courts "shall hold unlawful and set aside agency action, findings, and conclusions found to be in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Novedads y Servicios, Inc. v. Fin. Crimes Enforcement Network*, 785 F. Supp. 3d 785, 802 (S.D. Cal. 2025) (quoting 5 U.S.C. § 706(2)(C)). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024); *see China Unicom (Americas) Operations Ltd. v. Fed. Commc'ns Comm'n*, 124 F.4th 1128, 1143 (9th Cir. 2024) (applying *Loper Bright*).

On summary judgment, Defendants restate their earlier argument from the preliminary-injunction stage of the case. Defendants' position is that, inherent to their authority under the IIJA to "develop guidance for States and localities to strategically deploy electric vehicle charging infrastructure," 135 Stat. at 1423, is their authority to *rescind* that guidance. In support of their argument, Defendants cite the Court's prior Order, where it affirmed an administrative agency's ability "to correct past actions" such that it need not "be perpetually bound by policies

with which [it] disagree[s]." Dkt. No. 141 at 15 (quoting Dkt. No. 110 at 41). But Defendants

overstate the Court's language.

The Court's language does not mean that agencies have carte blanche power to use any

means necessary "to correct past actions." There are many ways to implement a new presidential

administration's policies, but only those that are *legal* will survive judicial review. What

Defendants have done here is not legal. The Court found that Congress had indeed given

Defendants the authority to withhold and withdraw a state's NEVI Formula funds—but only

"under very limited circumstances, none of which has obtained here." Dkt. No. 110 at 42. Again,

Defendants' re-issuance of new NEVI Formula Program guidance is not the issue here. The issue

is the funding freeze and, simply put, funding freezes are not available to Defendants under the

IIJA. Plaintiff States assert that neither "the IIJA, [n]or any other federal law, authorize[s]

Defendants to revoke all State Plans and categorically withhold NEVI funding." Dkt. No. 142 at

20. Yet this is what Defendants have done. "Federal agencies and departments can spend, award,

or suspend money based only on the power Congress has given to them—they have no other

spending power." *New York v. Trump*, 769 F. Supp. 3d at 127. The Court thus concludes that

Defendants' action here exceeded their statutory authority, in violation of the APA.

### 3. Arbitrary and Capricious

> Agency action is considered arbitrary and capricious if "the agency
> has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter
> to the evidence before the agency, or is so implausible that it could
> not be ascribed to a difference in view or the product of agency
> expertise."

*Doe v. Noem*, 778 F. Supp. 3d 1151, 1162 (W.D. Wash. 2025) (quoting *Motor Vehicle Mfrs.*

*Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In its prior Order,

the Court found that Defendants had acted arbitrarily and capriciously, because upon freezing the

NEVI Formula funds, Defendants "f[ell] far short of adequately explaining their actions." Dkt. No. 110 at 46.

In their motion for summary judgment, Defendants explain their rationale behind freezing the NEVI Formula funds: "FHWA acknowledged that 83.9% of NEVI Program funds remained unobligated, meaning that the States had not established any legal right to those particular funds." Dkt. No. 141 at 25 (citing Dkt. No. 115-2 at 118). "FHWA, therefore, concluded that it could re-align NEVI Program guidance writ large without impacting existing financial commitments." *Id.* (citing Dkt. No. 115-2 at 121).

This is too little, too late. As to the first assertion, there is no indication that Defendants "acknowledged" anything other than their assessment that the current administration's policies did not align with the former administration's policies. Defendants' motion cites to a table that does, indeed, indicate that the lion's share of NEVI Formula funds had not been obligated or disbursed at the time Defendants froze the funding. *See* Dkt. No. 141 at 25. But this is merely data. Defendants do not present any evidence that shows that any individual considered—or, for that matter, looked at—this data prior to the freezing of the NEVI Formula funds. It is one thing to point out that such evidence exists. It is another thing entirely to show that such evidence actually informed a decision. As to the second assertion, Defendants support it by citing to the Biondi Letter. *See id.* The Court, however, has expressly held that the Biondi Letter does not provide a sufficient explanation. *See* Dkt. No. 110 at 46 ("Defendants attempt to rely on two paragraphs in the Biondi Letter to satisfy their burden under the APA but fall far short of adequately explaining their actions."). What was insufficient last June is still insufficient now.

Further, "an agency must provide its 'reasoned explanation' in a form that can adequately be examined on judicial review, not simply present arguments in its briefing how the decision might have been reached." *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1068 (9th

Cir. 2021); *see Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1069 (9th Cir. 2018) ("FWS cannot rely on its briefing in this case to explain why the 2014 Finding relied on the Leary study rather than the DeHaan study."); *Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015, 1027 n.4 (9th Cir. 2011) ("If the Service relied on this study in making its determination, it did not adequately connect the dots in the Rule such that its 'path may reasonably be discerned.'" (quoting *State Farm*, 463 U.S. at 43)). Time and again, Defendants assert in their motion that they "acknowledged," "concluded" (three times), and "determined" various things prior to implementing the funding freeze. But beyond these bare assertions, they provide no evidence of such informed decision making. As the Plaintiff States argue, the Biondi Letter "does not explain how [revising NEVI Formula Program guidance] to align with new policy priorities . . . warrant[s] the retroactive revocation of all State Plan approvals and the categorical withholding of funds from obligation." Dkt. No. 142 at 25.

Further, the Court reiterates its finding that "[i]t is not evident that FHWA considered relevant factors that informed its decision." Dkt. No. 110 at 46. As the Court stated in its Order, Congress enumerated eight specific factors to be considered when developing guidance for the NEVI Formula Program. *See id.* at 47 (listing factors). None of these is referenced in any of the purported evidence of deliberation that Defendants have presented in support of their position. With only the Biondi Letter and Defendants' ex-post rationales to go on, then, the Court is left with no choice but to conclude that Defendants' action was arbitrary and capricious, in violation of the APA.

### 4.     Lawful Procedure

"Under the APA, a court may also review and set aside an agency action that was 'without observance of procedure required by law.'" *Ferreira v. Mayorkas*, 767 F. Supp. 3d 929, 936 (N.D. Cal. 2025) (quoting 5 U.S.C. § 706(2)(D)). In its prior Order, the Court found that

Defendants had not properly followed the IIJA's procedure for withholding NEVI Formula funds. *See* Dkt. No. 110 at 49–50. The Court found that, although Defendants had characterized their action as a "temporary pause on the distribution of NEVI funds," it could not plausibly be interpreted "as anything other than the withholding of funds." *Id.* at 49. And because the IIJA provides a specific procedure for withholding NEVI Formula funds, and that, prior to the issuance of the Biondi Letter, there was no indication that Defendants had followed it, Defendants had acted contrary to the IIJA *See id.* at 49–50; *see also* 135 Stat. at 1422–23.

In moving for summary judgment, Defendants appear to assert that the fund-withholding procedure described in the IIJA does not apply to them. Rather, "FHWA made the threshold decision to update NEVI Program guidance pursuant to its authority to issue guidance and administer State deployment plans," a decision that "was independent of States' submission of deployment plans under previously issued guidance and is unrelated to the States' performance under those guidance documents." Dkt. No. 141 at 26.

This is unavailing. For one thing, the Court cannot map this language onto the IIJA. The NEVI Formula Program is a collaborative effort between the federal government and the states. Guidance that informs and directs deployment plans is not at all "independent" of the States' submission of those plans. Simply saying it does not make it so, especially where the content of state plans is largely *dependent* on the content of federal guidance. For another, Defendants do not explain how "ma[king] the threshold decision to update NEVI Program guidance" obviates Defendants from following the statutorily required procedure. In any event, Defendants' decision was not a "threshold" decision at all, as it was made *during* the administration and implementation of the NEVI Formula program, not before it. Any decision could be framed as a "threshold" decision by simply ignoring everything that came before; as federal agencies bound by the APA, however, Defendants do not have that option. The result of Defendants' decision to

rescind the then-operative guidance and revoke the state plan approvals, as the Court has already found, was an interruption of something already in progress—the withholding of NEVI Formula funds *that had already been made available*. Or, as the Plaintiff States put it, "Defendants' actions have already resulted in the prolonged cessation, *i.e.*, withholding of NEVI fundings for more than seven months." Dkt. No. 165 at 19.

Therefore, the Court concludes that Defendants took action without observance of procedure required by law, in violation of the APA.

*        *        *

In sum, Plaintiffs prevail on all APA claims.

## B.        Constitutional Claims and *Ultra Vires* Claim

Plaintiff States advise that the "Court need not reach Plaintiffs' constitutional arguments should it rule in favor of Plaintiff States' APA claims." Dkt. No. 142 at 29 n.7. Similarly, Plaintiff–Intervenors assert that "the Court need not resolve Plaintiff-Intervenors' constitutional claims if it concludes that relief is warranted under the APA." Dkt. No. 150 at 14. As discussed above, *see supra* Section IV.A, the Court finds in Plaintiffs' favor on their APA claims. Therefore, the Court will not consider Plaintiffs' constitutional claims. *See Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1123 (9th Cir. 2025) (vacating district court's judgment on constitutional claim after determining that resolution of APA claims rendered consideration of constitutional claim "unnecessary and therefore inappropriate" (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 446 (1988))).

Similarly, both Plaintiff States and Plaintiff–Intervenors concede that the Court need not consider the *ultra vires* claim—i.e., Count VI of the FAC and Count 5 of the complaint-in-intervention—if it decides in Plaintiffs' favor on the APA claims. *See* Dkt. No. 142 at 24 n.5; Dkt. No. 150 at 13 n.8. Therefore, the Court declines to rule on Plaintiff States' Count VI and

Plaintiff–Intervenors' Count 5 here. *See Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 799 F. Supp. 3d 967, 994 (N.D. Cal. 2025) ("Plaintiffs concede that, because the record, analysis, and relief of the *ultra vires* claim overlap with that of their APA claims, the Court need not reach both. This order accepts plaintiffs' concession and declines to reach the *ultra vires* claim.").

## C.    Mootness

Defendants assert that Plaintiffs' claims are moot. Dkt. No. 141 at 10. However, Defendants' position is predicated on a fundamental mischaracterization of the nature of this case. Defendants have consistently framed the case as a controversy over Defendants' authority to manage and administrate the NEVI Formula program. *See, e.g.*, Dkt. No. 141 at 6 ("FHWA's decision to re-align the NEVI Program to be consistent with new Administration policies is fully within its statutory authority because the statute explicitly authorizes and requires DOT to issue such guidance. Defendants' decisions pursuant to that statutory authority do not violate the [APA] or the Constitution."). As Defendants see it, the issue here is whether they are *authorized* to do what they have done. This is an artificial flattening of the issues, however, that conflates *authority* with *legality*. The issue in this case is *how* Defendants have exercised—and continue to exercise—their authority to manage the NEVI Formula program. Under the IIJA, there is a lawful way to do what Defendants are endeavoring to do and, simply put, Defendants have neglected to pursue it.

It is inarguable that, as a matter of administrative law, the APA authorizes Defendants—as executive agencies—to implement a substantive program conceived of and funded by Congress. This is how our system of government works, whether the program involves the Bureau of Reclamation's construction of a dam, the National Park Service's management of a property, or the Department of Transportation's administration of an electric vehicle

infrastructure program. But the APA does not exist in a vacuum; it works in tandem with the various statutes that, by empowering administrative agencies to act, impliedly invoke the APA's authority. Put another way, the APA provides a standardized means for achieving some statutorily conceived end; the procedure it prescribes is not the end in and of itself. The prohibited agency actions described in 5 U.S.C. § 706(2) are to be considered in relation to the underlying statute that granted the agency the authority to act in the first place. *See Lane v. U.S. Dep't of Agric.*, 120 F.3d 106, 109 (8th Cir. 1997) (noting "the variety of issues and forums covered by the APA"); *Friends of Animals v. U.S. Fish & Wildlife Serv.*, 28 F.4th 19, 28 (9th Cir. 2022) (applying APA standard to determine agency's compliance with Endangered Species Act and National Environmental Policy Act). An agency's "observance of procedure required by law," 5 U.S.C. § 706(2)(D), might vary depending on the procedure that a particular statute requires.

Here, in moving for summary judgment, Defendants suggest that if they engaged in any misconduct at all, it was only to the extent that they did not implement the NEVI Formula Program for—in their estimation, at least—a short period of time. That is, they implemented a "temporar[y] pause[]" and, in so doing, did not let the program move forward for a discrete period of time. Dkt. No. 141 at 17. Defendants assert, then, that their re-issued NEVI Formula Program guidance "has, in effect, granted the relief that Plaintiffs seek": They ended the pause and got things moving again. *Id.* at 10. But the IIJA does not authorize or contemplate "temporary pauses" in the NEVI Formula Program. In establishing the program, the IIJA empowers the Secretary of Transportation to do many things—but taking a hiatus from executing the law is not one of them. As conceived in the IIJA, the NEVI Formula Program exists to fund the construction of electric-vehicle infrastructure. Where a "temporary pause" *stops* that funding, the temporary pause runs counter to the law.

Further, Defendants took affirmative steps that severely disrupted or wrecked parts of the program that were already underway and undid parts of the program that had already been done—impermissibly ignoring, among other things, the reliance interests that had been created as a result of those completed parts. In short, Defendants defied the will of Congress by withholding funds in a manner not contemplated by the IIJA. Defendants summarize their position as: "Because Plaintiffs are able to obtain approval for their NEVI Program deployment plans and submit new obligation requests pursuant to those approved plans, there is no case or controversy to be resolved by the Court." *Id.* at 6. The Court disagrees.

"A claim is moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012) (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980)). Put another way, "[a]n action 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *350 Montana v. Haaland*, 50 F.4th 1254, 1264 (9th Cir. 2022) (quoting *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 862 (9th Cir. 2017)). That is clearly not the case here. As will be discussed, it is far from "impossible" for the Court to grant effectual relief to both Plaintiff States and Plaintiff–Intervenors. "The party asserting mootness bears a 'heavy burden'" of demonstrating that a case is, as a matter of law, moot. *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

Defendants have not carried this heavy burden. As demonstrated by the Plaintiff States, the harm that resulted from Defendants' funding freeze has not gone away simply because Defendants have issued new NEVI Formula program guidance, "encouraged [States] to immediately submit deployment plans, and [instructed] FHWA Division Offices . . . to approve those plans after confirming that the plans implemented the three statutory and regulatory

requirements . . . ." Dkt. No. 141 at 11. The consequences and effects of the funding freeze still

linger: Significantly, the original, already-approved plans are still rescinded, and many of the

projects that those plans contemplated have been necessarily abandoned or significantly changed.

In the District of Columbia, for example, the District "was forced to immediately pause its plans

for a second round RFA as a result of the suspension of the NEVI program . . . ." Dkt. No. 146

¶ 21. The District's grant to Shell "to construct NEVI-compliant stations in the

District . . . stalled on June 5, 2025, when the District's conditional grant agreement with Shell

fell through." *Id.* A contractor in Vermont advised state officials about concern that, because of

the funding freeze, the contractor might not be able to complete work on a NEVI grant–funded

project and, consequently, might be forced to lay off employees. Dkt. No. 148 ¶ 22. The Court

cited additional disruptions in its preliminary-injunction order. *See* Dkt. No. 110 at 55–56.

What is more, as testimony submitted by the Plaintiff States illustrates, a substantial

amount of harm has resulted from the *uncertainty* introduced into the program by Defendants'

actions, and by the manner in which Defendants preformed them. As a California official

testified:

> The lack of funding has led to financial uncertainty among the
> CEC's awardees, potential project partners, and other industry
> participants, who may be unwilling to work with the CEC in the
> future. In addition, the CEC's ability to follow through on its
> commitments or provide clear direction to its project partners is
> harming its reputation in the EV charging industry.

Dkt. No. 7 (de Alba Decl.) ¶ 23. An Oregon official averred that Oregon "expects there will be

challenges securing future contracts due to uncertainty regarding the status of the NEVI

program." Dkt. No. 23 (Pietz Decl.) ¶ 31. And in Washington, "[t]he delays, changes, and

uncertainty caused by the funding pauses and rescinded plans are hurting the State's reputation

for delivering projects on time and on budget." Dkt. No. 28 (Meredith Decl.) ¶ 39.

Defendants' actions, whether considered arbitrary and capricious, contrary to law, or in excess of statutory authority, mean that, without the Court's intervention to re-impose the certainty that Congress wrote into the IIJA, these harms will continue. *See, e.g.*, *City & County of San Francisco*, 783 F. Supp. 3d at 1186–87 (finding injury where federal administrative action caused budgetary uncertainty); *Michigan v. DeVos*, 481 F. Supp. 3d 984, 996 (N.D. Cal. 2020) ("The Ninth Circuit has held that disruptions to budget plans . . . are a cognizable irreparable harm." (citing *Washington v. Trump*, 847 F.3d 1151, 1168–69 (9th Cir. 2017))).

Moreover, "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued. Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted). "[A] defendant claiming that its involuntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *Friends of the Earth, Inc.*, 528 U.S. at 190). Here, Defendants' assertion that "there is no likelihood of recurrence" (Dkt. No. 141 at 11) is unsubstantiated by evidence. Moreover, Defendants' conduct—both before and after Plaintiff States filed this lawsuit—as well as the legal argumentation advanced in their briefing, erode the Court's willingness to simply take Defendants' word that NEVI Formula funds are safe from further unlawful interference.

For one thing, Defendants do not provide any evidence—such as a declaration from the Secretary of Transportation, an affidavit from the FHWA Administrator, or even a public statement made by an official with authority over the governance of the NEVI Formula program—that clearly demonstrates a disavowal of future action to deprive states of their NEVI Formula funds. In *United States v. Concentrated Phosphate Export Ass'n*, the Supreme Court

found that "appellees' own statement" that they would cease the conduct at issue "c[ould not] suffice to satisfy the heavy burden of persuasion" that the case was moot. 393 U.S. 199, 203 (1968). Here, Defendants do not even present such a statement; they instead rely on language contained in the briefing prepared by their attorneys. *See* Dkt. No. 141 at 11. Under these circumstances, Defendants have not come close to carrying their "formidable" burden of establishing no likelihood of recurrence.

Further compounding the problem is Defendants' proffered basis for asserting mootness: "[T]here is no likelihood of recurrence *because Defendants lack any incentive to revoke guidance reflecting the current Administration's priorities.*" *Id.* (emphasis added). Defendants' problem here is that the new NEVI Formula Program guidance—i.e., the "Interim Guidance" (*see supra* Section II.B.4)—does not actually "reflect[] the current Administration's priorities," at least insofar as Defendants have enumerated those priorities to the public, to Plaintiff States and Plaintiffs–Intervenors, and to the Court. The new guidance is less than seven pages long. *See generally* Interim Final Guidance. It makes no reference to policies described in Secretary Duffy's DOT Order No. 2100.7, "Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities," even though aligning the NEVI Formula Program with "policy and priorities . . . set forth in DOT Order 2100.7" was purportedly a primary reason for scrapping the old guidance and issuing an updated version in the first place. Dkt. No. 115-2 at 120–21. Moreover, Defendants' counsel admitted at oral argument that the new guidance did not include any new requirements that were not already present in the old guidance. Put another way, the new guidance is merely the old guidance, *minus* what the current Administration deemed undesirable, *plus* nothing. If Defendants froze the NEVI Formula Program for the express purpose of aligning it with current Administration priorities,

1   the fact that such a realignment does not actually appear to have happened provides no assurance

2   against future funding freezes purportedly imposed for the exact same reason.

3         For another thing, as Plaintiff–Intervenors point out, "Defendants' own strenuous

4   assertion of unbounded authority over NEVI and its guidance confirms the . . . same risk" that

5   "the new policy 'could be easily abandoned or altered in the future.'" Dkt. No. 166 at 11

6   (quoting *Bell v. City of Boise*, 709 F.3d 890, 901 (9th Cir. 2014)). The record substantiates this

7   concern. The Federal Register entry that announced the promulgation of the Interim Final

8   Guidance stated that "FHWA *is reviewing* its existing regulations and guidance documents for

9   alignment with law and Administration priorities." National Electric Vehicle Infrastructure

10  Formula Program Guidance, 90 Fed. Reg. 39025, 39026 (Aug. 13, 2025) (emphasis added). The

11  concession that Defendants continue to review "for alignment with law and Administration

12  policies," when taken in light of Defendants' prior conduct and their sweeping assertion of

13  authority over the management of the NEVI Formula Program, does not meaningfully

14  demonstrate a commitment to keep NEVI Formula funds flowing. This is especially concerning

15  given Defendants' quiet transformation of the "Interim Final Guidance" into purported "Final

16  Guidance," a re-characterization of which the Court only became aware after it directly asked

17  Defendants' counsel about it during oral argument. In making the interim guidance final,

18  Defendants place the NEVI Formula Program under never-ending review and, implicitly, under a

19  never-ending threat of rescission or revision.

20        Such a state of affairs perpetuates uncertainty. It was, after all, a "deci[sion] to review the

21  policies underlying the implementation of the NEVI Formula Program" that precipitated the

22  funding freeze that is the subject of this lawsuit. Dkt. No. 115-2 at 120. As the Court pointed out

23  in its preliminary-injunction order, when the prior administration updated NEVI Formula

24  Program guidance, "the revised and reissued guidance expressly superseded the guidance it

1    replaced, resulting in a seamless transition from one regime to the next." Dkt. No. 110 at 42.

2    When the current administration updated NEVI Formula Program guidance, however, it resulted

3    in a funding freeze—and all that resulted from the withholding of that funding.

4      Finally, more recent developments in Defendants' administration of the NEVI Formula

5    Program do not demonstrate a full commitment to appropriate procedure. A Declaration from

6    one of Plaintiff State Washington's attorneys avers that "on November 24, 2025, the FHWA

7    unilaterally deobligated $54.7 million of the Washington State Department of Transportation's

8    $55.7 million in fiscal years 2022–2025 NEVI funds. FHWA did not cite to any provision of the

9    IIJA or FHWA regulations to support its . . . deobligation." Dkt. No. 172 (Soden Decl.) ¶ 7

10   (citation omitted). Similarly, "[o]n November 21, 2025, FHWA instructed the Illinois

11   Department of Transportation to deobligate any NEVI funds for projects that had not yet cleared

12   National Environmental Policy Act ('NEPA') review. FHWA did not cite to a provision of the

13   IIJA or FHWA regulations to support its request." *Id.* ¶ 9 (citation omitted). Defendants reversed

14   these actions (*see id.* ¶¶ 8, 10), and Defendants' counsel asserted at oral argument that the

15   deobligation of funds in Washington and instruction to deobligate funds in Illinois were indeed

16   mistakes, and that they were made at lower—i.e., regional—levels of Defendants' hierarchy. But

17   however unintended these mistakes might have been, they were still unlawful, and they still

18   happened. They respectively represented the imposition of a funding freeze on one Plaintiff State

19   and the demand for a funding freeze on another, at a time when Defendants were bound

20   generally by the provisions of the IIJA, and bound specifically by the preliminary injunction that

21   this Court issued in June 2025 (*see* Dkt. No. 110 at 65–66).[12] That officials of Defendant

22

---

23   [12] Defendants were enjoined from, among other things: "Withholding or withdrawing NEVI Formula Program funds
     for [Plaintiff States'] previously approved State Electric Vehicle Infrastructure Deployment Plans for any reason not

24   set forth in the IIJA or applicable FHWA regulations; or withholding or withdrawing NEVI Formula Program funds
     from a state without following the IIJA's substantive and procedural requirements." Dkt. No. 110 at 65–66.

agencies—irrespective of their geographic locations or hierarchical places in the agency org chart—took actions to freeze two Plaintiff States' NEVI Formula funds, after the Court had ruled that funding freezes were unlawful, is cause for concern. It casts further doubt on Defendants' assertions that their offending conduct will not happen again.

Put another way, Defendants' conduct demonstrates that only the actual disbursement of NEVI Formula funds from the federal government to the states—that is, not the availability of funds for obligation, and not the obligation of funds, but the *expenditure* of funds—guarantees Defendants' fulfillment of their NEVI Formula funding obligations under the IIJA. As the Plaintiff States have shown in the examples from Washington and Illinois, appropriated funds, apportioned funds, and obligated funds are all at risk of unlawful withholding. To date, no NEVI jurisdiction has received all of its available funds. Defendants have provided a declaration from FHWA's Acting Director of the Office of Financial Data and Technology (Dkt. No. 173 (Guterman Decl.)), which includes a spreadsheet that "reflects the status of NEVI Formula Program obligations as of December 31, 2025, including the amount of funds obligated following FHWA's August 11, 2025 issuance of NEVI Formula Program Interim Final Guidance." *Id.* ¶ 3; *see id.* at 5. Although a handful of states—Colorado, North Carolina, Pennsylvania, and Vermont—have obligated the entirety of their NEVI Formula funds, no state—these four included—has received all of the money mandated by Congress in the IIJA. *See* Dkt. No. 173 at 5.[13] Consequently, funds remain at risk of not being disbursed.

In sum, Defendants have not demonstrated that this case or controversy is moot.

---

[13] Four states—Louisiana, Missouri, Nevada, and Wyoming—have not obligated any of their NEVI Formula funds. *See* Dkt. No. 173 at 5.

**D.    Remedy**

Having determined that Defendants' action was unlawful under the APA, the Court now turns to the appropriate remedy. Plaintiffs request three remedies: vacatur, injunctive relief, and declaratory relief. *See* Dkt. No. 142 at 31–32; Dkt. No. 150 at 8. The Court will address these in turn.

**1.    Vacatur**

"Vacatur is the presumptive remedy when a court finds an agency's decision unlawful under the Administrative Procedure Act ('APA')." *AquAlliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 880 (E.D. Cal. 2018) (citing 5 U.S.C. § 706(2)(A)). "[C]ourts in the Ninth Circuit decline vacatur only in rare circumstances." *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) (citing *Humane Soc'y of the United States v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010)); *see Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely serious irreparable environmental injury.").

Plaintiffs assert that they are entitled to vacatur of Defendants' action. Dkt. No. 142 at 32; Dkt. No. 150 at 15. For their part, Defendants mount a broad semantic attack against the Court's authority under the APA to vacate anything at all, relying on Justice Gorsuch's concurring opinion in *United States v. Texas*, 599 U.S. 670, 686–74 (2023). *See* Dkt. No. 163 at 19. Defendants take the position, as presented by Justice Gorsuch, that the term "set aside," as written in 5 U.S.C. § 706(2), is not "synonymous" with the term "vacate." *See id.* (citing *Texas*, 599 U.S. at 695 (Gorsuch, J., concurring). "'[S]et aside' should be understood to mean that a court should 'disregard' the action taken by the agency in determining the outcome of a case." *Id.*

1      Without challenging or offering a rebuttal to Justice Gorsuch's position, the Court finds

2 that it is irrelevant here. *United States v. Texas* concerned an agency's promulgation of guidance

3 that would have a far-reaching and open-ended effect on how the Department of Homeland

4 Security enforced the Immigration and Nationality Act. *See Texas*, 599 U.S. at 673–74. In

5 contrast here, the challenged action is something quite different—namely, a one-off, a discrete

6 action that froze NEVI Formula funding and cannot reasonably be considered quasi-legislative in

7 nature. Justice Gorsuch was concerned with judicial overreach and courts' intrusion into the

8 realm of legislation, a concern that is not at issue here given the administrative action under

9 review here.

10      "[F]ederal courts," Justice Gorsuch wrote, "have never enjoyed the power to 'vacate'

11 legislation." *Texas*, 599 U.S. at 696 (Gorsuch, J., concurring). "Instead, [courts] possess 'little

12 more than the negative power to disregard an unconstitutional enactment.'" *Id.* (quoting

13 *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)). The challenged action in this case,

14 however, is not legislation, nor is it the "quasi-legislation" represented by agency rulemaking.

15 *See id.* (quoting *Humphrey's Executor v. United States*, 295 U.S. 602, 624 (1935)). Rather, what

16 the Court has been asked to "vacate" is Defendants' issuance of the Biondi Letter and the

17 revocation and rescission of State Plans that the Biondi Letter mandated. *See* Dkt. No. 142-1

18 (proposed order) at 1–2. Even if the Court were to apply Justice Gorsuch's argument that "set

19 aside" means "disregard," and not "vacate," the result here would be the same. *See Texas*, 599

20 U.S. at 696 (Gorsuch, J., concurring); *see also Bautista v. Santacruz*, No. C25-1873, 2025 WL

21 3713987, at *19 (C.D. Cal. Dec. 18, 2025) (finding that, notwithstanding Justice Gorsuch's

22 position, "the synonymous nature of 'vacate' and 'set aside' would weigh in favor of finding the

23 availability of [vacatur]"). If the Court *disregards* the Biondi Letter and the actions that

24 Defendants took pursuant to it, the results are the same as if the Court were to *vacate* it—and

thus "render[ it] a nullity," *Texas*, 599 U.S. at 691 (Gorsuch, J., concurring). Either way, the

Court restores the *status quo ante*, whether the Court effectively pretends that the Biondi Letter

was never issued (i.e., disregards it), or creates the legal fiction that the Biondi Letter was never

issued (i.e., vacates it).

The Court thus vacates the issuance of the Biondi Letter and the revocation of the state

plans that it demanded.[14]

### 2. Injunctive Relief

A plaintiff seeking a permanent injunction must demonstrate:

> (1) actual success on the merits; (2) that it has suffered an
> irreparable injury; (3) that remedies available at law are
> inadequate; (4) that the balance of hardships justify a remedy in
> equity; and (5) that the public interest would not be disserved by a
> permanent injunction.

*Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Rels.*, 730 F.3d 1024, 1032

(9th Cir. 2013) (citing *eBay Inc. v. MercExch., L.L.C.*, 547 U.S. 388, 391 (2006)). Where, as

here, the government is the defendant, the last two factors merge. *Roe ex rel. Roe v. Sjolander*,

No. C20-383, 2025 WL 3145104, at *3 (D. Ariz. Sept. 30, 2025) (citing *Nken v. Holder*, 556

U.S. 418, 435 (2009)); *see Galvez v. Jaddou*, 52 F.4th 821, 831 (9th Cir. 2022) ("The [balance-

of-hardships] and [public-interest] factors merge when the Government is the party opposing the

injunction."). "[A]n injunction 'should be no more burdensome to the defendant than necessary

to provide complete relief' to the plaintiff." *Washington v. Trump*, 441 F. Supp. 3d 1101, 1126

(W.D. Wash. 2020) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Plaintiff States argue that "the permanent injunction should parallel the relief granted in

the Court's PI Order." Dkt. No. 142 at 31. Further, "[i]t should also extend to all Plaintiff States,

---

[14] Given Defendants' issuance of updated NEVI Formula Program guidance, the rescission of the old NEVI Formula Program guidance need not be vacated; the old guidance was, instead, superseded by its successor.

as each Plaintiff State has submitted declaratory evidence demonstrating that Defendants' actions

have caused them harm." *Id.* Plaintiff–Intervenors seek broader relief, arguing that because

Defendants' action has caused harm "across virtually every NEVI jurisdiction," an injunction

should extend beyond the Plaintiff States, to "all NEVI jurisdictions where unobligated FY

2022–2025 funds were frozen." Dkt. No. 150 at 25. For their part, Defendants focus their

argument on the scope of any injunctive relief that the Court might grant. *See* Dkt. No. 141 at

12–14. Defendants argue, "To the extent the Court is inclined to grant any relief, it should be

narrowly tailored to only address the injuries to parties in this case." *Id.* at 13. Defendants reject

Plaintiff–Intervenors' position that harm suffered by members of the Plaintiff–Intervenor

organizations suffices to entitle the states in which those members reside to injunctive relief.

"Intervenors' request for nationwide relief," Defendants argue, "is not adequately tethered to any

actual injuries suffered by the non-party States—the only entities with any right to NEVI funds."

*Id.* at 14.

The Court will first address the scope of any injunctive relief, then turn to the individual factors

from *Independent Training and Apprenticeship Program* and *eBay*.

### a. *Scope of Relief*

"The scope of an injunction is 'dependent as much on the equities of a given case as the

substance of the legal issues it presents,' and courts must tailor the scope 'to meet the exigencies

of the particular case.'" *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (quoting *Trump v.

Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)). An injunction should be limited to

addressing harm that has been demonstrated by a sufficiently developed record. *See City &

County of San Francisco v. Trump*, 897 F.3d 1225, 1245 (9th Cir. 2018) (vacating injunction "to

the extent that it applies outside California," because "the record [was] insufficiently developed

as to the question of the national scope of the injunction").

1    Defendants argue any injunctive relief issued by the Court should be limited only to the

2    Plaintiff States. In Defendants' view, "Intervenors' proposed nationwide relief is inappropriate,"

3    however, because the Plaintiff–Intervenors "have failed to articulate concrete nationwide harms

4    because they have not established how they are harmed by DOT's actions with regard to *every*

5    State." Dkt. No. 163 at 9. But Defendants are mistaken; the record *does* indicate concrete harm in

6    every state. Plaintiff–Intervenors' proposed relief is directed to "all NEVI jurisdictions where

7    Plaintiff–Intervenors' members face ongoing harm from the NEVI freeze and/or remain at risk of

8    further unlawful interference." *Id.* at 15. That these jurisdictions include every state, the District

9    of Columbia, and Puerto Rico (*see* Dkt. No. 151 (Garcia Supp. Decl.) at 5–13; Dkt. No. 146

10   ¶¶ 18–24; Dkt. No. 24 (Kearns Decl.) ¶¶ 24–26) is indicative of the widespread effect of

11   Defendants' actions, not the overreach of Plaintiff–Intervenors' request. As discussed above, *see*

12   *supra* Section IV.C, Defendants' actions with respect to obligated funds in Washington and

13   Illinois demonstrate that even *obligated* funding "remain[s] at risk of further unlawful

14   interference." Plaintiff–Intervenors do not, then, seek the "nationwide" or "universal" relief that

15   the Supreme Court disapproved of in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Rather, they

16   seek the specific relief that the Supreme Court *validated* in *CASA*—namely, "complete relief to

17   the plaintiffs before the court." *CASA*, 606 U.S. at 852 (emphasis omitted). Complete relief,

18   however, requires remediation in all NEVI jurisdictions. As the Court discussed in its order on

19   intervention (*see* Dkt. No. 168 at 6–12), members of four of the Plaintiff–Intervenor

20   organizations have established injury-in-fact, and, as illustrated by the Supplemental Garcia

21   Declaration (*see* Dkt. No. 151 at 5–13), these injuries have been sustained in all but two NEVI

22   jurisdictions—Rhode Island and the District of Columbia. And because both Rhode Island and

23   the District of Columbia are Plaintiff States, they are entitled to relief as Plaintiffs *per se*,

24   irrespective of their entitlement through the associational standing of Plaintiff–Intervenors.

Similarly, Defendants' argument that Plaintiff–Intervenors' desired relief is inappropriate on the basis that "Section 705 [of the APA] is constrained by the same traditional equitable principles as the Judiciary Act of 1789" (Dkt. No. 141 at 14) is irrelevant, because Plaintiff–Intervenors do not seek relief under Section 705. As Plaintiff–Intervenors assert, they "seek relief under Section 706, which directs courts to 'set aside' agency actions found unlawful, not Section 705, which concerns only 'relief pending review.'" Dkt. No. 166 at 16 n.10.

Moreover, the Court agrees with Plaintiff–Intervenors' observation that "Defendants' real objection appears not to be about the requested relief, but about standing." Dkt. No. 166 at 16 (citing Dkt. No. 141 at 12 and Dkt. No. 163 at 9–12). Indeed, Defendants have merely re-heated and re-served their arguments that Plaintiff–Intervenors do not have Article III standing because: (1) their "generalized interest in the development of EV infrastructure is not sufficiently concrete and particularized to justify relief for States that failed to show that Defendants' policy decisions impacted their NEVI plans" (Dkt. No. 141 at 12; *accord* Dkt. No. 102 (Defendants' opposition to motion to intervene) at 7); and (2) Plaintiff–Intervenors' injuries are not fairly traceable to Defendants' actions (Dkt. No. 163 at 11; *accord* Dkt. No. 102 at 10). These are arguments that the Court has decisively rejected. *See* Dkt. No. 168 (Amended Order on Motion to Intervene) at 6 ("Defendants' blanket characterization of Movants' members' alleged harm as 'generalized' does not withstand scrutiny."), 13 (finding that "cause-and-effect" asserted by Plaintiff–Intervenors "satisfies the 'fairly traceable' requirement of the standing inquiry"). Defendants do not now add any factual or legal analysis to their argument, and their invocation of *Trump v. CASA* is inapposite because, as discussed above, a "universal" injunction is not at issue here. *See* Dkt. No. 141 at 13 (citing *CASA*, 606 U.S. at 851). The Court will not revisit its injury-in-fact or

1   fairly-traceable analyses regarding Plaintiff–Intervenors here. *See* Dkt. No. 168 at 6–12.[15] *See*

2   *United States v. Phillips*, 367 F.3d 846, 856 (9th Cir. 2004) ("Issues that a district court

3   determines during pretrial motions become law of the case.").

4         Finally, Defendants also seek to re-litigate the Court's prior decision that Plaintiff–

5   Intervenors have satisfied the zone-of-interests requirement for mounting an APA challenge to

6   Defendants' action. *See* Dkt. No. 141 at 12 n.1. The Court has already heard—and rejected—this

7   argument. *See* Dkt. No. 168 at 14–15 ("Movants have met the zone-of-interests requirement.").

8   Again, absent any new factual or legal material from Defendants, the Court will not re-engage on

9   this issue. *See Phillips*, 367 F.3d at 856.

10              **b.    *Actual Success on the Merits***

11        As discussed above, the Court has found in Plaintiffs' favor on the APA claims, thus

12   demonstrating success on the merits and satisfying the first requirement for permanent injunctive

13   relief.

14              **c.    *Irreparable Injury and Inadequacy of Monetary Damages***

15                   (1)   Plaintiff States

16        In establishing irreparable injury, Plaintiff States point to the injuries that the Court

17   recognized in its Order granting Plaintiff States' motion for a preliminary injunction. *See* Dkt.

18   No. 110 at 19–30. Additionally, Plaintiff States have submitted further evidence demonstrating

19   injury sustained by three original Plaintiff States—Minnesota (Dkt. No. 143), Vermont (Dkt.

20   No. 148), and the District of Columbia (Dkt. No. 146)—and by the four Plaintiff States that

21

22   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
23   [15] In its order on intervention, the Court found that four Plaintiff–Intervenors—Sierra Club, NRDC, SACE, and Plug In America—adequately established injury-in-fact. *See* Dkt. No. 168 at 12. Two Plaintiff–Intervenors—CleanAIRE NC and West End Revitalization Association—did not. *See id.* Relevant here, for all 50 jurisdictions in which Plaintiff–Intervenors seek injunctive relief here, a member from one of Sierra Club, NRDC, SACE, and/or Plug In America has provided testimony that sufficiently establishes injury-in-fact. *See* Dkt. No. 151 at 5–13.

24

joined the Amended Complaint—Kentucky (Dkt. No. 144), Michigan (Dkt. No. 149), North

Carolina (Dkt. No. 145), and Pennsylvania (Dkt. No. 147). As it did for those states that qualified

for preliminary injunctive relief, the Court will briefly discuss the particular injuries sustained by

the Plaintiff States that have submitted declaratory evidence since the Court's preliminary-

injunction decision, and the particular injuries sustained by the new Plaintiff States.

**Minnesota** "prepared and provided to the FHWA its State Plans for federal fiscal years

2023–2025 describing how it intended to use its share of funds to carry out the NEVI Formula

Program." Dkt. No. 143 ¶ 6. FHWA approved the plans, making $53,645,989 in NEVI Formula

funds "available to Minnesota for obligation"—$10,089,418 for fiscal year 2022, $14,518,786

for fiscal year 2023, $14,518,886 for fiscal year 2024, and $14,518,899 for fiscal year 2025. *Id.*

¶¶ 7–8. The Biondi Letter, however, "made clear that Minnesota would not have access to the

$42.8 million in FY22–25 funds which had been made available to Minnesota through its State

Plan Approvals." *Id.* ¶ 15. Minnesota had "relied and acted upon the FHWA's statutory

obligation to provide NEVI formula funding consistent with the IIJA's requirements," and

Minnesota "is relying on FHWA to fulfill reimbursement of existing obligations to not disrupt

current financial commitments." *Id.* ¶ 16. When Defendants suspended the NEVI program,

Minnesota canceled processes it had undertaken "towards executing contracts for" five EV

infrastructure projects, and these projects, although planned and budgeted, "are currently on

hold." *Id.* ¶ 9. "[S]ignificant work has been completed by [Minnesota], public utilities, local

municipalities, stakeholders and grantees to get to the point of contract execution. Should any

one of the three partners (federal, state or grantee) back out at this time, it will result in a

considerable waste of public and private resources." *Id.* ¶ 16.

**Vermont** "submitted to [FHWA] State Electric Vehicle Infrastructure Development

Plans covering the first four years of the NEVI Formula Program funds apportioned by the

1   FHWA, representing fiscal years 2022 through 2025." Dkt. No. 148 ¶ 10. "The State's shares of

2   NEVI Formula Program Funds for fiscal years 2022 through 2025 were made available to the

3   State to obligate upon the FHWA's approval of its State Electric Vehicle Infrastructure

4   Development Plans covering those fiscal years. The first four fiscal years of apportioned funding

5   equaled approximately $16.7 million." *Id.* ¶ 13. In reliance on those funds, "Vermont expended

6   significant resources to establish planning milestones for the development [of] public electric

7   vehicle supply equipment. . . . In December 2024, the State awarded $9.3 million in federal

8   funding to 11 public fast-charger projects along the state's busiest highway corridors, but had to

9   halt that work after receiving" the Biondi Letter. *Id.* ¶ 20. The Biondi Letter "made clear that

10  [Vermont] would not have access to the unobligated total of $15.9 million in unobligated Fiscal

11  Year 2022–2025 funds which had been made available to Vermont through its State Plan

12  Approvals." *Id.* ¶ 19. One of the contractors with whom Vermont had contracted to perform

13  "work funded through the NEVI grants," and whose contract had been frozen "due to the funding

14  freeze announced in the" Biondi Letter, "expressed concerns about its ability to complete future

15  work because of the uncertainty arising from the federal freeze, suggesting they would have to

16  lay off staff." *Id.* ¶ 22.

17          In 2022, the **District of Columbia** "prepared and submitted to the FHWA its District

18  NEVI Electric Vehicle Infrastructure Deployment (EVID) Plans for fiscal years 2022–

19  2026 . . . ." Dkt. No. 146 ¶ 7. FHWA approved the plans, asserting each time that "with this

20  approval, . . . funds are now available to the District of Columbia for obligation." *Id.* ¶ 8. In total,

21  "the District was set to receive $16.7 million in funding over five years through the NEVI

22  Formula Program." *Id.* ¶ 9. But the Biondi Letter "made clear that the District of Columbia

23  would not have access to the $9.6 million in unobligated funds for fiscal years 2022, 2023, and

24  2025 for an unclear and indefinite period of time." *Id.* ¶ 19. When the Biondi Letter was issued,

the District had "planned to open a second round of funding in 2025, to support further buildout" of EV infrastructure and "hoped to issue conditional awards to additional partners by fall 2025." *Id.* ¶ 12. The District paused these plans, however, "significantly delaying opportunities to secure additional grant agreements for EV charging infrastructure in the District." *Id.* ¶ 20. Due to timeframes associated with funding projects in the District, this pause "has harmed the District" by forcing the District "to pause all of its NEVI-related plans." *Id.* ¶ 24.

**Kentucky** "submitted its Deployment Plan and the required updates by August 1 in each of 2022, 2023, and 2024." Dkt. No. 144 ¶ 5. FHWA approved each of Kentucky's plans, "apportion[ing] $54,661,824 in NEVI funds for FY 2022 through FY 2025": $25,074,183 for 2022 and 2023, $14,793,815 for 2024, and $14,793,827 for 2025. *Id.* ¶¶ 6–7. An additional $14,793,858 would have been made available for 2026. *See id.* ¶ 8. The issuance of the Biondi Letter and subsequent "revocation of [Kentucky's] Development Plan approval makes . . . $17,790,873 of previously unlocked NEVI Formula Funding unavailable for obligation. *Id.* ¶ 15. Kentucky had entered into some 47 contracts to construct EV infrastructure "with the expectation that FHWA would stand behind the funding appropriated by the U.S. Congress via the IIJA and NEVI Formula Program Guidance." *Id.* ¶ 18. Performance on the contracts is in jeopardy, because Kentucky "must have the ability to obligate the previously unlocked amount of $17,790,873 in funding to ensure appropriate oversight and implementation of the 47 contracts through the life of the NEVI program, which includes all construction activities and five full years of EV charging station operations." *Id.*

**Michigan** "submitted its State Electric Vehicle Infrastructure Deployment plans (State Plans) to the FHWA in August 2022, August 2023, and July 2024." Dkt. No. 149 ¶ 6. FHWA approved each of these plans, making $86,618,888 in NEVI Formula funds "available to Michigan for obligation." *Id.* ¶¶ 7–8. In 2023 and 2024, Michigan engaged in two rounds of

solicitation and contracting for the construction of up to 91 NEVI charging stations, which are to be funded by $57,961,354 in NEVI Formula funds. *Id.* ¶¶ 9–12. Michigan had intended to utilize $28,657,534.08 in "remaining apportioned NEVI Program Funds . . . for a Round 3 solicitation to install up to an additional 65 EV charging stations in Michigan." *Id.* ¶ 13. The Biondi Letter and subsequent freezing of funds, however, has "deprived" Michigan "of access to" these funds. *Id.* ¶ 14. The freeze has "negatively affected [Michigan's] current NEVI implementation efforts." *Id.* ¶ 17. Specifically, "five selected vendors have declined to proceed with project awards from [Michigan's] Round 1 solicitation." *Id.* Michigan received fewer proposals for its Round 2 solicitation—which began "on March 14, 2025, approximately one month after the FHWA advised the States of its suspension of the approved NEVI State Plans"—than it did for its Round 1 solicitation, and some projects received no proposals at all. *See id.*

**North Carolina** "submitted State Plans to the FHWA covering the first four fiscal years of NEVI Formula Program funds apportioned by the FHWA, representing fiscal years 2022 through 2025." Dkt. No. 145 ¶ 9. "FHWA approved North Carolina's State Plans, asserting each time that "[w]ith this approval, . . . funds are now available to North Carolina for obligation." *Id.* ¶ 10. "Combined, these approvals made roughly $86 million in funds available for [North Carolina] to obligate." *Id.* ¶ 11. On September 9, 2024, North Carolina issued conditional awards in a first round of solicitations, and on December 4, 2024, North Carolina published a map of potential construction sites "in preparation for Round 2." *Id.* ¶ 12. But on February 6, 2025, the Biondi Letter "made clear that North Carolina would not have access to the full amount that had been made available through its State Plan approvals." *Id.* ¶ 15. "As a direct result of FHWA's actions, [North Carolina] could only proceed with the $5.9 million in NEVI Formula Program funds already tied to nine construction contracts, leaving roughly $103 million of North Carolina's apportioned funds (approximately $80 million of which was made available for NC to

obligate) inaccessible, forcing [North Carolina] to halt forthcoming Round 2 solicitation." *Id.* ¶ 16. Consequently, North Carolina "will incur unrecoverable NEVI-eligible costs to oversee and manage the program for the 9 approved locations for the 5 years of operations after commissioning . . . ." *Id.* ¶ 17.

**Pennsylvania** "submitted State Electric Vehicle Infrastructure Deployment Plans to the FHWA covering the first four fiscal years of NEVI Formula Program funds apportioned by the FHWA, representing fiscal years 2022 through 2025." Dkt. No. 147 ¶ 6. FHWA approved Pennsylvania's plans, making $134.9 million in NEVI funding available for obligation. *See id.* ¶¶ 7–8. The Biondi Letter, however, rescinded approval of Pennsylvania's state plans "for [fiscal year] 2022 through and including [fiscal year] 2025 and similarly withheld [Pennsylvania's] statutorily-mandated funding." *Id.* ¶ 10. "Today, [Pennsylvania] is unable to access NEVI funds appropriated by Congress and previously apportioned by FHWA. [Pennsylvania] relied on the availability of these funds . . . when it built out its [alternative fuel corridor]. The unavailability of the remainder of the statutorily-appropriated funds imperils [Pennsylvania's] entire NEVI program beyond [alternative fuel corridor] build out." *Id.* ¶ 12.

*   *   *

As to whether these injuries are irreparable, "[i]reparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). In issuing a permanent injunction in *Planned Parenthood of Greater Washington and Northern Idaho v. U.S. Department of Health of Human Services*, the court found irreparable harm where the plaintiffs had "designed their budgets, programming, staffing, and partnerships with community organizations based on the understanding that [the agency] would fulfill its obligations." 328 F. Supp. 3d 1133, 1150 (E.D. Wash. 2018). Similarly, the court in *Washington v. U.S. Department of Education* recently held

that the plaintiffs' increased administrative burden resulting from a federal agency's withdrawal of funding represented irreparable harm for the purpose of granting a permanent injunction. No. C25-1228, 2025 WL 3690779, at *16 (W.D. Wash. Dec. 19, 2025).

Here, in granting Plaintiff States' motion for a preliminary injunction, the Court found irreparable harm where Plaintiff States "identif[ied] concrete actions that they ha[d] taken 'in reliance on [Congressional] support': 'Plaintiff States developed deployment plans, sought out private partnerships, conducted public outreach, committed state tax dollars, and hired or redirected existing staff resources to carry out the NEVI Formula Program.'" Dkt. No. 110 at 55 (quoting Dkt. No. 5 at 21). The Court found further that "the interference with Plaintiff States' ability to budget, plan for the future, and properly serve their residents is itself an intangible, uncompensable harm." *Id.* at 59 (quoting Dkt. No. 5 at 24).

Nothing in the intervening period between the Court's issuance of a preliminary injunction and now changes the Court's analysis. Indeed, the administrative record that Defendants have provided contains no documents—and therefore no evidence—that post-dates the February 6, 2025, Biondi Letter. As Plaintiff States assert, "Plaintiff States' injuries stem from Defendants' illegal revocation of State Plan approvals and the withholding of NEVI funds appropriated and previously made available to States for obligation. Any process Defendants are undertaking to update guidance has no bearing on the legality or illegality of these actions . . . ." Dkt. No. 142 at 16–17. In Pennsylvania, for example, the "new guidance does not mean that [Pennsylvania's] certification of the [alternative fuel corridor] buildout has been or will be approved, meaning that it continues to be unable to access NEVI funds for obligation." Dkt. No. 147 ¶ 13. Defendants' insistence on their "authority to control Program guidance, which includes control over past and present guidance and plans approved thereunder" is unpersuasive, and it is not supported by the authority that they cite in their briefing. *See* Dkt. No. 141 at 19.

In sum, the Court finds that the Plaintiff States have demonstrated irreparable injury that cannot be remedied with monetary damages.

### (2)    Plaintiff–Intervenors

Plaintiff–Intervenors assert that they have suffered irreparable harm in five broad categories: (1) loss of benefit; (2) consumer injury; (3) economic harm; (4) quality of life impacts; and (5) health, safety, and environmental impacts. Dkt. No. 150 at 21–23. In arguing against Plaintiff–Intervenors' entitlement to relief, Defendants reduce any cognizable harm that Plaintiff–Intervenors might have suffered to the impact of Defendants' actions on "any ongoing infrastructure projects in non-party States." Dkt. No. 163 at 9.

Defendants do not explain why harm must necessarily be limited to "ongoing infrastructure projects" and appear to predicate their position on the grounds that harm to such projects represented one particular type of injury that the Court found that Defendants' actions had caused the Plaintiff States. *See id.* at 9 (characterizing Court's identification of harm to Plaintiff States as having been derived from "careful consideration of each Plaintiff States' [*sic*] submission of evidence regarding their infrastructure projects"). But the Court never concluded that the *only* cognizable harm attributable to Defendants' actions was a detrimental impact on infrastructure projects. Certainly, in granting Plaintiff–Intervenors' motion to intervene, the Court cited "as-yet unrealized infrastructure" as a source of the probabilistic harm that Plaintiff–Intervenors' members might suffer as a result of Defendants' actions. Dkt. No. 168 at 8. But the Court also identified impacts on "utilization of public highways and enjoyment of [one's] vehicle" as interests that had been injured by Defendants' actions. *Id.* at 9. The Court referred to the inability to evacuate one's home during an emergency or natural disaster and higher transportation costs as harms derived from Defendants' actions. *See id.* at 10–11. Defendants take a position that unreasonably ignores the purpose and function of public infrastructure: a road

does not exist simply to take up space as a ribbon of blacktop. Rather, it is meant to be driven on by people who find themselves near that road, and used to bring people from one place to another. To presume that the harm caused by unbuilt public infrastructure exclusively affects only whomever was supposed to build that infrastructure is to ignore the nature of transportation itself, as well as the ultimately *functional* purpose of infrastructure.

As to loss of benefit, "a plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity." *Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015) (omission in original) (quoting *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989)). Plaintiff–Intervenors have presented substantial evidence from individuals, from all NEVI jurisdictions whose opportunities to benefit from "strategically deploy[ed] electric vehicle charging infrastructure," 135 Stat. at 1421, have been negatively impacted by Defendants' actions. *See* Dkt. No. 151 at 5–13. The Court cited from this evidence in its order on intervention (*see* Dkt. No. 168 at 7–12), and although Defendants have repeatedly attempted to categorically negate such harm as a matter of law, they have not factually rebutted any of it.

As to consumer injury, in *Center for Auto Safety v. National Highway Traffic Safety Administration*, the D.C. Circuit recognized that members of plaintiff organizations suffered injury-in-fact where the agency's fuel-efficiency standards were not set at "the maximum feasible average fuel economy level," as mandated by law, because "vehicles available for purchase will likely be less fuel efficient than if the fuel economy standards were more demanding." 793 F.2d 1322, 1323–24 (D.C. Cir. 1986). That "injury c[ould] be traced to NHTSA's rulemaking and [was] likely to be redressed by a favorable decision." *Id.* at 1324. Similarly here, Plaintiff–Intervenors have presented evidence from members whose "use of their

preferred vehicle technology: electric vehicles" has been restricted by Defendants' actions. Dkt. No. 150 at 21. The Court recognizes that there is a distinction between a consumer's ability to purchase an electric vehicle and their ability to use that vehicle, but simple economics dictates that these two concepts do not exist independently from one another. Members of Plaintiff–Intervenors who find that their "ability to realize the fuel and maintenance cost savings associated with EV ownership" has been impeded suffer similarly to consumers who are forced to purchase an inefficient vehicle to begin with. *See* Dkt. No. 77 at 108 (Garcia Decl.) ¶ 10. Again, Defendants do not present evidence to meaningfully rebut any of this.

As to economic harm, "where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). Plaintiff–Intervenors point to economic harm associated with their members' "being unable to rely on their EVs for planned or preferred travel. When public chargers are unavailable or unreliable, members must take longer routes, use gas-powered vehicles, or resort to more expensive transportation—each of which increases costs." Dkt. No. 150 at 22. Plaintiff–Intervenors assert that "[t]hese ongoing injuries are irreparable because there is no 'vehicle for recovery' under the APA." *Id.* (quoting *E. Bay Sanctuary Covenant*, 993 F.3d at 677). Given that "reliability" is a specific objective of the NEVI Formula Program, 135 Stat. at 1421, the *unreliability* cited by Plaintiff–Intervenors' members as resulting in economic harm (*see, e.g.*, Dkt. No. 168 at 10 (citing Dkt. No. 77 at 187 (Minault Decl.) ¶ 10) is a cognizable injury here. Defendants do not meaningfully rebut Plaintiff–Intervenors' evidence.

As to quality-of-life impacts, Plaintiff–Intervenors assert that "[i]mpaired mobility negatively impacts quality of life. Dkt. No. 150 at 22. Plaintiff–Intervenors' members describe "burdensome trip planning, delay[ed] travel, increase[d] . . . risk of being stranded, and . . .

forego[ne] or alter[ed] desired trips." *Id.* (citing Dkt. No. 76 at 5–6). Such injury constitutes

irreparable harm. *See, e.g.*, *Ft. Funston Dog Walkers v. Babbitt*, 96 F. Supp. 2d 1021, 1040 (N.D.

Cal. 2000) (citing impairment of plaintiffs' "continued access to recreation that improves the

quality of their lives" as "substantial and irreparable" harm); *Am. Trucking Ass'ns, Inc. v. City of

Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (citation modified) (citing "emotional damages

and stress" as irreparable damages). Defendants' assertion that Plaintiff–Intervenors' examples

of irreparable harm do not constitute "concrete injury" (*see, e.g.*, Dkt. No. 163 at 9) contravenes

established precedent.

Finally, as to health, safety, and environmental impacts, Plaintiff–Intervenors cite

"asthma or other respiratory conditions worsened by vehicle pollution" and assert that "[d]elayed

NEVI implementation slows the transition to cleaner vehicles and prolongs members' exposure

to these pollutants." Dkt. No. 150 at 23. Increased air pollution constitutes irreparable harm,

especially where it has a disproportionately detrimental effect on individuals with preexisting

health conditions. *See Beame v. Friends of the Earth*, 434 U.S. 1310, 1314 (1977) (recognizing

"irreparable injury that air pollution may cause . . . , particularly for those with respiratory

ailments"); *California v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1073–74 (N.D. Cal.

2018). Defendants' assertions notwithstanding, individuals' concerns about their health are not

"general environmental interests." Dkt. No. 141 at 7. And beyond environmental and health

concerns, Plaintiff–Intervenors demonstrate the impact Defendants' actions have on "EV drivers'

ability to evacuate during environmental disasters, particularly in rural or underserved areas—

creating foreseeable threats to personal safety." Dkt. No. 150 at 23.

These are real harms, and they are irreparable. Plaintiff–Intervenors have demonstrated

irreparable injury that cannot be remedied with monetary damages.

1

           **d.**     ***Balance of Hardships/Public Interest***

2

"The public interest is served by compliance with the APA." *Azar*, 911 F.3d at 581.

3

"[T]he public has an interest in ensuring that the statutes enacted by their representatives are not

4

imperiled by executive fiat." *E. Bay Sanctuary Covenant*, 993 F.3d at 679 (citation modified).

5

Further, Defendants have not demonstrated that a permanent injunction would impose upon them

6

any hardship. *See generally* Dkt. Nos. 141, 163. The Ninth Circuit has found that where a statute

7

"sets out a categorical requirement"—such as the IIJA's mandate regarding the disbursement of

8

NEVI Formula Program funds—and "does not qualify that requirement with 'reasonably,' 'to the

9

extent practicable,' or any other language that might invite consideration of costs," then

10

"Congress has already done the relevant balancing of interests and resolved that balance in favor

11

of ensuring that," in this case, NEVI Formula funds are disbursed in accordance with the formula

12

and parameters enacted in the statute. *N.D. v. Reykdal*, 102 F.4th 982, 996 (9th Cir. 2024).

13

        Therefore, the balance of hardships and public interest factors tips in favor of Plaintiffs.

14

                     \*      \*      \*

15

        Having considered scope of injunctive relief and the requirements of a permanent

16

injunction, the Court finds that Plaintiffs' requested injunctive relief is reasonable and necessary

17

to remediate Defendants' unlawful actions.

18

        **3.**     **Declaratory Relief**

19

        In recent cases involving APA violations by executive agencies of the current

20

administration, courts have granted declaratory relief without finding the need for extensive

21

explanation. *See, e.g.*, *Am. Fed'n of Gov't Emps.*, 799 F. Supp. 3d at 995; *Washington v. Dep't of*

22

*Ed.*, 2025 WL 3690779, at \*15; *California v. U.S. Dep't of Transp.*, No. C25-208, 2025 WL

23

3072541, at \*13 (D.R.I. Nov. 4, 2025); *Tennessee v. Kennedy*, No. C24-161, 2025 WL 2982069,

24

at \*12 (S.D. Miss. Oct. 22, 2025). Although Plaintiffs specifically seek declaratory relief in their

1    respective complaints (*see* Dkt. No. 76-1 at 34; Dkt. No. 124 at 62), Defendants do not contest

2    Plaintiffs' entitlement to such relief, at least beyond their blanket denial that they have done

3    anything unlawful. *See generally* Dkt. Nos. 141, 163. "'[T]here is a continuing public interest in

4    determining the appropriate legal principles' by which Defendants" manage Congressionally

5    created programs like the NEVI Formula Program. *See Becerra v. U.S. Dep't of the Interior*, 276

6    F. Supp. 3d 953, 961 (N.D. Cal. 2017) (quoting *Joint Bd. of Control of Flathead, Mission &*

7    *Jocko Irrigation Dists. v. United States*, 832 F.2d 1127, 1130 (9th Cir. 1987)). Given

8    Defendants' failure to offer substantial reassurance that they will not reprise their actions and

9    impose future funding freezes on the NEVI Formula Program, the Court finds declaratory relief

10   appropriate here. *See id.* at 960 (finding declaratory relief appropriate in APA case where "the

11   likelihood that one or more Defendants will use the same strategy . . . is not remote"); *Mansor v.*

12   *U.S. Citizenship & Immigr. Servs.*, 685 F. Supp. 3d 1000, 1015 (W.D. Wash. 2023)

13   (distinguishing between injunctive relief that addressed a current policy and declaratory relief

14   that clarified affirmative rights). Only forward-looking declaratory relief can address the cloud of

15   uncertainty into which Defendants have placed the NEVI Formula Program.

16        Having found that Defendants' actions violated the APA, the Court therefore declares

17   that the rescission of NEVI Formula Program guidance and subsequent suspension of state plans

18   exceeded Defendants' statutory authority, was arbitrary and capricious, and was done without

19   observance of proper procedure.

## V.    CONCLUSION

21        Accordingly, as to Counts I, II, and III of the Amended Complaint (Dkt. No. 124),

22   Plaintiff States' Motion for Summary Judgment (Dkt. No. 142) is GRANTED. As to Counts IV, V,

23   and VI of the Amended Complaint, Plaintiff States' Motion for Summary Judgment is DENIED.

24   As to Counts 1 and 2 of the Complaint-in-Intervention (Dkt. No. 76-1), Plaintiff–Intervenors'

Motion for Summary Judgment (Dkt. No. 150) is GRANTED. As to Counts 3, 4, and 5 of the

Complaint-in-Intervention, Plaintiff–Intervenors' Motion for Summary Judgment is DENIED.

Defendants' Motion for Summary Judgment (Dkt. No. 141) is DENIED. It is hereby ORDERED:

> (1)    Judgment is ENTERED in favor of Plaintiff States and against Defendants on
>
>        Counts I, II, and III of Plaintiff States' First Amended Complaint (Dkt. No. 124).
>
> (2)    Judgment is ENTERED in favor of Plaintiff–Intervenors and against Defendants on
>
>        Counts 1 and 2 of Plaintiff–Intervenors' Complaint-in-Intervention (Dkt.
>
>        No. 76-1).
>
> (3)    Defendants' actions, as announced in the February 6, 2025, letter from the Federal
>
>        Highway Administration to State Department of Transportation Directors, to
>
>        "suspend[] the approval of all State Electric Vehicle Infrastructure Deployment
>
>        plans for all fiscal years" and prohibit "new obligations . . . under the NEVI
>
>        Formula Program until the updated final NEVI Formula Program Guidance is
>
>        issued and new State plans are submitted and approved," are VACATED and SET
>
>        ASIDE in their entirety.
>
> (4)    Defendants and all their respective officers, agents, servants, employees and
>
>        attorneys, and any person in active concert or participation with them who
>
>        receives actual notice of this order are hereby fully ENJOINED from the following:
>
>        (a)    Suspending or revoking—or maintaining any current suspension or
>
>               revocation of—previously-approved State Electric Vehicle Infrastructure
>
>               Deployment Plans of Plaintiff States Arizona, California, Colorado,
>
>               Delaware, District of Columbia, Hawai'i, Illinois, Kentucky, Maryland,
>
>               Michigan, Minnesota, New Jersey, New Mexico, New York, North
>
>               Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and

Wisconsin, as well as previously-approved State Electric Vehicle
Infrastructure Deployment Plans of any NEVI jurisdiction which has not
yet fully obligated its funds for Fiscal Years 2022–2025. These States'
State Electric Vehicle Infrastructure Deployment Plans SHALL be restored
to the legal status they held prior to the February 6, 2025, issuance of the
Biondi Letter; and

(b) Withholding or withdrawing NEVI Formula Program funds for any
previously approved State Electric Vehicle Infrastructure Deployment
Plans for any reason not set forth in the IIJA or applicable FHWA
regulations; or withholding or withdrawing NEVI Formula Program funds
from a state without following the IIJA's substantive and procedural
requirements, including by refusing to review and/or process requests for
authorization to obligate funds for specific EV charging infrastructure
development activities.

(5) The Court DECLARES that Defendants' actions, as announced in the February 6,
2025, letter from the Federal Highway Administration to State Department of
Transportation Directors, to "suspend[] the approval of all State Electric Vehicle
Infrastructure Deployment plans for all fiscal years" and prohibit "new
obligations . . . under the NEVI Formula Program until the updated final NEVI
Formula Program Guidance is issued and new State plans are submitted and
approved":

(a) Violate the Administrative Procedure Act because they are in excess of
statutory authority;

(b) Violate the Administrative Procedure Act because they are arbitrary and

capricious; and

      (c)     Violate the Administrative Procedure Act because they are not in accordance with law and without observance of procedure required by law.

(6)     Within five (5) days of this Judgment, Defendants' attorneys SHALL provide written notice of this Judgment to all Defendants and agencies and their employees or contractors with responsibility for administering the NEVI Formula Program. Defendants SHALL file a copy of the notice on the docket at the same time.

(7)     The Court retains jurisdiction to resolve any issues related to the enforcement of this Judgment.

Dated this 23rd day of January 2026.

 

Tana Lin
United States District Judge